## UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **JOHN DOE,** | : | |
| | : | **Civil Action No:** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | **COMPLAINT** |
| -against- | : | |
| | : | |
| | : | **JURY TRIAL** |
| **TRUSTEES OF BOSTON COLLEGE,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

Plaintiff John Doe[1] (hereinafter referred to as "Plaintiff" or "John Doe"), by his attorneys Nesenoff & Miltenberg, LLP, as and for his Complaint, respectfully alleges as follows:

### THE NATURE OF THIS ACTION

1.      This case arises out of the actions taken and procedures employed by Defendants the Trustees of Boston College (the "Trustees" or "BC" or the "College"), and their employees and/or agents against Plaintiff, a male student at BC, as a result of false allegations of sexual assault made by fellow BC student Jane Roe.[2]

2.      In investigating and adjudicating the false charges against Doe, BC conducted a disciplinary process that was neither thorough nor impartial, exhibited a bias against Doe as the male accused, and deprived Doe of his fundamental rights to a fair proceeding including proper notice of the charges, the opportunity to present his case to an impartial hearing panel and the ability to cross-examine his accuser, notwithstanding that the ultimate decision came down to a determination of which party's account was more credible.

---

[1] Plaintiff herewith files a Motion to proceed pseudonymously.
[2] Plaintiff refers to Jane Roe pseudonymously.

3.      A non-exhaustive list of Defendants' wrongful actions include the following: (i) Defendants changed the charge against Doe, without providing him notice of such change, after the Investigators determined they could not find him responsible for the initial charge, and at the conclusion of the investigation process, thus limiting his ability to defend himself; (ii) Defendants failed to conduct a thorough and impartial investigation when they disregarded critical inconsistencies in Roe's testimony while assigning great weight to inconsequential aspects of Doe's testimony; (iii) Defendants evidenced a gender bias against Plaintiff as the male accused when the Investigators reached a conclusion unsupported by the evidence and instead motivated by a bias against Doe as a male ████; (iv) Defendants made assessments of credibility and evidentiary weight with respect to each party and witness without any ascertainable rationale or logic; (v) Defendants failed to afford Plaintiff the requisite presumption of innocence required by a preponderance of the evidence standard; (vi) Defendants failed to provide Doe an opportunity to have his case heard before an impartial panel, and to cross-examine his accuser or any witnesses; and (viii) Defendants reached an erroneous finding that was not supported by the evidence. All of these procedural errors, individually and when taken together, unfairly and materially affected the outcome of Plaintiff's case.

4.      As a result of Defendants' discriminatory and unlawful conduct, Plaintiff was suspended from the College for one academic year, resulting in a permanent notation on his academic record, a delayed graduation date, the loss of his ██████████████████ College, and the consequent loss of anticipated career opportunities and prospective earnings.

5.      Plaintiff therefore brings this action to obtain relief based on causes of action for violations of Title IX of the Education Amendments of 1972, breach of contract, denial of basic fairness/arbitrary and capricious decision-making, and other state law causes of action.

**THE PARTIES**

6.      Plaintiff is a natural person, citizen of the United States, and resident of the State

of ▮▮▮▮▮▮▮▮. John Doe matriculated at Boston College in the fall of ▮▮▮▮, with an anticipated

graduation date of spring ▮▮▮. During the events described herein, Plaintiff was enrolled as a full-

time student at BC and ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮. While attending Boston

College, Doe resided in Chestnut Hill, Massachusetts.

7.      Upon information and belief, Boston College is a private Jesuit research university

located in Chestnut Hill, Massachusetts.

8.      Trustees of Boston College is the legal name of the educational institution formed

under the laws of the Commonwealth of Massachusetts and located in Chestnut Hill,

Massachusetts. The school is generally known as Boston College.

9.      Plaintiff and Defendant Trustees of Boston College are sometimes hereinafter

collectively referred to as the "Parties."

**JURISDICTION AND VENUE**

10.      This Court has federal question and supplemental jurisdiction pursuant to 28 U.S.C.

§ 1331 and 28 U.S.C. § 1367 because: (i) the federal law claim arises under the constitution and

statutes of the United States; and (ii) the state law claims are so closely related to the federal law

claim as to form the same case or controversy under Article III of the United States Constitution.

11.      This Court has personal jurisdiction over Trustees of Boston College on the grounds

that it is conducting business within the State of Massachusetts.

12.      Venue for this action properly lies in this district pursuant to 28 U.S.C. §1391

because Boston College is considered to reside in this judicial district.

## FACTUAL ALLEGATIONS COMMON TO ALL CLAIMS

I. **Background Information**

13. Doe matriculated at Boston College in the fall of ██ .

14. Doe chose to attend BC due to its rigorous academic curriculum and ██████

███ .

15. On November 4, 2018, Doe engaged in a consensual sexual encounter with fellow BC student Jane Roe.

16. Subsequently, Roe filed a Title IX complaint against him, alleging that she was incapacitated due to alcohol during the encounter and was therefore unable to consent.

17. Upon concluding that the evidence did not support a finding of the violation with which Doe was initially charged (non-consensual sexual contact due to incapacitation), the Investigators unilaterally changed the charge against Doe, after the investigation had been concluded, without providing advance notice of this new charge, or allowing Doe an opportunity to contest it before a final decision was issued.

18. After an investigation process which did not afford Doe an opportunity to have his case heard by an independent panel, to confront his accuser, or to cross-examine witnesses, Doe was ultimately found responsible for non-consensual sexual contact, in violation of BC's Policy against Sexual Assault.

II. **The Office for Civil Rights' April 2011 Dear Colleague Letter**

19. On April 4, 2011, the Office for Civil Rights ("OCR") of the U.S. Department of Education ("DOE") issued a guidance letter to colleges and universities in the United States, widely known as the "Dear Colleague Letter" ("DCL").  The letter advised recipients that sexual violence constitutes sexual harassment within the meaning of Title IX of the Education

Amendments of 1972, 20 U.S.C. §1681 *et seq.* and its regulations, and directed schools to "take immediate action to eliminate the harassment, prevent its recurrence, and address its effects."

20.     The Dear Colleague Letter advised that, to comply with Title IX, colleges and universities must have prompt procedures to investigate and resolve complaints of sexual misconduct.

21.     Most notably, the Dear Colleague Letter required schools to adopt a relatively low burden of proof – "more likely than not" – in cases involving sexual misconduct, including assault. Several colleges had been using "clear and convincing," and some, like Stanford University, applied the criminal standard, "beyond a reasonable doubt."

22.     The Dear Colleague Letter stated that schools should "minimize the burden on the complainant," transferring alleged perpetrators, if necessary, away from shared courses or housing.

23.     The Dear Colleague Letter, while not completely ignoring due process concerns, suggested that schools should focus more on victim advocacy.

24.     The Dear Colleague Letter stated that schools should give both parties the right to appeal a decision, which amounts to double jeopardy for an accused student.

25.     After the Dear Colleague Letter was published, many schools changed their sexual assault and sexual harassment policies and procedures.

26.     The Obama Administration, through the DOE and OCR, treated the Dear Colleague Letter as binding on regulated parties for all practical purposes and thus pressured colleges and universities to aggressively pursue investigations of sexual assaults on campuses.

27.     In February 2014, Former DOE Assistant Secretary for Civil Rights, Catherine J. Lhamon ("Lhamon"), told college officials attending a conference at the University of Virginia that schools needed to make "radical" change.

28.     According to the *Chronicle of Higher Education*, college presidents said afterward that there were "crisp marching orders from Washington."  *See* "Colleges Are Reminded of Federal Eye on Handling of Sexual-Assault Cases," *Chronicle of Higher Education*, February 11, 2014 (available at:  https://www.chronicle.com/article/Colleges-Are-Reminded-of/144703).

29.     On April 29, 2014, OCR issued additional directives to colleges and universities in the form of a guidance document titled *Questions and Answers on Title IX and Sexual Violence* ("Q&A").  Like the DCL, the Q&A was aimed at addressing educational institutions' sexual misconduct policies, including the procedures schools "must" have in place "to prevent sexual violence and resolve complaints" and the elements that "should be included in a school's procedures for responding to complaints of sexual violence."

30.     In June 2014, Lhamon testified at a Senate Hearing that "some schools are still failing their students by responding inadequately to sexual assaults on campus.  For those schools, my office and this Administration have made it clear that the time for delay is over."  Lhamon stated at the Senate Hearing in June 2014 that "we do" expect institutions to comply with the Dear Colleague Letter.  She told the Senate Committee, "This Administration is committed to using all its tools to ensure that all schools comply with Title IX . . ."  She further told the Committee: "If OCR cannot secure voluntary compliance from the recipient, OCR may initiate an administrative action to terminate and/or refuse to grant federal funds or refer the case to the DOJ to file a lawsuit against the school."

31.     In July 2014, Lhamon, speaking at a conference on campus sexual assault held at Dartmouth College, stated that she was prepared to cut off federal funding to schools that violate Title IX and that she would strip federal funding from any college found to be non-compliant with the requirements of the Dear Colleague Letter.  "Do not think it's an empty threat," Lhamon

warned.  She went on to describe that enforcement mechanism as part of a set of "very, very effective tools," adding that "[i]f a school refuses to comply with Title IX in any respect, I will enforce."  Lhamon was quoted: "It's not surprising to me that we haven't gone to the last step. . . . It means that so far the process has been working."  Meredith Clark, "Official to colleges: Fix sexual assault or lose funding," July 15, 2014 (available at: http://www.msnbc.com/msnbc/campus-sexual-assaultconference-dartmouth-college#51832).

32.   Lhamon was quoted in the *Los Angeles Times* stating, "We don't treat rape and sexual assault as seriously as we should, . . . [There is] a need to push the country forward."  Savage and Timothy M. Phelps, "How a little-known education office has forced far-reaching changes to campus sex assault investigations," *Los Angeles Times*, August 17, 2015.

33.   To support making the Dear Colleague Letter binding, the OCR hired hundreds of investigators for Title IX enforcement. The Federal Government is investigating approximately 250 schools for possible Title IX violations, including notable schools such as UC Berkeley, Stanford, Harvard, Brown University, Columbia University, Cornell University, Dartmouth College, Johns Hopkins University, the University of Chicago, and Boston College.

34.   Colleges and universities, including Boston College, are fearful of and concerned about being investigated or sanctioned by the DOE and/or of potential Title IX lawsuits by the U.S. Department of Justice ("DOJ").  The Obama Administration issued a report entitled "Not Alone" in April 2014, which included a warning that if the OCR finds a Title IX violation, the "school risks losing federal funds."  It further advised that the DOJ shares authority with OCR for enforcing Title IX, and may initiate an investigation or compliance review of schools.  If a voluntary resolution cannot be reached, the DOJ may initiate litigation against the institution.  In July 2016, Vice President Biden suggested that schools that do not comply with administration

guidelines could be stripped of federal funding.  "Obama, Biden Won't Visit Universities That Fall Short In Addressing Sexual Assault," Huffington Post, July 4, 2016 ("The vice president said he'd like to take away federal funding from those universities.")

35.     To revoke federal funds – the ultimate penalty – is a powerful tool because institutions receive billions of dollars a year from the federal government. Anne Neal of the American Council of Trustees and Alumni was quoted as follows: "There is a certain hysteria in the air on this topic, . . . It's really a surreal situation, I think."  She explained that "schools are running so scared of violating the civil rights of alleged victims that they end up violating the due process rights of Defendants instead."  "How Campus Sexual Assaults Came To Command New Attention," NPR, August 12, 2014.

36.     The DOJ and OCR have created a significant amount of pressure on colleges and universities to treat all those accused of sexual misconduct with a presumption of guilt.  The *Chronicle of Higher Education* noted that "Colleges face increasing pressure from survivors and the federal government to improve the campus climate."  Robin Wilson, "*Presumed Guilty: College men accused of rape say the scales are tipped against them*," *Chronicle of Higher Education,* September 1, 2014,   https://www.chronicle.com/article/Presumed-Guilty/148529  In the same article, the *Chronicle* noted that different standards were applied to men and women: "Under current interpretations of colleges' legal responsibilities, if a female student alleges sexual assault by a male student after heavy drinking, he may be suspended or expelled, even if she appeared to be a willing participant and never said no.  That is because in heterosexual cases, colleges typically see the male student as the one physically able to initiate sex, and therefore responsible for gaining the woman's consent."  *Id*.  Robert Dana, Dean of Students at the University of Maine, told NPR that some rush to judgment is inevitable. "I expect that that can't

help but be true," he says. "Colleges and universities are getting very jittery about it." "Some Accused Of Sexual Assault On Campus Say System Works Against Them," NPR, September 3, 2014.

37.     In response, BC's administration turned its focus to addressing sexual assault on campus, with the intent of making the reporting of assaults more easily available to members of the community.

38.     Recognizing an increase in the number of reported sexual assaults on campus in 2013 (http://bcheights.com/2014/10/09/bcpd-chief-responds-increased-number-sexual-assaults-reported-2013/), the College revised its Student Sexual Misconduct Policy and the investigative process, in October 2014. http://bcheights.com/2014/10/22/bc-revises-sexual-misconduct-policies-investigative-process/

39.     Prior to 2014, the investigative process for all conduct matters including those involving sexual misconduct included the right to have one's case heard before a neutral panel, and the opportunity to introduce evidence and call witnesses.

40.     The revised policy eliminated hearings in cases of sexual misconduct only, changing BC's process from a student conduct hearing to an investigative model, in which the tasks of investigation and adjudication were put in the hands of one or two individuals. This change was made with the purpose of making reporting "as easy for [survivors] as possible." http://bcheights.com/2014/10/22/bc-revises-sexual-misconduct-policies-investigative-process/

41.     On information and belief, Defendant Trustees reviewed and authorized the Policy in its current form.

42.     In March 2015, as part of Concerned About Rape Education (C.A.R.E.) Week, BC administrators, including Associate Dean of Students Corey Kelly ("Dean Kelly"), held a forum

on the sexual assault policy, during which they outlined the sexual assault policy and the reporting process. http://bcheights.com/2015/03/30/administrators-stage-forum-on-sexual-assault-policies/

43.     Also in March 2015, a graduate of Boston College commenced a lawsuit against BC, claiming the school violated its own policies and federal anti-discrimination law in investigating a charge of sexual assault, finding him responsible and imposing a suspension. After the 1st Circuit reversed in part the District Court's decision granting BC's summary judgment motion, the case is scheduled to proceed to trial in September 2019 on the plaintiff's breach of contract and basic fairness claims.

44.     In December 2015, the Department of Education's Office for Civil Rights opened a Title IX investigation against BC in response to a sexual violence complaint. The case remains active to date.

45.     On September 22, 2017, OCR rescinded the Dear Colleague Letter and put in place an interim guidance while the current administration reviews and revises its practices with regard to the adjudication of complaints of sexual misconduct on college campuses receiving federal funding.    *See, e.g.*,    https://www.ed.gov/news/press-releases/department-education-issues-new-interim-guidance-campus-sexual-misconduct.

46.     The interim OCR guidance, in a significant departure from the 2011 Dear Colleague Letter, states: "The findings of fact and conclusions should be reached by applying either a preponderance of the evidence standard or a clear and convincing evidence standard," as long as the standard for evaluating claims of sexual misconduct is the same as that applied in other student disciplinary proceedings.  The interim guidance also requires that "[a]ny rights or opportunities that a school makes available to one party during the investigation should be made available to the other party on equal terms."

47.     The interim OCR guidance, as well as the accompanying review of OCR's prior guidance documents, suggest that the Equity Grievance policies and procedures in place at all times relevant to this lawsuit – which were tailored in such a way as to comply with the **Dear Colleague Letter** under threat of loss of federal funding – were unfair and, ultimately, out of step with the goal of gender equity in Title IX-related proceedings. *See* "Q&A on Campus Sexual Misconduct," available at https://www2.ed.gov/about/offices/list/ocr/docs/qa-title-ix-201709.pdf.

48.     Since 2011 the number of rapes reported at BC has increased considerably- from 7 in 2011 to 38 in 2017, consistent with general reporting increases at institutions across the country since 2011.

### III.     The Contract Between the College and Plaintiff

49.     Upon Doe's enrollment at the College, he was provided copies of the Student Sexual Misconduct Policy (the "Policy") and the Code of Student Conduct (the "Code" and collectively, the "Policies"), which established the procedures by which the College would investigate and adjudicate alleged violations of its standards.

50.     It is well settled in Massachusetts that the relationship between a student and a university is contractual in nature. *Doe v. W. New England Univ.,* 228 F. Supp. 3d 154, 169 (D. Mass. 2017).

51.     Thus, in consideration for Doe's payment of tuition and attendance at the College, BC assured Doe that it would comply with its policies and procedures in carrying out any disciplinary process.

52.     Universities owe its students a duty of care when creating and enforcing its policies and procedures.

53.     Moreover, Massachusetts recognizes a student's common law right to basic fairness in university disciplinary proceedings, which is an obligation separate from and in addition to its contractual obligations. *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 601 (D. Mass. 2016).

54.     The Boston College Student Sexual Misconduct Policy 2018-2019 was in effect at the time of the investigation against Plaintiff.

55.     The Policy defines Sexual Assault as "any sexual contact or sexual penetration with another individual without consent."

56.     Consent is defined as:

> "the clear and voluntary agreement to engage in particular sexual activity, communicated through mutually understandable words or actions. Consent is always freely informed and actively given. Silence or lack of resistance cannot be assumed to imply consent. Consent must be ongoing, and it may be withdrawn at any time. Consent for one sexual act does not imply consent for any subsequent sexual activity. Consent may never be obtained through use of coercion, intimidation, force, or threats."

57.     The Policy goes on to note that consent cannot be obtained from an individual who is incapable of giving consent due to, among other things, incapacitation due to alcohol or drugs.

58.     Sexual Contact is defined by BC's Policy as "intentional contact with the intimate body parts of another person, causing another person to touch one's intimate parts, or disrobing or exposure of another person without permission. Intimate parts may include the breasts, genitals, buttocks, groin, mouth, or any other part of the body that is touched in a sexual manner. Sexual contact includes kissing and attempted sexual penetration."

59.     The College, under the oversight of the Office of the Dean of Students, and with consultation from the Student Affairs Title IX Coordinator determines whether to conduct an investigation.

60.     The investigation is carried out by one or more internal and/or external investigators that must be specifically trained in sexual misconduct investigations.

61.     The investigation generally includes one or more interviews with the complainant, the respondent, and any witnesses, and the gathering of any physical or documentary evidence.

62.     It is within the Investigators' discretion to determine what evidence is relevant, and which witnesses to interview.

63.     The University strives to complete the investigation within 60 days but may extend the timeframe in certain circumstances. The College must keep the parties informed of the progress of the investigation.

64.     In determining responsibility of the accused student, the Investigators utilize the "preponderance of the evidence" standard which the Policy defines as "the information supporting a finding of responsibility be more convincing than the information in opposition to it."

65.     After each of the parties have been interviewed, they are provided copies of the written summaries from their own interviews and may provide comments on the summary within 5 days. The investigators retain discretion to consider or disregard any comments submitted.

66.     Once the investigators have finished evidence gathering, the parties can review the evidence file and submit comments concerning the evidence within 10 days. The investigators retain discretion to consider or disregard any comments submitted.

67.     Subsequently, the investigators prepare a final report, which includes a summary of the findings. This final report is submitted to the Office of the Dean of Students and Student Affairs Title IX Coordinator for review and approval. Once finalized, the parties receive simultaneous notification of the decision.

68.     If the accused party is found responsible, the College determines what sanctions to impose. The Policy notes that "[t]ypically, students found responsible for sexual assault are suspended or dismissed from the University."

69.     Thereafter, both parties may file an appeal, based on (1) material procedural error that was likely to adversely affect the result of the conduct adjudication; or (2) the existence of relevant testimony or other evidence that (i) was unavailable to the student submitting the appeal at the time of the adjudication process, and (ii) would have likely affected the finding.

70.     In cases where a student is charged with non-sexual misconduct related policy violations, BC affords either a Student Conduct Board or Administrative Hearing Board. During this process, which is not offered in the case of an alleged sexual assault, the parties may appear before an impartial panel of decisionmakers, make opening and closing statements, present witnesses, pose questions to be asked of the witnesses, present evidence, and answer questions from the Board. This type of hearing was not available in the present matter.

### IV.     <u>The Alleged Incident of November 4, 2018</u>

71.     Doe and Roe met sometime during their freshmen year. Though they did not engage in any regular communications, they were on friendly terms and would exchange greetings when they saw each other.

72.     On the evening of November 3, 2018, Doe and several of his friends pre-gamed in his suite, from approximately 9:00 p.m. until 10:30 p.m.

73.     During this time, Doe consumed roughly three glasses of wine, which did not cause him to feel impaired.

74.     Doe and his friends decided to go to a bar downtown. They took an Uber to the bar, at which point they discovered there was a long line to get in.

75.     After waiting in line for approximately 15-20 minutes, some members of the group, including Doe, decided to go to another bar.

76.     Doe and the friends waited in line at the second bar, until they learned that there was a cover charge to enter. At that point, they decided to take an Uber back to BC, arriving shortly before 1:00 a.m.

77.     Doe did not consume any alcohol in the time between his departure from BC and his return to BC.

78.     Once they returned to BC, Doe and two of his friends decided to go to an off-campus party that they had heard about from another friend, and took an Uber there.

79.     Doe and his friends stayed at this off-campus party for approximately thirty minutes. Doe did not consume any alcohol at this party.

80.      They next took another Uber back to campus, arriving to ███████████ ██ around 1:30 a.m. on November 4, 2018.

81.     Upon arriving at ████████, Doe saw Roe waiting in line to get food. Doe and his friends joined her when Roe either smiled or waved at him.

82.     Doe did not recall engaging in any physical contact with Roe at this time, aside from potentially greeting with her with a hug to say hello, since they had greeted each other in this manner in the past.

83.     Doe asked Roe why she was wearing a ███, to which Roe responded that she had been at a ████████. They engaged in a normal and coherent conversation as they stood in line for food, along with Doe's three friends.

84.     While waiting in line, Doe got the impression that Roe was flirting with him, as she seemed to focus her attention on him, and they talked and stood near each other.

85.    Roe offered to buy food for both Doe and his friend, ███, which they accepted.

86.    Once they had purchased food, the five of them (Doe, Roe and Doe's three friends) all decided to walk back to Doe's suite to eat their food there.

87.    Roe did not exhibit any difficulties walking, nor did she exhibit any other signs of incapacitation, as she engaged in conversation with one of Doe's friends.

88.    When they arrived in the suite, Doe, Roe and two of his friends (one had gone off to his own room in the suite) sat in the common room to consume their food, where they talked and ate.

89.    After a few minutes, Doe's two friends left the common area, leaving Doe and Roe alone. Doe asked Roe if she wanted to go into his room and she stated "Yes."

90.    Doe and Roe then entered Doe's room, where Doe climbed up onto his bed, which was raised several feet off the floor, by standing on a desk chair. Roe followed him.

91.    After talking for a few minutes on Doe's bed, Doe and Roe started to kiss. They then lay down and continued kissing, as they began grinding against each other.

92.    Roe asked Doe to kiss her neck, which he did, and told him "I know you want to do it."

93.    Doe did not respond to this comment but understood Roe to mean that she knew he wanted to have sexual intercourse with her.

94.    Roe assisted Doe in removing her spandex shorts, which she wore under her ███, by arching her back.

95.    Roe then told Doe to "get a condom."

96.    With her instruction, Doe got off the bed and retrieved a condom from his wallet.

97.     When he returned to the bed, he did not put the condom on immediately, at which point Roe stated "Other people have done that [had sex without a condom]", to which he responded "I wouldn't do that."

98.     Roe instructed Doe not to remove her underwear, and instead pulled her underwear to the side using one hand.

99.     Doe then put the condom on, and after being instructed by Roe to "do it", he penetrated her vagina with his penis.

100.    Roe told him to "go slow" because it had "been a while."

101.    They engaged in sexual intercourse in missionary position for 5 to 7 minutes, during which Roe told Doe to kiss her neck and gave him verbal instructions, including "go slow" and "keep it there."

102.    Doe asked Roe to flip on to her stomach, however she replied that she did not want to do this because she "did not want [him] to cum too fast." When Doe told her he would not do so, she then turned over onto her stomach.

103.    After approximately two to three minutes in this position, Roe told Doe that her back hurt. Although she did not ask him to stop, the intercourse ceased.

104.    Doe and Roe then both got off the bed and got dressed. Doe walked Roe into the common room and then to the door of the suite, where they said goodbye. Roe also said goodbye to one of Doe's roommates, who was sitting in the common room.

105.    On December 4, 2018, Doe and Roe's mutual friend ███ informed Doe that Roe was "thinking of coming forward with sexual charges" against Doe. Roe had told ███ that she had "blacked out" during their encounter and only recalled asking Doe to get a condom.

106.     Subsequently, Doe texted Roe, asking if she would meet him to discuss the night of November 4. The following day, Roe responded, and agreed to meet with Doe on December 7, 2018.

107.     On December 7, Doe and Roe met in the dining hall to discuss the encounter and each of their recollections, which varied substantially.

108.     During this conversation, Roe mentioned the fact that she was upset Doe had not spoken to her at a football game they both attended the weekend after the encounter (even though Doe did not see her there), and was very upset that he had "ignored" her when she requested that he return the shorts she had left in his room.

109.     This was the last communication engaged in by the parties.

**V.      Roe's Complaint Against Doe; The Investigation**

110.     One to two days after the November 4 encounter, Roe scheduled a meeting with the ███████████████ to report that someone ███████ had "done something wrong involving alcohol and consent." Roe requested that he speak with ███████ about this topic, which he agreed to. In attendance with Roe at this meeting was ████████████████████ ██████████████████.

111.     On November 7, 2018, ███████ reported to Associate Vice President of Student Affairs/Student Title IX Coordinator Melinda Stoops ("Ms. Stoops") that Roe had notified her that over the weekend a ████████████████ had engaged in sexual activity with her, without her consent, while she was intoxicated.

112.     On November 15, 2018, Roe met with Ms. Stoops to discuss the alleged incident and available resources.

113.    On December 7, 2018, Roe notified Ms. Stoops that she wanted to go forward with the charges and an investigation.

114.    On December 10, 2018, Dean Kelly contacted Roe to set up a time to meet to discuss the charges.

115.    On December 11, 2018, Roe met with Dean Kelly to discuss the College's investigation process.

116.    On December 11, 2018, Doe received a mutual Stay Away Order from Dean Kelly, prohibiting him from having any contact, either direct or indirect, with Jane Roe. The Order noted that a violation could result in Doe's arrest, a summary suspension from Boston College, and other disciplinary action by the University.

117.    On December 14, 2018, Doe met with Dean Kelly to discuss the charges. Dean Kelly specifically informed Doe that he would receive written notification of the allegations and the policy sections that were implicated by those allegations, from Assistant Dean of Students Kristen O'Driscoll ("Dean O'Driscoll"). Doe did not receive the notification letter until more than one month later, on January 23, 2019.

118.    On January 2, 2019, Dean O'Driscoll emailed Roe to set up an interview. Roe responded on January 7 and agreed to meet with the Investigators on January 14.

119.    Roe met with the Investigators, internal investigator Dean O'Driscoll and external investigator Jenn Davis of Jenn Davis LLC ("Ms. Davis"), for 2 hours on January 14. Roe continued her initial interview on January 18, for another hour and 15 minutes.

120.    On January 23, 2019, Doe received a Notice to Appear from Dean O'Driscoll, stating she was "in receipt of a report of alleged violations of the Boston College Code of Student Conduct" in relation to the November 4, 2018 encounter.

121.    The Notice to Appear identified the general Sexual Misconduct Policy (Section 4.4.6 of the Code of Student Conduct) as the policy Doe may have violated. Dean O'Driscoll specifically noted that Doe was accused of sexually assaulting Roe in his residence hall by "engaging in non-consensual sexual contact through kissing and touching of intimate body parts and penetrating her vagina with [his] penis without her consent *while [Jane Roe] was incapacitated.*"

122.    The Notice also advised Doe of a second allegation related to an earlier encounter at Lower Dining. The only description of this offense was that the encounter was a "non-consensual touching."

123.    The Notice to Appear underscored that if additional allegations were to arise during the investigation, "*we would provide an updated notice to you*."

124.    Dean O'Driscoll requested that Doe schedule an interview with her and an external investigator, during the week of January 29.

125.    Doe appeared for an initial interview on January 29, 2019 with Investigators Dean O'Driscoll and Ms. Davis. His attorney advisor accompanied him to the interview, which lasted approximately two hours.

126.    On February 9, Dean O'Driscoll provided Doe with the Investigators' summary of Doe's initial interview and requested that he provide any comments to the summary within 5 calendar days.

127.    On February 22, 2019, Doe submitted a photo of his bedroom and Uber receipts from the night of the alleged incident to the Investigators, to corroborate the facts and timeline of events he had presented.

128.     Also on February 22, 2019, Dean O'Driscoll contacted Doe to schedule a follow up interview, during the week of March 11.

129.     By email dated February 27, 2019, Doe inquired whether he would be able to review the evidence collected to date, prior to appearing for his second interview. Dean O'Driscoll responded the same day, stating that the Investigators would not share the evidence with him prior to Doe's follow up interview.

130.     On March 5, 2019, Doe submitted comments on the summary of his initial interview, by email.

131.     Doe appeared for a second interview on March 11, 2019.

132.     On March 18, 2019, Dean O'Driscoll provided Doe with a written summary of his second interview and instructed that he submit any comments to the summary within five days.

133.     Doe submitted comments to the second interview summary on March 21, 2019.

134.     On March 27, 2019, Dean O'Driscoll emailed Doe to advise that all comments had been received on both follow up interview summaries and that the evidence binder was near completion.

135.     On April 5, 2019, Dean O'Driscoll notified Doe that the evidence binder related to the investigation was available for his review. He was informed that he would have 10 calendar days in which to review the evidence in the Dean of Students Office, and to submit any comments on the evidence, by April 15. Dean O'Driscoll noted that Doe was only permitted to review the materials in their office and was prohibited from making any copies. Thus, he was never provided with a copy of the full investigation file, consisting of approximately 60 pages.

136.     Consequently, he was required to review the evidence file in the Dean of Students office on several occasions.

137.     On April 18, 2019, Doe submitted his response and comments to the evidence binder, in which he established that the investigation did not reveal any credible evidence to support a finding of responsibility. Specifically, the evidence demonstrated that (i) Roe did not lack the capacity to engage in a consensual sexual encounter, and (ii) she was an active participant in the encounter.

138.     On April 24, 2019, Dean O'Driscoll notified Doe that the Investigators had received final comments to the evidence binder review from both parties and were working on the final report.

139.     On May 1, 2019, Dean O'Driscoll emailed Doe to advise him that the final report was still in progress and that she would provide an update once final exams were complete.

140.     On May 21, 2019, Dean O'Driscoll again notified Doe that she and Ms. Davis were working on finalizing the report.

141.     On or about June 11, 2019, the Investigators submitted to Ms. Stoops and Dean Kelly their Final Investigation Report (the "Report"), which concluded that Doe was responsible for Sexual Assault.

## VI.     **The Disciplinary Decision.**

142.     Approximately one month after he last received correspondence concerning the status of the final report, on June 18, 2019, Doe received a Resolution Letter from Dean Kelly, notifying him that she and the Student Affairs Title IX Coordinator reviewed and approved the final investigative report and determined that he was responsible for Sexual Misconduct: Sexual Assault (the "Decision").

143.     The Resolution Letter indicated that the Investigators found by a preponderance of the evidence that Doe penetrated Roe's vagina with his penis without her consent. Significantly,

Dean Kelly noted that the Investigators concluded Doe did not know, nor could he have reasonably known, that Roe was incapacitated by alcohol.

144.    Demonstrating a clear violation of Doe's rights to a fair process, at all times during the investigation, Doe understood the charges against him to be non-consensual contact due to incapacitation, and focused his defense on combating this specific charge, identifying the witnesses and evidence that would refute Roe's claims of incapacitation. Yet, when the Investigators themselves concluded that the evidence did not support a finding that Roe was incapacitated, they changed their theory of the case, to a charge of non-consensual sexual contact. At no time was Doe notified that these additional charges were being pursued, as guaranteed by the initial Notice to Appear letter.

145.    The Resolution Letter notified Doe that he had been suspended from the University, effectively immediately, through May 18, 2020, and that such suspension will be noted on his transcript. It also noted that if Doe were to be readmitted to the College, he will be placed on University Probation for one year following his return.

## VII.    The Appeal

146.    On June 27, 2019, Doe timely submitted an appeal of the Decision on the grounds that (1) BC committed material procedural errors that likely adversely affected the result of the conduct adjudication, and (2) Doe had recently become aware of new evidence that was unavailable to him at the time of the adjudication process, which would have likely affected the finding.

147.    Specifically, the appeal outlined that BC engaged in substantial procedural errors including: (i) BC failed to notify Doe of the allegations against him, when he was found responsible for conduct in violation of the Policy that differed from the alleged violation with

which he was initially charged; (ii) the Investigators failed to complete the investigation within 60 days; (iii) the Investigators misapplied the preponderance of the evidence standard; (iv) the Investigators required Doe to prove his innocence rather than affording him a presumption of innocence; (v) the Investigators did not examine whether the encounter was consensual as demonstrated through both words and actions; (vi) the investigation was not thorough or impartial; (vii) Doe was not permitted to review his accuser's statements, witness statement or any evidence until after he had appeared for two interviews; (viii) BC does not provide a hearing in cases of sexual misconduct while providing hearings in other conduct matters; and (ix) BC failed to ensure confidentiality in the process when it permitted Roe to discuss the allegations with Doe's ███.

148.    Further, Doe described that he had recently become aware of new evidence that was not available to him during the investigation process, which would affect the finding of non-consent- specifically, one of the witnesses previously interviewed confided in Doe that he had been present in the suite during the sexual encounter and had heard unambiguous signs of consensual sex from both parties.

149.    On July 24, 2019, Vice President for Student Affairs Joy Moore denied Doe's appeal, on the grounds that it did not state a valid ground for appeal in accordance with BC's Policy.

150.    Vice President Moore overlooked each of Doe's articulated procedural arguments, reasoning that the points raised amounted to Doe's personal views concerning how the evidence was weighed, rather than procedural errors. She reasoned that regardless of any such errors, the outcome would not have changed.

151.    Vice President Moore also declined to consider the material information provided to Doe by Roommate 1 after the investigation process concluded as "new evidence," on the

grounds that such information was "available" when the witness was interviewed. In this way, Vice President Moore penalized Doe for the Investigators' failure to conduct a thorough investigation in which they obtained all critical information from relevant witnesses.

152.    This decision constituted the final decision of the College.

## VIII.    Plaintiff's Injuries.

153.    Doe has already suffered and will continue to suffer significant damages as a result of BC's erroneous finding of responsibility and the imposition of a one-year suspension.

154.    In addition to the damages Doe will suffer as a result of the permanent disciplinary notation on his academic record, the resultant delay in his anticipated graduation date, and the disclosure to all potential graduate schools and employers that he was found responsible for sexual assault, Doe will also suffer immense irreparable harm with respect to his ████████████ career.

155.    Specifically, Doe will lose his ████████████████ while on suspension from the College during his ████████████, which will translate into lost ████████████████, a complete loss of or a significant lowering in his ██████████, an all but certain loss of career opportunities to ████████████████, and loss of future earning capacity.

156.    The likelihood of Doe being ████████████████████ is not purely speculative; last year, ████████████████████████████████████████████ ████████████████████.

157.    However, it is well known that ██████ with any disciplinary violation in their background are unlikely to ever be ██████ by a ████████████, regardless of their talent and skill.

158.    A suspension of even one day from Boston College could result in Doe's ███

███████████████   ████████, directly resulting in the irreparable damages described

above.[3]

## COUNT I
## Violation of Title IX of the Education Amendments of 1972, 20 U.S.C. § 1681 *et seq*.
## Erroneous Outcome

159.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set

forth herein.

160.    Title IX of the Education Amendments of 1972 provides, in relevant part:

> "No person in the United States shall, on the basis of sex, be excluded from
> participation in, be denied the benefits of, or be subjected to discrimination
> under any education program or activity receiving Federal financial
> assistance."

161.    Title IX of the Education Amendments of 1972 applies to all public and private

educational institutions that receive federal funding, which includes Defendant BC.

162.    Title IX may be violated by a school's failure to prevent or remedy sexual

harassment or sexual assault or by the imposition of university discipline where gender is a

motivating factor in the decision to discipline. In either case, the statute is enforceable through an

implied private right of action.

163.    The Obama Administration's promulgated regulations under Title IX require a

school to "adopt and publish grievance procedures providing for the prompt and equitable

resolution of student... complaints alleging any action which would be prohibited by" Title IX or

regulations thereunder. 34 C.F.R. § 106.8(b) (Dep't of Education); 28 C.F.R. § 54.135(b) (Dep't

---

[3] Plaintiff refers the Court to John Doe's Declaration in Support of Plaintiff's Motion for a Temporary
Restraining Order and Preliminary Injunction filed on July 29, 2019 for a more detailed discussion
concerning the specific damages and injuries he will suffer with respect to his ████████████████,
if the requested relief is not granted.

of Justice) (*emphasis added*). Such prohibited actions include all forms of sexual misconduct. 34 C.F.R. § 106.8(b).

164.    Even the Obama Administration ostensibly recognized that the procedures adopted by a school such as Boston College covered by Title IX must accord due process to both parties involved.

165.    Moreover, there must be "[a]dequate, reliable, and impartial investigation of complaints" and a school has an obligation under Title IX to make sure that all employees involved in the conduct of the procedures have "adequate training as to what conduct constitutes sexual harassment, which includes "alleged sexual assaults."

166.    The First Circuit recognizes the erroneous outcome theory of liability, following the standard articulated by the Second Circuit in *Yusuf v. Vassar College,* 35 F.3d 709 (2d Cir. 1994).

167.    To plead an erroneous outcome claim under Title IX, a Plaintiff found guilty of sexual assault by a university must allege: (1) facts sufficient to "cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) show "gender bias was a motivating factor." *Doe v. Trustees of Bos. Coll.,* 892 F.3d 67, 91 (1st Cir. 2018).

168.    With respect to the first element, Defendant's finding that Plaintiff was guilty of sexual assault was utterly erroneous. The "pleading burden in this regard is not heavy" and can be met by alleging "particular procedural flaws affecting the proof." *See Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994).

169.    Facts casting much more than "articulable doubt" on the accuracy of the outcome are described in detail above, but such facts include, without limitation:

   (a) Doe was not given an opportunity to confront his accuser, even though the finding came down to an assessment of which party's version of events was more credible. This fact

alone casts some articulable doubt on the accuracy of the outcome. *See Doe v. Baum*, 903 F.3d 575, 585–86 (6th Cir. 2018) ("[B]ecause Doe alleged that the university did not provide an opportunity for cross-examination even though credibility was at stake in his case, he has pled facts sufficient to cast some articulable doubt on the accuracy of the disciplinary proceeding's outcome.") (internal citations omitted).

(b) The Investigators overlooked the unambiguous evidence that Roe consented to sexual intercourse with Doe: (i) she consented to the removal of her shorts and assisted Doe in doing so; (ii) Roe stated "I know you want to do it"; (iii) Roe asked Doe to get a condom; (iv) Roe held her underwear to the side and told him to "Do it"; (v) Roe gave verbal instructions during the penetration, such as "go slow" and "hold it there"; and (vi) Roe agreed to switch positions, then turned over onto her stomach.

(c) The Investigators disregarded a text message Roe sent to her friend the morning after the encounter wherein she conceded that the encounter was consensual, stating: "it was fine." Instead, they adopted Roe's revisionist explanation that she meant to state "it's fine", as a way to suppress something that was bothering her.

(d) While concluding that Roe was highly intoxicated to the point of being unable to make informed, rational judgments and decisions (citing in the Report to 22 distinct reasons why the Investigators believe she was incapacitated) the Investigators nonetheless credit her account as being more reliable than Doe's.

(e) In her first interview, Roe disputed that she consented to any aspect of the sexual encounter. Yet, in her second interview, she conceded that she agreed to go into Doe's room, consented to "making out" with Doe, that she "probably" instructed Doe to kiss her neck, and that she "did lift up her back so that he could pull her shorts off," all of which corroborated Doe's account. These significant inconsistencies in Roe's statements were never considered by the Investigators when assessing her credibility.

(f) BC failed to re-open the investigation to interview Roommate 1 In Doe's appeal, he noted that after the conclusion of the investigation process, he had become aware of new evidence that directly bore on the issue of Roe's consent to sexual activity. Specifically, Roommate confided in Doe that he had heard unambiguous signs of consensual sex from his location in the common area of the suite at the time of the relevant sexual activity.

170.    Second, particular circumstances suggest that gender bias was a motivating factor

behind the erroneous findings and the decision to impose an unjustly severe penalty upon Plaintiff.

These circumstances include, *inter alia:*

(a) Upon concluding that the evidence did not support a finding of the violation with which Doe was initially charged (non-consensual sexual contact due to incapacitation), the Investigators unilaterally changed the charge against Doe, after the investigation had

been concluded, without providing advance notice of this new charge, or allowing Doe
an opportunity to contest it before a final decision was issued.

(b) The failure to afford Doe the requisite presumption of innocence; BC's Policy
repeatedly uses the term "victim" (more than 40 times) when referring to the reporting
party/complainant.

(c) The Investigators misapplied the preponderance of the evidence standard when they
found Roe's account of the events to be more credible than Doe's despite the clear
evidence refuting her statements, and the various inconsistencies that should have
called her account into question.

(d) The Investigators disregarded the clear indications of consent expressed by Roe on the
grounds that Doe failed to essentially cross-examine Roe on these particular points
during their conversation of December 7 (4 weeks after the encounter, and after Roe's
report had been filed).

(e) The Investigators deemed Roe's recollection of the events more credible than Doe's,
while simultaneously concluding that Roe was highly intoxicated to the point of being
unable to make informed, rational judgments and decisions.

(f) The College condoned Roe's reporting to Doe's ███████ that someone ██████████ had
sexually assaulted her. This disclosure occurred before a formal complaint was filed,
and before Doe had the opportunity to appear for a first interview to present his account
of the events.

(g) While the Investigators discussed Roe's demeanor when speaking with her roommates
about the alleged incident, they excluded information concerning Doe's reaction to
learning of these false charges; i.e. being shocked, scared, upset, and appearing as
though he was going to vomit.

171.    The foregoing demonstrates how a bias against Doe as the male accused led to the
erroneous finding.

172.    In *Doe v. Brandeis Univ.*, 177 F.Supp.3d 561, 572–73 (D. Mass. 2016), the court
recognized that universities across the country have adopted "procedural and substantive policies
intended to make it easier for victims of sexual assault to make and prove their claims and for the
schools to adopt punitive measures in response."

173.    Boston College similarly took steps in response to the issuance of the Dear Colleague Letter, to demonstrate its aggressive stance against sexual assault on campus, with the intent of making the reporting of assaults more easily available to members of the community.

174.    Recognizing an increase in the number of reported sexual assaults on campus in 2013 (http://bcheights.com/2014/10/09/bcpd-chief-responds-increased-number-sexual-assaults-reported-2013/), the College revised its Student Sexual Misconduct Policy and the investigative process, in October 2014.    http://bcheights.com/2014/10/22/bc-revises-sexual-misconduct-policies-investigative-process/

175.    Prior to 2014, the investigative process for all conduct matters including those involving sexual misconduct, included the right to have one's case heard before a neutral panel, and the opportunity to introduce evidence and call witnesses.

176.    The removal of these procedural safeguards has led to more findings of responsibility against male students at BC.

177.    On information and belief, all students that have been suspended and expelled from BC for sexual assault have been male.

178.    Based on the foregoing, Plaintiff was subjected to a biased, prejudiced and unfair process in violation of Title IX designed to find him, the male, responsible for sexual assault and be punished severely for it.

179.    This unlawful discrimination in violation of Title IX proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future employment prospects.

180.     As a direct and proximate result of the above conduct, Doe has sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of educational, ███████████████, and other career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

181.     As a result of the foregoing, Plaintiff is also entitled to an injunction enjoining implementation of the suspension, expunging Plaintiff's records, requiring BC to destroy all disciplinary records concerning Plaintiff, and permitting Plaintiff to enroll at the College for the fall 2019 semester.

## COUNT II
## Breach of Contract

182.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

183.     Plaintiff applied to and enrolled at BC and paid associated fees and expenses. Plaintiff did so in reliance on the understanding and with the reasonable expectation that BC would implement and enforce the provisions and policies set forth in its official publications, including the Student Sexual Misconduct Policy.

184.     An express contract or, alternatively, a contract implied in law or in fact was formed between Plaintiff and BC.

185.     The contract contained an implied covenant of good faith and fair dealing. It implicitly guaranteed that any proceedings would be conducted with basic fairness.

186.     Based on the aforementioned facts and circumstances, Defendant breached express and/or implied agreement(s) with Plaintiff, and the covenant of good faith and fair dealing contained therein.

187.    Defendants committed several breaches of their agreements with Plaintiff during the investigation process. A non-exhaustive list of Defendants' breaches includes the following:

**a. *Failure to provide fundamental fairness.***

188.    Boston College's Code of Conduct provides that "The student conduct system exists to protect the rights of the Boston College community and assure fundamental fairness to the complainant and to the respondent."

189.    Notwithstanding, BC deprived Doe of fundamental fairness in the investigatory process when it (1) deprived Doe of proper notice of the charges; (ii) did not provide him an opportunity to confront or cross-examine his accuser or witnesses; (iii)  denied Doe access to all evidence until after he had already been interviewed; (iv) deprived him of an effective appeal; and (v) failed to ensure an independent investigation process when it permitted two individuals to serve in the roles of investigator and adjudicator.

**b. *Failure to conduct a thorough and impartial investigation.***

190.    The Policy states "For sexual misconduct complaints reported to the Office of the Dean of Students or when the University otherwise determines a thorough investigation and/or conduct action is appropriate, the University…will conduct an investigation of the complaint."

191.    Notwithstanding, BC failed to conduct a thorough and impartial investigation of the complaint against Doe, in violation of its own policies and fundamental fairness.

192.    The Investigators refused to examine Roe's narrative in the same manner in which they examined what Doe said. While the Investigators took a critical eye to much of what Doe offered (as well as the information provided by some of his witnesses[4]), they were utterly silent on a number of critical inconsistencies and omissions made by Roe. *See* ¶¶ 198-201.

---

[4] For instance, while Roe claimed to have been crying when she left Doe's suite after the encounter, ▮▮Roommate 1▮▮ ▮▮, who was sitting in the common area and saw her leave the suite stated that she was not crying. The

193.     BC further failed to conduct a thorough and impartial investigation when it refused to re-open the investigation to interview ███Roommate 1███ In Doe's appeal, he noted that after the conclusion of the investigation process, he had become aware of new evidence that directly bore on the issue of Roe's consent to sexual activity. Specifically, ███ confided in Doe that he had heard unambiguous signs of consensual sex from his location in the common area of the suite at the time of the relevant sexual activity.[5]

194.     Though the foregoing was unquestionably directly material to the determination of whether Roe did in fact consent to sexual intercourse, the College disregarded this previously unavailable new evidence.

195.     Despite the delayed disclosure of this critical information, the failure of the College to take every step possible to ensure a correct finding, given the severe ramifications to one of its students, resulted in a process that was neither thorough nor impartial.

*c.  Incorrect application of the relevant standard of review.*

196.     BC's Policy specifies that the "Investigator's findings as to the responsibility of the respondent will be made using the preponderance of the evidence standard. This standard requires that the information supporting a finding of responsibility be more convincing than the information in opposition to it."

197.     The Investigators misapplied the preponderance of the evidence standard when they found Roe's account of the events to be more credible than Doe's despite the clear evidence

_____

Investigators arbitrarily dismiss his account on the nonsensical grounds that his interaction with Roe was "fleeting" and he was "not well-acquainted" enough with Roe to determine if she was crying.
[5] ███ had not disclosed this information to the Investigators during his interview, due to their hostile questioning of him despite his role as a neutral witness, and for fear of getting into trouble himself, or being perceived as having some prurient intent.

refuting her statements, and the various inconsistencies that should have called her account into question.

198.    First, while concluding that Roe was highly intoxicated to the point of being unable to make informed, rational judgments and decisions (citing in the Report to 22 distinct reasons why the Investigators believe she was incapacitated) the Investigators nonetheless credited her account as being more reliable than Doe's. There is no rational explanation for this credibility assessment, when it is undisputed that Doe was not intoxicated during the relevant events.

199.    Second, in her first interview, Roe disputed that she consented to any aspect of the sexual encounter. Yet, in her second interview, she conceded that she agreed to go into Doe's room, consented to "making out" with Doe, that she "probably" instructed Doe to kiss her neck, and that she "did lift up her back so that he could pull her shorts off," all of which corroborated Doe's account. These significant inconsistencies in Roe's statements were never considered by the Investigators when assessing her credibility.

200.    In contrast, the Investigators treated the fact that Doe could not specifically recall whether his wallet containing the condom was located on his desk or in his wardrobe, months after the alleged incident date, as a significant discrepancy, supporting their determination that Doe's account was not reliable and that therefore, Roe did not consent to sexual intercourse.

201.    Third, in her first interview, Roe claimed that she did not know if Doe used a condom during their encounter. During the second interview, Roe stated that she vaguely remembered some conversation about condoms but could not recall what was said. Again, it is unclear how an impartial investigator could arrive at the conclusion that Roe's account was more credible when she provided inconsistent testimony on key points of her complaint.

202.    Fourth, the Investigators erroneously overlooked the unambiguous evidence that Roe consented to sexual intercourse with Doe: (i) she consented to the removal of her shorts and assisted Doe in doing so; (ii) Roe stated "I know you want to do it"; (iii) Roe asked Doe to get a condom; (iv) Roe held her underwear to the side and told him to "Do it"; (v) Roe gave verbal instructions during the penetration, such as "go slow" and "hold it there"; and (vi) Roe agreed to switch positions, then turned over onto her stomach. The combination of the foregoing factors, when considered by any reasonable and properly trained investigator, could only lead to the conclusion that Roe consented to sexual intercourse with Doe.

203.    Yet, each of these clear verbal and non-verbal indications of consent were bewilderingly explained away by the Investigators. They reasoned that Doe's failure to essentially cross-examine Roe on these particular points during their conversation of December 7 (4 weeks after the encounter, and after Roe's report had been filed) established that each of these actions were unlikely to have actually occurred.

204.    Had the Investigators applied the correct standard of review, they would have reached the only plausible conclusion- that Roe consented to sexual activity with Doe.

### d.   *Violation of Confidentiality.*

205.    BC's policies afford confidentiality to those involved in an investigation, assuring that all parties "respect the right of confidentiality of other participants" in the process, and affirm that the "unauthorized disclosure of confidential information by participants to persons not involved in the [adjudication] process…may be dealt with as a subsequent charge…"

206.    Notwithstanding, Doe's right to confidentiality was violated when, with the approval of the College, Roe ███████████  ██████  that someone on the ███ had sexually assaulted her. This disclosure occurred before a formal complaint was filed, and before Doe had

the opportunity to appear for a first interview to present his account of the events. With ███████

███████████ ███, his ████ was readily able to determine that Doe was the one accused,

and called Doe into his office to ask him about the situation the day before his first interview.

207.    Approximately one week later, the ████ █████████████████ ███,

during which he generally addressed the issue of consent, and provided a warning about the

meaning of consent. Noticeably, ████ ████ ██████████████████████

████████████████████████████. Consequently, any

member of the ███ was able to piece two and two together and determine that Doe was the one

who had been accused of assault.

208.    At no time did BC take any action in response to Roe's disclosure of this

confidential and highly private information to a third-party.

209.    This action on the part of Roe, and inaction on the part of the College, illustrated

the College's bias against Doe, and predetermination of his guilt. There is no other logical

explanation for the College allowing someone who alleges a claim of sexual assault to disclose

that allegation to an ████████, prior to the accused having any opportunity to defend himself.

210.    The foregoing constituted a clear violation of his rights to confidentiality and

privacy in the process.

> **e.   *Breach of the obligation to presume Doe innocent of the charges and assign the burden of proof to the University.***

211.    BC's Policy does not include a provision that specifically addresses the

presumption of innocence, or which party is assigned the burden of proof.

212.    However, both the accused's right to fundamental fairness and the implied covenant

of good faith and fair dealing required that Doe be presumed innocent, and that the College have

the burden of proof to establish otherwise.

213.    BC violated this obligation when it presumed Doe guilty from the outset and operated from the presumption that Doe was responsible for a violation of the College's Policy.

214.    BC's presumption of Doe's guilt was apparent when the Investigators, upon discovering that the evidence did not support a finding of the violation for which Doe was charged, changed the charge against him in order to ensure some finding of responsibility. The Investigators unilaterally changed the charge against Doe, after the investigation had been concluded, without providing advance notice of this new charge, or allowing Doe an opportunity to contest it before a final decision was issued.

215.    Further demonstrating the College's failure to afford accused students the requisite presumption of innocence, BC's Policy repeatedly uses the term "victim" (more than 40 times) when referring to the reporting party/complainant. However, "[w]hether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning." *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 573 (D. Mass. 2016).

216.    The foregoing reveals a process in which Doe was presumed guilty from the time the complaint was received, and the investigation was conducted in a manner to reach this predetermined result.

   *f.   The Investigators failed to complete the investigation within 60 days.*

217.    BC's Policy provides that the College will endeavor to complete its investigation within 60 days and will keep the parties apprised of when the investigation will continue beyond that time frame.

218.    Notwithstanding, the investigation and adjudication took nearly eight months, far more than the 60 days indicated in BC's Policy.

219.    Roe alerted BC officials on November 7 of her allegation and informed BC officials she wanted to go forward with an investigation on December 7, 2018. Doe was alerted to this fact on December 14. The Investigators, however, did not even reach out to Roe until January 2 to schedule an interview.

220.    Doe was not interviewed until January 29, 2019, 53 days after Roe alerted the school she wanted to proceed with an investigation, and 83 days after the sexual encounter. This was particularly problematic in that Doe's recollection about minor details (i.e. whether he retrieved the condom from his wardrobe or his desk) were assigned great significance in the Investigators' ultimate decision as to which party was more credible.

221.    On March 27, 2019 Doe received a "Timeline Update" from Dean O'Driscoll in which she anticipated the Evidence Binders would be available at the "beginning of next week." However, after being given access to the binder and submitting his response, the next notice Doe received about the progress of the Report was on May 1. Doe was told that they were working on the Report and that he would be alerted after finals. His finals ended on May 10. On May 21, still having not received the Final Report, Doe received an email from Dean O'Driscoll stating that her and Ms. Davis were "striving to submit the final report after the upcoming Memorial Day holiday." Doe did not receive any correspondence after the Memorial Day holiday. He finally received the Report approximately one month after this latest correspondence, on June 18.

222.    Notably, Doe was given 10 days to review the entire Evidence Binder and submit a substantive response. In contrast, the Investigators took the entire time the Code allows for them to complete an investigation (60 days) to write the Report--- a task Doe was given 10 days to complete.

223.    The foregoing violations, individually and in the aggregate, resulted in a process that was neither fair nor impartial, ultimately contributing to an erroneous finding against Doe and the resultant damages to his academics and ████████████████.

224.    As a direct and proximate result of the above conduct, Doe has sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of educational, professional ████████, and other career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

### COUNT III
### Breach of Contract/Common Law: Denial of Basic Fairness/
### Arbitrary and Capricious Decision Making

225.    Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

226.    Massachusetts courts have held that a private university may not act "arbitrarily or capriciously" in disciplining a student. *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 600 (D. Mass. 2016).

227.    Specifically, "[s]chool disciplinary hearings must be "conducted with basic fairness." *Cloud v. Trustees of Boston University*, 720 F.2d 721, 725 (citing *Coveney v. President & Trustees of Holy Cross College,* 445 N.E.2d 136, 139 (1983); *Schaer v. Brandeis University*, 432 Mass. 474, 481, 735 N.E.2d 373, 380 (2000).

228.    Boston College's obligation to provide basic in its proceedings is separate from and in addition to its contractual obligation to follow the rules it set forth in its policies. *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 601 (D. Mass. 2016).

229.     Thus, Defendants had a duty, either under an express or implied contract or as a matter of common law, to ensure that the proceedings against Plaintiff were conducted in good faith and with basic fairness.

230.     While "'Basic fairness' is an uncertain and elastic concept, and there is little case law to serve as guideposts in conducting the fairness inquiry" (*Doe v. Brandeis Univ.,* 177 F. Supp. at 601), "[i]n this context, at least, there are two principal threads to the "fairness" inquiry. The first is procedural fairness—that is, whether the process used to adjudicate the matter was sufficient to provide the accused student a fair and reasonable opportunity to defend himself. The second is substantive fairness—that is, even if the procedure was fair, whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness. *Doe v. Brandeis,* 177 F.Supp. 3d at 602.

231.     First, Defendants breached this duty of good faith and basic fairness when they failed to afford procedural fairness.

   a) ***Failure to provide proper notice of the charges.***

232.     Fair process requires that an accused be notified of the allegations against him.

233.     Notwithstanding, Doe was ultimately found responsible for conduct in violation of BC's Policy that differed from the alleged violation with which he was initially charged.

234.     In the January 23, 2019 Notice to Appear, Dean O'Driscoll advised that he was under investigation for engaging in non-consensual sexual contact with Roe while she was incapacitated, and pointed to the relevant policy sections that were implicated by these allegations.

235.     Based on this notice, Doe understood the charges against him to relate to an allegation that Roe was unable to consent due to her incapacitation at the time of the sexual encounter.

236.    The letter outlining the charges against Doe was clearly based on the evidence collected during the Investigators' two interviews with Roe, which had spanned over nearly three and a half hours, on January 14 and January 18.

237.    Based on the information obtained in those interviews, Dean O'Driscoll sent to Doe the notification of charges the following week.

238.    There was no question, as outlined in the January 23 letter, that the investigation revolved around whether Roe was incapacitated and thus, unable to consent.

239.    This fact was confirmed by the Investigators' focus on this issue throughout witness interviews. Numerous people who were present at a party Roe attended before her interactions with Doe were interviewed to discuss this particular issue. Her roommate, with whom she interacted immediately before seeing Doe at ▮▮▮▮▮▮, was interviewed. People with whom she interacted at ▮▮▮▮▮▮ and afterwards were interviewed. The interview notes of all of these people almost exclusively centered around whether or not Roe was incapacitated.

240.    In fact, the Investigatory Report itself in the, "Scope of the Investigation," section reiterates that the investigation involved non-consensual activity "all while (Roe) was incapacitated and therefore unable to consent to sexual interaction." Accordingly, based on Doe's understanding of the charges against him, as presented by both Dean Kelly and Dean O'Driscoll, he approached his two investigatory interviews with the objective of disputing Roe's claims that she was incapacitated and thus, unable to consent to sexual activity.

241.    However, in issuing their findings, the Investigators cleared Doe of those allegations, changed the theory of the case without providing him notice, and instead found him responsible for allegations supported by different policy sections.

242.    At the conclusion of the investigation, Doe was cleared of the charge alleging Roe was unable to consent due to incapacitation. The Investigatory Report specifically found that he "neither knew, nor reasonably should have known, that [Roe] was incapacitated by alcohol during his sexual interaction with her."

243.    Nonetheless, the Investigators abandoned the theory they had charged him with (only after there was indisputable evidence that no reasonable person would have believed she was incapacitated) and then found him responsible for an allegation that was not supported by sufficient evidence.

244.    Recognizing their error, the Investigators attempted to address this change in the charge in footnote 115 of the Report. They noted that they exonerated Doe of the incapacitation charge, but then argued that this exoneration "meant that the Investigators had to consider whether [Roe] provided [Doe] with the consent that the Policy requires to be present in every sexual interaction between individuals within its scope."

245.    This assertion disingenuously suggests that the investigative process was divided into two parts: first, to determine whether a reasonable person in his position would have understood her to be incapacitated and second, whether Roe consented. This was not the case.

246.    After interviewing Roe for over three hours, the Investigators and/or Dean Kelly concluded that the only viable charge against Doe was under an incapacitation theory.

247.    However, after completing the investigation, and discovering that the evidence irrefutably revealed Roe did not appear to numerous people (including her own roommate) as though she was incapacitated, the Investigators asserted that their investigation must follow some undefined two-step process wherein, after the evidence fails to support the actual charge, it somehow defaults to a more general inquiry as to consent.

248.     Nowhere in the Policy is there authority for such an approach. In fact, Dean Kelly's letter reveals the opposite is true as it specifically stated: "(i)f during the investigation there are additional allegations, we would provide an updated notice to you."

249.     At no time did Doe receive such an updated notice.

250.     Had Doe been made aware, prior to appearing for an interview and formulating my defense to the charges, that the central issue in dispute concerned not whether Roe was *unable* to consent due to alcohol incapacitation but instead, whether or not she consented to the activity, he would have taken a different approach to his defense- for instance, highlighting the specific words and actions that demonstrated she was an active and willing participant, rather than focusing on the behaviors that demonstrated she was not incapacitated.

251.     The Investigators' decision to change the charge against Doe after the investigation had been concluded, without providing advance notice of this new charge, or allowing Doe an opportunity to contest it before a final decision was made was a clear violation of Doe's rights to a fair process.

   *b)  Depriving Doe of an opportunity to confront or cross-examine his accuser.*

252.     BC deprived Doe of basic fairness when it did not permit him an opportunity to confront or cross-examine his accuser, either directly or through counsel. *See Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 604–05 (D. Mass. 2016) ("In the famous words of John Henry Wigmore, cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth." 3 Wigmore, Evidence § 1367, p. 27 (2d ed. 1923)).

253.     The ability to cross-examine is most critical when the issue is the credibility of the accuser. *See Donohue v. Baker*, 976 F.Supp. 136, 147 (N.D.N.Y.1997) ("[I]f a case is essentially one of credibility, the 'cross-examination of witnesses might [be] essential to a fair hearing.'")

(quoting *Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir.1972)).") *See also Univ. of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017) ("Few procedures safeguard accuracy better than adversarial questioning.")

254.    As in *Brandeis,* here, there was no third-party witness present during the alleged non-consensual sexual intercourse. "The entire investigation thus turned on the credibility of the accuser and the accused. Under the circumstances, the lack of an opportunity for cross-examination may have had a very substantial effect on the fairness of the proceeding." *Id.*

c)  *Depriving Doe of an opportunity to cross-examine witnesses.*

255.    For the same reasons articulated above, BC's failed to permit Doe an opportunity to cross-examine witnesses, either directly or indirectly, deprived him of a fair process.

d)  *Failure to provide Doe access to all evidence collected.*

256.    Prior to appearing for his first interview, the only information presented to Doe was the initial Notice to Appear. Even though Roe had, as of January 23, 2019, appeared for two interviews lasting more than three hours, BC's Policy does not permit the Investigators to provide the respondent with copies of a complainant's interview summaries, any documentary evidence gathered at that point, or other evidence collected.

257.    Instead, Doe was not permitted to review the evidence against him (aside from being confronted with printouts of certain text messages he had never seen before in the midst of his second interview on March 11, 2019), to which he was required to respond in the interviews, until I was given access to the Evidence Binder on April 5, 2019.

258.    Though permitted to submit a response to the Evidence Binder, the points raised in his submission were entirely disregarded when the Investigators, unable to find him responsible

for the initial charges, abandoned the incapacitation argument and pursued a new theory of the case against him.

   *e)  Denial of the right to an effective appeal.*

259.   Doe did not have the right to an effective appeal. BC limits appeals to two grounds: (1) material procedural error that likely adversely affected the outcome; or (2) previously unavailable information that likely would have affected the outcome. ("Conspicuously absent from that list is the ability to appeal on the ground that the Special Examiner's decision was not supported by the evidence, or that it was otherwise unfair, unwise, or simply wrong." (*Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 607 (D. Mass. 2016)).

260.   Second, Defendants breached the duty of good faith and basic fairness when they failed to afford Doe substantive fairness by issuing a decision that was unduly arbitrary and irrational, or tainted by bias or other unfairness. *Doe v. Brandeis,* 177 F.Supp. 3d at 602. *See* ¶¶ 169-170.

261.   The investigation process and findings thus violated the contractual relationship.

262.   Defendants' breach of the duty to ensure basic fairness proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

263.   As a result of the foregoing, Plaintiff is entitled to damages in an amount to be determined at trial.

*f)   Failure to separate the investigation and adjudication process.*

264.    BC's Policy employs an investigative model whereby one or more internal and/or external investigators interview the parties and witnesses, collect evidence, prepare a report, and make findings of responsibility, which may only be challenged on very limited grounds.

265.    This failure to separate out the investigation and adjudication functions results in a process that deprives an accused of a fair process. This is so because "[t]he dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions." *Doe v. Brandeis,* 177 F. Supp. 3d 561, 606 (D. Mass. 2016).

266.    Under the single (or in this case, dual) investigator model, as one federal district judge has described the process, a single individual "is given complete authority to decide whether the accused [is] 'responsible' for the alleged violations," acting "simultaneously [as] the investigator, the prosecutor, and the judge who determine[s] guilt."   Doe v. Brandeis Univ., 177 F. Supp. 3d 561, 579 (D. Mass. 2016).

267.    This model contrasts with the procedures employed by BC in non-sexual misconduct related disciplinary matters where the accused is afforded a live hearing before a hearing panel, with an opportunity to confront the evidence against him and to cross-examine his accuser.

268.    The investigator model has been criticized by judges and commentators because: it is an inquisitorial, as opposed to adversarial, process; it offers no checks or balances against investigator bias, including unconscious racial or sexual bias; it allows a single individual to act as prosecutor, investigator, judge, and jury determining guilt; and, crucially, it allows the

investigator to find the accused guilty without ever affording him a hearing where evidence can be confronted, witnesses questioned, and the accuser cross-examined.

269.   Doe's inability to present his case before an impartial and separate adjudication panel substantially prejudiced him and may have adversely affected the outcome.

270.   The foregoing constituted violations of Doe's right to a fair process.

271.   As a direct and proximate result of the above conduct, Doe has sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of educational, professional █████, and other career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT IV
### Estoppel

272.   Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

273.   BC's various policies constitute representations and promises that BC should have reasonably expected to induce action or forbearance by Plaintiff.

274.   BC expected or should have expected Plaintiff to accept its offer of admission and offer to join its █████ program,  incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that BC would not tolerate, and Plaintiff would not suffer, discrimination or harassment by fellow students or faculty members and would not deny Plaintiff his procedural rights should he be accused of a violation of BC's policies.

275.   Plaintiff relied to his detriment on these express and implied promises and representations made by BC, by choosing to attend BC rather than other schools of equal caliber and paying the required tuition and fees.

276.   Based on the foregoing, BC is liable to Plaintiff based on Estoppel.

277.     As a direct and proximate result of the above conduct, Doe has sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of educational, professional █████, and other career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

## COUNT V
## Negligence

278.     Plaintiff repeats and realleges each and every allegation hereinabove as if fully set forth herein.

279.     In conducting its investigation and adjudication of Roe's complaint against Doe, the College owed Doe a common law duty to exercise reasonable care, with due regard for uncovering the truth, applying the College's fairly and impartially, appreciating the severity of the charges and potential consequences, and in consideration of Doe's fundamental rights to a fair process.

280.     Through the acts set forth above, the College breached its duty by carelessly, improperly, and negligently performing its investigation and adjudication and facilitating a process that violated the rights and interests of Doe.

281.     Specifically, the College has negligently trained and supervised the individuals it employs to serve as investigators and adjudicators in Title IX disciplinary proceedings.

282.     Evidence of the College's negligent training and selection of its investigators was made apparent by the fact that, upon discovering that the evidence did not support a finding of a policy violation, the Investigators decided to change the charge against Doe after the investigation had been concluded, without providing advance notice of this new charge, or allowing Doe an opportunity to contest it before issuing a final decision.

283.    Moreover, the College was negligent when it failed to take any action in response to a clear violation of Doe's right to confidentiality in the process.

284.    Specifically, Roe reported to Doe's ███ ███████████ ███ had sexually assaulted her. This disclosure occurred before a formal complaint was filed, and before Doe had the opportunity to appear for a first interview to present his account of the events.

285.    This inappropriate disclosure was condoned by the College as Roe was accompanied to this meeting by Senior Associate ██████████████████████.

286.    A non-negligent university conducting a Title IX disciplinary proceeding would have ensured that its personnel were thoroughly familiar with its procedure and capable of carrying them out in a fair and impartial manner to ensure a correct outcome.

287.    As a direct and proximate result of the above conduct, Doe has sustained tremendous damages, including, without limitation, emotional and psychological distress, loss of educational, professional ██████, and other career opportunities, past and future economic injuries, reputational damages, and other direct and consequential damages.

288.    Accordingly, the College is liable to Doe for negligence and for all damages arising therefrom.

**PRAYER FOR RELIEF**

**WHEREFORE,** for the foregoing reasons, Plaintiff demands judgment against Defendants as follows:

(i)    on the first cause of action for violation of Title IX of the Education Amendments of 1972-Erroneous Outcome, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses,

loss of educational and ███ opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements, and an injunction enjoining enforcement of the suspension, expunging Plaintiff's academic records, and requiring Boston College to destroy all disciplinary records concerning Plaintiff;

(ii)     on the second cause of action for breach of contract, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, career and ███ opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iii)     on the third cause of action for denial of basic fairness under contract and common law, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to physical well-being, emotional and psychological damages, damages to reputation, past and future economic losses, loss of educational, career and ███ opportunities, and loss of future career prospects, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(iv)     on the fourth cause of action for estoppel, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to past and future economic losses, loss of educational, career and ███ opportunities, loss of future earning capacity, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements;

(v)     on the fifth cause of action for negligence, a judgment awarding Plaintiff damages in an amount to be determined at trial, including, without limitation, damages to past and future economic losses, loss of educational, career and ███ opportunities, loss of future earning capacity, plus prejudgment interest, attorneys' fees, expenses, costs and disbursements; and

(vi)     a declaratory judgment, pursuant to 28 U.S.C. § 2201, declaring that: (i) the outcome and findings made by BC be reversed; (ii) Plaintiff be immediately reinstated as a student in good standing and permitted to begin classes in the Fall 2019 semester (iii) Plaintiff be permitted to ███████████████████     ████████████; (iv) Plaintiff's reputation be restored; (v) Plaintiff's disciplinary record be expunged; (vi) the record of Plaintiff's suspension be removed from his education file; (vii) any record of the complaint against Plaintiff be permanently destroyed; and (viii) awarding Plaintiff such other and further relief as the Court deems just, equitable and proper.

## JURY DEMAND

Plaintiff herein demands a trial by jury of all triable issues in the present matter.

Dated:   **New York, New York**
         **July 29, 2019**

**Respectfully submitted,**

**NESENOFF & MILTENBERG, LLP**
*Attorneys for Plaintiff John Doe*

By: */s/ Tara J. Davis*
**Andrew T. Miltenberg, Esq. (*pro hac vice* pending)**
**Stuart Bernstein, Esq. (*pro hac vice* pending)**
**Tara J. Davis, Esq. (BBO # 675346)**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
tdavis@nmllplaw.com