# UNITED STATES DISTRICT COURT
## DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| **JOHN DOE,** | : | |
| | : | **Civil Action No:** |
| | : | |
| **Plaintiff,** | : | |
| | : | |
| | : | |
| **-against-** | : | |
| | : | |
| | : | |
| **TRUSTEES OF BOSTON COLLEGE,** | : | |
| | : | |
| | : | |
| **Defendants.** | : | |

**PLAINTIFF JOHN DOE'S MEMORANDUM OF LAW IN SUPPORT
OF PLAINTIFF'S MOTION FOR A TEMPORARY RESTRAINING ORDER
AND A PRELIMINARY INJUNCTION AND
<u>REQUEST FOR EXPEDITED CONSIDERATION</u>**

**NESENOFF & MILTENBERG, LLP**
**Attorneys for Plaintiff John Doe**
**363 Seventh Avenue, Fifth Floor**
**New York, New York 10001**
**(212) 736-4500**

## **TABLE OF CONTENTS**

**Page**

TABLE OF AUTHORITIES ........................................................................iii-vi

PRELIMINARY STATEMENT .......................................................................1

STATEMENT OF FACTS ...............................................................................2

ARGUMENT ...................................................................................................2

I. THE REQUESTED TEMPORARY RESTRAINING ORDER AND
PRELIMINARY INJUNCTION IS PROPER UNDER THE LAW ..................2

II. APPLICATION OF THE FOUR-PRONG TEST FOR PRELIMINARY
INJUNCTIVE RELIEF ESTABLISHES THAT A TEMPORARY
RETRAINING ORDER AND PRELIMINARY INJUNCTION SHOULD BE
GRANTED .....................................................................................................4

    A. Plaintiff Will Suffer Irreparable Injury if the Requested Relief is Not
Granted.....................................................................................................4

    B. Plaintiff is Likely to Succeed on the Merits of his Claims.....................6

        *1) Title IX-Erroneous Outcome* ......................................................6

        *2) Breach of Contract* ...................................................................10

            *a. Failure to provide fundamental fairness*.......................12

            *b. Failure to conduct a thorough and impartial
investigation*.................................................................13

            *c. Incorrect application of the relevant standard of
review*...........................................................................14

            *d. Violation of Confidentiality*...........................................16

            *e. Breach of the obligation to presume Doe innocent of the
charges and assign the burden of proof to the
University*.......................................................................17

            *f. The Investigators failed to complete the investigation
within 60 days* ...............................................................17

        *3) Breach of Contract/Common Law Denial of Basic Fairness*....18

i

*a) Failure to provide proper notice of the charges*............20

*b) Depriving Doe of an opportunity to confront or cross-examine his accuser* ...............................22

*c) Depriving Doe of an opportunity to cross-examine witnesses* ........................................................23

*d) Failure to provide Doe access to all evidence collected* .......................................................23

*e) Denial of the right to an effective appeal* .....................24

*f) Failure to separate the investigation and adjudication process* ..........................................................25

*4) Estoppel* ......................................................................26

*5) Negligence* ..................................................................26

C. The Balance Of Hardships Tips Decidedly In Plaintiff's Favor ...........28

D. The Requested Injunction Is In The Public Interest.............................29

CONCLUSION....................................................................................30

REQUEST FOR EVIDENTIARY HEARING.................................................30

# TABLE OF AUTHORITIES

**Cases**                                                                                     **Page**

*Boutilier v. John Alden Life Ins. Co.,*
    2000 WL 1752623 (D. Mass. Sept. 29, 2000) ......................................................27

*Bulwer v. Mount Auburn Hosp.,*
    473 Mass. 672 (2016) ..........................................................................................10

*Burns v. Quinnipiac University,*
    120 Conn. App. 311 (2010) ..................................................................................10

*Cloud v. Trustees of Boston University,*
    720 F.2d 721 ........................................................................................................19

*Collick v. William Paterson Univ.,*
    2016 WL 6824374 (D.N.J. Nov. 17, 2016) ........................................................12

*Coveney v. President & Trustees of Holy Cross College,*
    445 N.E.2d 136 (1983)..........................................................................................19

*Davis v. Monroe Bd. Of Education,*
    526 U.S. 629 (1999)................................................................................................6

*Doe v. Allee,*
    30 Cal. App. 5th 1036 (Ct. App. 2019)................................................................19

*Doe v. Amherst College,*
    238 F.Supp.3d 195 (D. Mass. 2017) ....................................................................11

*Doe v. Baum,*
    903 F.3d 575 (6th Cir. 2018) .............................................................................4,7

*Doe v. Brandeis Univ.,*
    177 F.Supp.3d 561 (D. Mass. 2016) ..........................................................*Passim*

*Doe v. Brown Univ.,*
    166 F.Supp.3d 177 (D.R.I. 2016) ........................................................................11

*Doe v. Brown Univ.,*
    2010 F. Supp. 3d 310 (D.R.I. 2016)......................................................................3

*Doe v. Emerson Coll.,*
    153 F. Supp. 3d 506 (D. Mass. 2015) ..................................................................27

*Doe v. Lynn Univ., Inc.,*
    235 F.Supp.3d 1336 (S.D. Fla. 2017) ...................................................12

*Doe v. Marymount Univ.,*
    297 F.Supp.3d 585 .........................................................................................8

*Doe v. Miami Univ.,*
    882 F.3d 579 (6th Cir. 2018) ...................................................................8

*Doe v. Middlebury,*
    2015 WL 5488109 .......................................................................................5

*Doe v. Pennsylvania State Univ.,*
    2017 WL 3581672 (M.D. Pa. Aug. 18, 2017) .........................................3

*Doe v. Syracuse Univ.,*
    2019 WL 2021026 (N.D.N.Y. May 8, 2019).......................................12

*Doe v. Trustees of Bos. Coll.,*
    892 F.3d (1st Cir. 2018) ...........................................................................11

*Doe v. University of Cincinnati,*
    223 F. Supp.3d 704 (S.D. Ohio 2016) ....................................................3

*Doe v. Univ. of Michigan,*
    325 F. Supp. 3d 821 (E.D. Mich. 2018)...............................................3,4

*Doe v. Univ. of Notre Dame,*
    2017 WL 1836939 (N.D. Ind. May 8, 2017) .........................................3

*Donohue v. Baker,*
    976 F.Supp. 136 (N.D.N.Y. 1997).......................................................22

*Goss v. Lopez,*
    419 U.S. 565 (1975)...................................................................................20

*Havlik v. Johnson & Wales Univ.,*
    509 F.3d 25 (1st Cir. 2007)....................................................................11

*Johnson v. Schmitz,*
    119 F. Supp.2d 90 (D. Conn. 2000)....................................................11

*King v. DePauw University,*
    2014 WL 4197507 (S.D. Ind. Aug. 22, 2014) ..................................5,29

*LaForest v. Former Clean Air Holding Co.,*
    376 F.3d 48 (2d Cir. 2004)........................................................................4

*LaRouche v. Kezer,*
    20 F.3d 68 (2d Cir. 1994)........................................................................................3

*Maczaczyj v. State of N.Y.,*
    956 F. Supp. 403 (W.D. N.Y. 1997) .......................................................................6

*Mangla v. Brown Univ.,*
    135 F.3d 80 (1st Cir. 1998).....................................................................................10

*Naumov v. McDaniel College, Inc.,*
    2017 WL 1214406 (D. Md. Mar. 31, 2017)............................................................12

*Nokes v. Miami Univ.,*
    2017 WL 3674910 (S.D. Ohio Aug. 25, 2017).........................................................3

*Norris v. Univ. of Colorado, Boulder,*
    362 F. Supp. 3d 1001 (D. Colo. 2019).....................................................................8

*O Centro Espirita Beneficiente Uniao Do Vegetal v. Ashcroft,*
    389 F.3d 973 (10th Cir. 2004) .................................................................................3

*Phillip v. Fairfield University,*
    118 F.3d 131 (2d Cir. 1997)......................................................................................3

*Phillip v. Nat'l Collegiate Athletic Ass'n,*
    960 F. Supp. 552 (D. Conn. 1997)............................................................................5

*Reuters Ltd v. United Press International, Inc.,*
    903 F.2d 904 (2d Cir. 1990).....................................................................................2

*Ritter v. Oklahoma,*
    2016 WL 2659620 (W.D. Okla. May 6, 2016).........................................................3

*Ross v. Creighton University,*
    957 F.2d 410 (7th Cir. 1992) .................................................................................10

*Schaer v. Brandeis University,*
    432 Mass. 474 (2000) .....................................................................................*Passim*

*Shurtleff v. City of Bos.,*
    2019 WL 2635622 (1st Cir. June 27, 2019).............................................................2

*Travelers Casualty & Surety Co. of America v. The Netherlands Ins. Co.,*
    312 Conn. 714 (2014) ............................................................................................11

*Univ. of Cincinnati,*
    872 F.3d 393 (6th Cir. 2017) ...............................................................23

*Viken Detection Corp. v. Videray Techs. Inc.,*
    No2019 WL 2491618 (D. Mass. June 14, 2019) ...............................................2,10

*Winnick v. Manning,*
    460 F.2d 545 (2f Cir. 1972) ...............................................................23

*Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.,*
    339 F.3d 101 (2d Cir. 2009).................................................................4

*Yusuf v. Vassar College,*
    35 F.3d 709 (2d Cir. 1994)...............................................................6,7,8

## **Statutes**

3 Wigmore, Evidence § 1367, p. 27 (2d ed. 1923) ...........................................22

## **Other Authorities**

Nancy Gertner, *Complicated Process*, 125 Yale L.J. Forum 442 (2106)..........................30

## PRELIMINARY STATEMENT

Plaintiff John Doe (a pseudonym) ("Plaintiff" or "Doe"), a male student expecting to begin his ██████ at Boston College on August 26, 2019 and a ██████████████████ ████, hereby moves, pursuant to Fed. R. Civ. P. 65(a), for a temporary restraining order and a preliminary injunction enjoining Defendants Trustees of Boston College ("BC" or the "College") from enforcing Plaintiff's one-year suspension. In December 2018, fellow BC student Jane Roe filed a complaint alleging Doe sexually assaulted her while she was incapacitated, on November 4, 2018. After the College completed its investigation, Doe was cleared of the charge alleging Roe was unable to consent due to incapacitation, finding he "neither knew, nor reasonably should have known, that [Roe] was incapacitated by alcohol during his sexual interaction with her." Nonetheless, the Investigators abandoned the theory they had initially charged him with and instead found Doe responsible for non-consensual sexual contact, an allegation that was not supported by sufficient evidence. On June 18, 2019, Plaintiff was issued a suspension from the College, which banned him from the campus for the fall semester of 2019 and spring semester of 2020. The decision was upheld when Doe's appeal was denied, on July 24, 2019.

In addition to delaying his academic progress and expected graduation date, the suspension will have the effect of preventing Plaintiff, a ██████████████████████, from remaining on the BC ██████████, thus eliminating his ██████████████ and destroying his chances of ██████████████████████. Given the university appeal was denied on July 24, 2019, Plaintiff respectfully makes application for a temporary restraining order and a preliminary injunction that will allow him to resume his studies and remain on BC's ██████████ forthwith.

In a Complaint filed in this Court on July 29, 2019, Plaintiff sets forth in detail how BC engaged in Title IX prohibited sex discrimination, violated Plaintiff's contract with BC, and deprived Doe of his fundamental right to a fair process when it erroneously found Plaintiff

responsible for "Sexual Assault" despite the breadth of evidence establishing that the encounter was consensual. The College unjustly sanctioned Plaintiff, a ███████, with undue severity in order to demonstrate its aggressive stance against male perpetrators of sexual assault. As shown herein, Plaintiff meets the requirements for a temporary restraining order and a preliminary injunction: irreparable injury, a substantial likelihood of success on the merits, balance of hardships tipping decidedly in Plaintiff's favor and the public interest.

## STATEMENT OF FACTS

For a detailed recitation of the facts, see Plaintiff's Complaint dated July 29, 2019 and Plaintiff John Doe's Declaration in Support of Motion for Temporary Restraining Order and a Preliminary Injunction dated July 26, 2019.

## ARGUMENT

## I.   THE REQUESTED TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION IS PROPER UNDER THE LAW

Plaintiff's motion for a temporary restraining order and preliminary injunction should be granted because, as will be discussed herein, Plaintiff satisfies the four elements for obtaining a temporary restraining order and preliminary injunction: (1) a likelihood of irreparable injury; (2) a likelihood of success on the merits; (3) the balance of hardships tips in the moving party's favor; and (4) the requested injunction is in the public interest. *Shurtleff v. City of Bos.,* 2019 WL 2635622, at *3 (1st Cir. June 27, 2019). "Out of these factors, the likelihood of success on the merits normally weighs heaviest in the decisional scales." *Viken Detection Corp. v. Videray Techs. Inc.,* No2019 WL 2491618, at *6 (D. Mass. June 14, 2019) (internal citations omitted).

A preliminary injunction, while considered an extraordinary remedy, should be issued when necessary to preserve the status quo pending final outcome of a case. *Reuters Ltd v. United Press International, Inc.*, 903 F.2d 904, 909 (2d Cir. 1990). ("[F]or purposes of a preliminary injunction,

the status quo is 'the situation that existed between the parties immediately prior to the events that precipitated the dispute.'")  The "'status quo' does not mean the situation existing at the moment the law suit is filed, but the 'last peaceable uncontested status existing between the parties before the dispute developed.'" *O Centro Espirita Beneficente Uniao Do Vegetal v. Ashcroft*, 389 F.3d 973, 1013 (10th Cir. 2004) (additional citations omitted). *See also LaRouche v. Kezer*, 20 F.3d 68, 74 n.7 (2d Cir. 1994) (same); *Phillip v. Fairfield University*, 118 F.3d 131, 133-134 (2d Cir. 1997). The temporary restraining order and preliminary injunction that Plaintiff seeks here preserves the status quo of his being a student at Boston College.

In a number of recent cases, federal courts have granted the kind of injunctive relief sought here prohibiting schools from implementing discipline against students accused of sexual assault: *See Doe v. Univ. of Michigan,* 325 F. Supp. 3d 821 (E.D. Mich. 2018) (preliminary injunction granted where student accused of sexual assault established likelihood of success on merits of his claim that university's sexual misconduct policy, which afforded neither a live hearing nor cross-examination, violated his right to due process, and demonstrated irreparable harm because expulsion could drastically curtail future educational and employment opportunities, for which money damages could not compensate student.)*; Nokes v. Miami Univ*., 2017 WL 3674910 (S.D. Ohio Aug. 25, 2017) (preliminary injunction granted prohibiting university from suspending student who alleged that the school had acted in violation of his constitutional due process rights to notice and confrontation of adverse witnesses); *Doe v. Pennsylvania State Univ*., 2017 WL 3581672 (M.D. Pa. Aug. 18, 2017) (granting preliminary injunction to student who alleged that school acted in violation of his due process right to confrontation in disciplinary proceedings). *See also Doe v. University of Cincinnati,* 223 F. Supp.3d 704 (S.D. Ohio 2016); *Doe v. Brown Univ.,* 210 F. Supp. 3d 310, 313 (D.R.I. 2016); *Doe v. Univ. of Notre Dame*, 2017 WL 1836939, (N.D. Ind. May 8, 2017); *Ritter v. Oklahoma*, 2016 WL 2659620 (W.D. Okla. May 6, 2016).

## II.   APPLICATION OF THE FOUR-PRONG TEST FOR PRELIMINARY INJUNCTIVE RELIEF ESTABLISHES THAT A TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION SHOULD BE GRANTED

Application of the four-prong test for preliminary injunctive relief establishes that the requested temporary restraining order and preliminary injunction should be granted.

### A.   Plaintiff Will Suffer Irreparable Injury if the Requested Relief is Not Granted.

Plaintiff satisfies the first prong for a preliminary injunction, which is that he will suffer irreparable injury if the requested relief is not granted, and the suspension is immediately enforced. To make a showing of irreparable harm, the moving party must establish that he is subject to a continuing harm that cannot be adequately addressed by final relief on the merits and for which money damages are inadequate. *See LaForest v. Former Clean Air Holding Co.*, 376 F.3d 48, 56 (2d Cir. 2004); *Wisdom Import Sales Co., LLC v. Labatt Brewing Co., Ltd.*, 339 F.3d 101, 113-114 (2d Cir. 2003). In the context of a university disciplinary proceeding, various courts have recognized that "[b]eing labeled a sex offender by a university has both an immediate and lasting impact on a student's life." *Doe v. Baum,* 903 F.3d 575, 582 (6th Cir. 2018). Further, where a plaintiff's "constitutional right to due process is 'threatened or impaired' the Court may presume irreparable injury." *Doe v. Univ. of Michigan,* 325 F.Supp. 3d 821, 829 (E.D. Mich. 2018).

Plaintiff readily makes such a showing here. As of the time of his suspension, Plaintiff was expecting to begin his ████████, in August of 2019. Without injunctive relief, Plaintiff will lose an entire academic year, delaying his anticipated graduation date and postponing his ability to earn an income. He will also be unable to secure employment or obtain admission to a graduate school in the future, as his transcript will be permanently marked with a notation of the disciplinary suspension. Further, Plaintiff will continue to suffer emotional and psychological damage as he has been branded -- unjustifiably -- a sexual predator.

In addition to the damages Doe will suffer as a result of the permanent disciplinary notation on his academic record, Doe will also suffer immense irreparable harm with respect to his ███████████████████. ███████████████ ███ ███ ██████████ ███████████████, ███████████████ ███████████ ███ ███████████████ ███████████ ██████████, ███████████████████████████████████████ █ ██ ██ █, ███████████████████████████████████ ███████████████ ██ █ ██████████████████████████████████████████████████ ███████████████████████ ██ ███████████████ ███████████████████████████████. ███████████████ █ █ ███ ███████████████████████████████████████ ██████████ ███████ █████████████████████████████████████████████████ ███, █████████████████████ ██████ ██████ ████████, ███████████████████████████ ███████████.[1]

For these losses, money damages cannot make him whole. *See, e.g., Doe v. Middlebury, supra,* No. 1:15-cv-192-jgm, 2015 WL 5488109, 2015 U.S. Dist. LEXIS 124540 (while plaintiff may recover money damages to compensate for lost wages, money damages cannot compensate him for loss of his senior year in college with his class, the delay in completing his degree, or the opportunity to begin his future career upon graduation); *King v. DePauw University,* 2014 WL 4197507 (S.D. Ind. Aug. 22, 2014) (if plaintiff not permitted to complete studies, he will forever have either a gap or senior-year transfer on his record, which he will have to explain to future employers or graduate school admissions committees by revealing sexual misconduct finding, and money damages would not provide adequate remedy); *Phillip v. Nat'l Collegiate Athletic Ass'n,*

---

[1] Plaintiff refers the Court to John Doe's Declaration in Support of Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction filed on July 29, 2019 for a more detailed discussion concerning the specific damages and injuries he will suffer with respect to his ██████████████████████, if the requested relief is not granted.

960 F. Supp. 552, 558 (D. Conn. 1997) (plaintiff demonstrated irreparable harm where, if preliminary injunction not granted, plaintiff's education would be interrupted and delayed, perhaps for years); *Maczaczyj v. State of N.Y.*, 956 F. Supp. 403, 408 (W.D. N.Y. 1997) (plaintiff showed irreparable harm where, in absence of injunction, he would not be able to participate in his master's program, which would likely affect ability to engage in future employment of his choice and would have an unquantifiable effect on his mental health).

Based on the foregoing, Plaintiff has adequately demonstrated that, absent the granting of an injunction, he will be irreparably harmed, particularly with respect to his ███████████. Accordingly, Plaintiff satisfies this prong of his request for injunctive relief.

### B. <u>Plaintiff is Likely to Succeed on the Merits of his Claims.</u>

#### *1) Title IX – Erroneous Outcome*

Title IX provides, in relevant part, that "[n]o person in the United States shall, on the basis of sex, be excluded from participation in, be denied the benefits of, or be subjected to discrimination under any educational program or activity receiving Federal financial assistance." 20 U.S.C. § 1681(a). Title IX may be violated by a school's failure to prevent or remedy sexual harassment or sexual assault, *Davis v. Monroe Bd. Of Education*, 526 U.S. 629 (1999), or by the imposition of university discipline where gender is a motivating factor in the decision to discipline, *Yusuf v. Vassar College*, 35 F.3d 709, 715 (2d Cir. 1994). In either case, the statute is enforceable through an implied private right of action. *Yusuf*, 35 F.3d at 714.

*Yusuf* classified challenges to university disciplinary proceedings based on sex discrimination as falling in two categories: (1) "erroneous outcome" cases, in which "the claim is that plaintiff was innocent and wrongly found to have committed an offense"; and (2) "selective enforcement" cases, in which "the claim asserts that, regardless of the student's guilt or innocence,

the severity of the penalty and/or decision to initiate the proceeding was affected by the student's gender." 35 F.3d at 715.

According to *Yusuf*, for either kind of claim, the plaintiff must plead and prove that conduct was discriminatory; for an "erroneous outcome" case, the plaintiff must allege (1) "particular facts sufficient to cast some articulable doubt on the accuracy of the outcome of the disciplinary proceeding" and (2) "particular circumstances suggesting gender bias was a motivating factor behind the erroneous findings," such as (but not only) statements by disciplinary tribunal members and university officials and patterns of decision-making. 35 F.3d at 715.

An "erroneous outcome" occurred in this case because Plaintiff was innocent and wrongly found to have committed sexual assault and gender bias was a motivating factor. Plaintiff easily satisfies the first prong of the erroneous outcome analysis. Facts casting much more than "articulable doubt" on the accuracy of the outcome are described in detail above, but such facts include, without limitation:

a) Doe was not given an opportunity to confront his accuser, even though the finding came down to an assessment of which party's version of events was more credible. This fact alone casts some articulable doubt on the accuracy of the outcome. *See Doe v. Baum*, 903 F.3d 575, 585–86 (6th Cir. 2018).

b) The Investigators overlooked the unambiguous evidence that Roe consented to sexual intercourse with Doe: (i) she consented to the removal of her shorts and assisted Doe in doing so; (ii) Roe stated "I know you want to do it"; (iii) Roe asked Doe to get a condom; (iv) Roe held her underwear to the side and told him to "Do it"; (v) Roe gave verbal instructions during the penetration, such as "go slow" and "hold it there"; and (vi) Roe agreed to switch positions, then turned over onto her stomach.

c) The Investigators disregarded a text message Roe sent to her friend the morning after the encounter wherein she conceded that the encounter was consensual, stating: "it was fine." Instead, they adopted Roe's revisionist explanation that she meant to state "it's fine", as a way to suppress something that was bothering her.

d) While concluding that Roe was highly intoxicated to the point of being unable to make informed, rational judgments and decisions (citing in the Report to 22 distinct reasons why the Investigators believe she was incapacitated) the Investigators nonetheless credit her account as being more reliable than Doe's.

7

e) In her first interview, Roe disputed that she consented to any aspect of the sexual encounter. Yet, in her second interview, she conceded that she agreed to go into Doe's room, consented to "making out" with Doe, that she "probably" instructed Doe to kiss her neck, and that she "did lift up her back so that he could pull her shorts off," all of which corroborated Doe's account. These significant inconsistencies in Roe's statements were never considered by the Investigators when assessing her credibility.

f) BC failed to re-open the investigation to interview Witness ▮▮▮ In Doe's appeal, he noted that after the conclusion of the investigation process, he had become aware of new evidence that directly bore on the issue of Roe's consent to sexual activity. Specifically, ▮▮▮ confided in Doe that he had heard unambiguous signs of consensual sex from the common area of the suite at the time of the relevant sexual activity.

Each of the foregoing casts sufficient doubt on the outcome of the proceeding, to satisfy the first prong of the erroneous outcome analysis. *See Yusuf*, 35 F.3d at 715 ("a complaint may allege particular evidentiary weaknesses behind the finding of an offense such as a motive to lie on the part of a complainant or witnesses, particularized strengths of the defense, or other reason to doubt the veracity of the charge. A complaint may also allege particular procedural flaws affecting the proof."); *Doe v. Miami Univ.,* 882 F.3d 579, 592 (6th Cir. 2018) (articulable doubt cast by arguing that administrative hearing panel did not sufficiently analyze evidentiary inconsistencies); *Norris v. Univ. of Colorado, Boulder,* 362 F. Supp. 3d 1001, 1011 (D. Colo. 2019); *Doe v. Marymount Univ.*, 297 F.Supp.3d at 585–86 (articulable doubt cast by noting a combination of: (1) procedural deficiencies; (2) an adjudicator's decision lacking compelling evidence; and (3) inconsistency in accuser's statements)).

Second, particular circumstances suggest that gender bias was a motivating factor behind the erroneous findings and the decision to impose an unjustly severe penalty upon Plaintiff. These circumstances include, *inter alia:*

a) Upon concluding that the evidence did not support a finding of the violation with which Doe was initially charged (non-consensual sexual contact due to incapacitation), the Investigators unilaterally changed the charge against Doe, after the investigation had been concluded, without providing advance notice of this new charge, or allowing Doe an opportunity to contest it before a final decision was issued.

8

b) The failure to afford Doe the requisite presumption of innocence; BC's Policy repeatedly uses the term "victim" (more than 40 times) when referring to the reporting party/complainant.

c) The Investigators misapplied the preponderance of the evidence standard when they found Roe's account of the events to be more credible than Doe's despite the clear evidence refuting her statements, and the various inconsistencies that should have called her account into question.

d) The Investigators disregarded the clear indications of consent expressed by Roe on the grounds that Doe failed to essentially cross-examine Roe on these particular points during their conversation of December 7 (4 weeks after the encounter, and after Roe's report had been filed).

e) The Investigators deemed Roe's recollection of the events more credible than Doe's, while simultaneously concluding that Roe was highly intoxicated to the point of being unable to make informed, rational judgments and decisions.

f) The College condoned Roe's reporting to Doe's ▇▇▇▇ that someone on the ▇▇▇ had sexually assaulted her. This disclosure occurred before a formal complaint was filed, and before Doe had the opportunity to appear for a first interview to present his account of the events.

g) While the Investigators discussed Roe's demeanor when speaking with her roommates about the alleged incident, they excluded information concerning Doe's reaction to learning of these false charges; i.e. being shocked, scared, upset, and appearing as though he was going to vomit.

The foregoing demonstrates how a bias against Doe as the male accused led to the erroneous finding.

In *Doe v. Brandeis Univ.*, 177 F.Supp.3d 561, 572–73 (D. Mass. 2016), the court recognized that universities across the country have adopted "procedural and substantive policies intended to make it easier for victims of sexual assault to make and prove their claims and for the schools to adopt punitive measures in response." Boston College similarly took steps in response to the issuance of the Dear Colleague Letter, to demonstrate its aggressive stance against sexual assault on campus, with the intent of making the reporting of assaults more easily available to members of the community. Recognizing an increase in the number of reported sexual assaults on

9

campus in 2013, the College revised its Student Sexual Misconduct Policy and the investigative process, in October 2014. Prior to 2014, the investigative process for all conduct matters including those involving sexual misconduct, included the right to have one's case heard before a neutral panel, and the opportunity to introduce evidence and call witnesses. On information and belief, the removal of these procedural safeguards has led to more findings of responsibility, and all students that have been suspended and expelled from BC for sexual assault have been male.

Based on the facts as alleged in the Complaint, Plaintiff is likely to succeed on the merits of his Title IX claim.

### 2)   *Breach of Contract*

Plaintiff satisfies the second prong for a preliminary injunction, as he is also likely to succeed on the merits of his breach of contract claim. It is well settled that "'the basic legal relation between a student and a private university or college is contractual in nature.'" *Johnson v. Schmitz*, 119 F. Supp.2d 90, 93 (D. Conn. 2000), quoting *Ross v. Creighton University*, 957 F.2d 410 (7th Cir. 1992); *accord Burns v. Quinnipiac University*, 120 Conn. App. 311, 320, 991 A.2d 666 (2010) (same). "The terms of the contract may include statements provided in student manuals and registration materials." *Mangla v. Brown Univ.*, 135 F.3d 80, 83 (1st Cir.1998).

Under Massachusetts law, to prove a breach of contract the plaintiff must demonstrate that: 1) "there was an agreement between the parties"; 2) "the agreement was supported by consideration"; 3) "the plaintiff was ready, willing, and able to perform his or her part of the contract"; 4) "the defendant committed a breach of the contract"; and 5) "the plaintiff suffered harm as a result". *Viken Detection Corp. v. Videray Techs. Inc.,* No. CV 19-10614-NMG, 2019 WL 2491618, at *6 (D. Mass. June 14, 2019), *quoting Bulwer v. Mount Auburn Hosp.,* 473 Mass. 672, 46 N.E.3d 24, 39 (2016).

Here, the contract is formed by Boston College's Student Sexual Misconduct Policy and other documents it distributes to its community concerning sexual misconduct. Together, these materials constitute BC's contract with Plaintiff, and the standard for interpreting the contract is that of "reasonable expectation," *i.e.*, "what meaning the party making the manifestation, the university, should reasonably expect the other party to give it." *Doe v. Brandeis Univ.*, 177 F.3d 561, 594 (D. Mass. Mar. 31, 2016); *Doe v. Brown Univ.*, 166 F.Supp.3d 177 (D. R.I. 2016) (same). *See also Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 34 (1st Cir. 2007) (whether the "process [was] carried out in line with [the Plaintiff] student's reasonable expectations"); *Travelers Casualty & Surety Co. of America v. The Netherlands Ins. Co.*, 312 Conn. 714, 740 (2014) (any ambiguity in contract is construed in accordance with reasonable expectations of non-drafting party when that party entered into the contract).

Plaintiff applied to and enrolled at BC and paid associated fees and expenses. Plaintiff did so in reliance on the understanding and with the reasonable expectation that BC would implement and enforce the provisions and policies set forth in its official publications, including the Student Sexual Misconduct Policy. An express contract or, alternatively, a contract implied in law or in fact was formed between Plaintiff and BC. The contract contained an implied covenant of good faith and fair dealing that required any proceedings be conducted with basic fairness. *See Doe v. Trustees of Bos. Coll.,* 892 F.3d 67, 87 (1st Cir. 2018) ("the implied covenant of good faith and fair dealings imposed on every contract by Massachusetts law, applied in the context of school disciplinary proceedings, creates an independent duty to provide basic fairness.")

A number of recent lawsuits challenging the failure to adhere to university procedures have survived preliminary motions as federal courts expressed concern about the failure of schools to comply with their own procedures.  *See e.g, Doe v. Amherst* College, 238 F.Supp.3d 195, 217-218 (D. Mass. 2017) (denying motion for judgment on pleadings for breach of contract for school

11

policies enacted due to OCR pressure); *Naumov v. McDaniel College, Inc*., No. GJH-15-482, 2017 WL 1214406, 2017 U.S. Dist. LEXIS 49887, at *29 (D. Md. Mar. 31, 2017) (rejecting argument that April 4, 2011 Dear Colleague Letter required breach of college handbook); *Collick v. William Paterson Univ*., No. 16-471 (KM) (JBC), 2016 WL 6824374, 2016 U.S. Dist. LEXIS 160359, at *69-70 (D.N.J. Nov. 17, 2016) ("the Complaint sufficiently alleges that Defendants did not adhere to [the school's] own rules, that the procedure they followed was unfair, and that the decision was not based on sufficient evidence"); *Doe v. Brandeis Univ*., 177 F. Supp.3d 561, 600 (D. Mass. 2016) ("the Court concludes that the complaint plausibly alleges that [the school] did not provide 'basic fairness' to" accused student); *Doe v. Lynn Univ., Inc*., 235 F.Supp.3d 1336, 1342 (S.D. Fla. 2017) (plaintiff stated valid claims for of contract and breach of the implied covenant of good faith and fear dealing in connection with sexual assault investigation); *Doe v. Syracuse Univ.*, 2019 WL 2021026, at *11 (N.D.N.Y. May 8, 2019) (Plaintiff adequately pleaded breach of contract claim when specifically referred to "expressly enumerated conditions and rights").

Here, Defendants committed several breaches of their agreements with Plaintiff during the investigation process. A non-exhaustive list of Defendants' breaches includes the following:

### a. *Failure to provide fundamental fairness.*

Boston College's Code of Student Conduct provides that "The student conduct system exists to protect the rights of the Boston College community and assure fundamental fairness to the complainant and to the respondent." Notwithstanding, BC deprived Doe of fundamental fairness in the investigatory process when it (1) deprived Doe of proper notice of the charges; (ii) did not provide him an opportunity to confront or cross-examine his accuser or witnesses; (iii) denied Doe access to all evidence until after he had already been interviewed; (iv) deprived him of an effective appeal; and (v) failed to ensure an independent investigation process when it

permitted two individuals to serve in the roles of investigator and adjudicator. *See* discussion concerning "Breach of Contract/Common Law Denial of Basic Fairness" *infra*.

### b. *Failure to conduct a thorough and impartial investigation.*

The Policy states "For sexual misconduct complaints reported to the Office of the Dean of Students or when the University otherwise determines a thorough investigation and/or conduct action is appropriate, the University…will conduct an investigation of the complaint." Notwithstanding, BC failed to conduct a thorough and impartial investigation of the complaint against Doe, in violation of its own policies and fundamental fairness.

Specifically, the Investigators refused to examine Roe's narrative in the same manner in which they examined what Doe said. While the Investigators took a critical eye to much of what Doe offered (as well as the information provided by some of his witnesses), they were utterly silent on a number of critical inconsistencies and omissions made by Roe. For instance, in her first interview, Roe disputed that she consented to any aspect of the sexual encounter. Yet, in her second interview, she conceded that she agreed to go into Doe's room, consented to "making out" with Doe, that she "probably" instructed Doe to kiss her neck, and that she "did lift up her back so that he could pull her shorts off," all of which corroborated Doe's account. These significant inconsistencies were never considered by the Investigators when assessing Roe's credibility.

BC further failed to conduct a thorough and impartial investigation when it refused to re-open the investigation to interview Roommate 1 In Doe's appeal, he noted that after the conclusion of the investigation process, he had become aware of new evidence that directly bore on the issue of Roe's consent to sexual activity. Specifically, Roommate 1 confided in Doe that he had heard unambiguous signs of consensual sex from his location in the common area of the suite at the time

of the relevant sexual activity.[2] Though the foregoing was unquestionably directly material to the determination of whether Roe did in fact consent to sexual intercourse, the College disregarded this previously unavailable new evidence.

Despite the delayed disclosure of this critical information, the failure of the College to take every step possible to ensure a correct finding, given the severe ramifications to one of its students, resulted in a process that was neither thorough nor impartial.

### c.   Incorrect application of the relevant standard of review.

BC's Policy specifies that the "Investigator's findings as to the responsibility of the respondent will be made using the preponderance of the evidence standard. This standard requires that the information supporting a finding of responsibility be more convincing than the information in opposition to it." Yet, the Investigators violated this provision when they misapplied the preponderance of the evidence standard, to find Roe's account of the events more credible than Doe's despite the clear evidence refuting her statements, and the various inconsistencies that should have called her account into question.

First, while concluding that Roe was highly intoxicated to the point of being unable to make informed, rational judgments and decisions (citing in the Report to 22 distinct reasons why the Investigators believe she was incapacitated) the Investigators nonetheless credited her account as being more reliable than Doe's. There is no rational explanation for this credibility assessment, when it is undisputed that Doe was not intoxicated during the relevant events.

Second, in her first interview, Roe disputed that she consented to any aspect of the sexual encounter. Yet, in her second interview, she conceded that she agreed to go into Doe's room,

---

[2] ▮▮▮▮▮ had not disclosed this information to the Investigators during his interview, due to their hostile questioning of him despite his role as a neutral witness, and for fear of getting into trouble himself, or being perceived as having some prurient intent.

consented to "making out" with Doe, that she "probably" instructed Doe to kiss her neck, and that she "did lift up her back so that he could pull her shorts off," all of which corroborated Doe's account. These significant inconsistencies in Roe's statements were never considered by the Investigators when assessing her credibility. In contrast, the Investigators treated the fact that Doe could not specifically recall whether his wallet containing the condom was located on his desk or in his wardrobe, months after the alleged incident date, as a significant discrepancy, supporting their determination that Doe's account was not reliable and that therefore, Roe did not consent to sexual intercourse.

Third, in her first interview, Roe claimed that she did not know if Doe used a condom during their encounter. During the second interview, Roe stated that she vaguely remembered some conversation about condoms but could not recall what was said. Again, it is unclear how an impartial investigator could arrive at the conclusion that Roe's account was more credible when she provided inconsistent testimony on key points of her complaint.

Fourth, the Investigators erroneously overlooked the unambiguous evidence that Roe consented to sexual intercourse with Doe: (i) she consented to the removal of her shorts and assisted Doe in doing so; (ii) Roe stated "I know you want to do it"; (iii) Roe asked Doe to get a condom; (iv) Roe held her underwear to the side and told him to "Do it"; (v) Roe gave verbal instructions during the penetration, such as "go slow" and "hold it there"; and (vi) Roe agreed to switch positions, then turned over onto her stomach. The combination of the foregoing factors, when considered by any reasonable and properly trained investigator, could only lead to the conclusion that Roe consented to sexual intercourse with Doe. Yet, each of these clear verbal and non-verbal indications of consent were bewilderingly explained away by the Investigators. They reasoned that Doe's failure to essentially cross-examine Roe on these particular points during their conversation of December 7 (4 weeks after the encounter, and after Roe's report had been filed)

established that each of these actions were unlikely to have actually occurred. Had the Investigators applied the correct standard of review, they would have reached the only plausible conclusion- that Roe consented to sexual activity with Doe.

### d. Violation of Confidentiality.

BC's policies afford confidentiality to those involved in an investigation, assuring that all parties "respect the right of confidentiality of other participants" in the process, and affirm that the "unauthorized disclosure of confidential information by participants to persons not involved in the [adjudication] process…may be dealt with as a subsequent charge…" Notwithstanding, Doe's right to confidentiality was violated when, with the approval of the College, Roe reported to his ███ that someone on the ███ had sexually assaulted her. This disclosure occurred before a formal complaint was filed, and before Doe had the opportunity to appear for a first interview to present his account of the events. With only three ███ on the ██, his ███ was readily able to determine that Doe was the one accused, and called Doe into his office to ask him about the situation the day before his first interview. Approximately one week later, the ███ held a meeting with the entire ██, during which he generally addressed the issue of consent, and provided a warning about the meaning of consent.

At no time did BC take any action in response to Roe's disclosure of this confidential and highly private information to a third-party. This action on the part of Roe, and inaction on the part of the College, illustrated the College's bias against Doe, and predetermination of his guilt. There is no other logical explanation for the College allowing someone who alleges a claim of sexual assault to disclose that allegation to an ███, prior to the accused having any opportunity to defend himself. The foregoing constituted a clear violation of his rights to confidentiality and privacy in the process.

16

### e. Breach of the obligation to presume Doe innocent of the charges and assign the burden of proof to the University.

BC's Policy does not include a provision that specifically addresses the presumption of innocence, or which party is assigned the burden of proof. However, both the accused's right to fundamental fairness and the implied covenant of good faith and fair dealing required that Doe be presumed innocent, and that the College have the burden of proof to establish otherwise. BC violated this obligation when it presumed Doe guilty from the outset and operated from the presumption that Doe was responsible for a violation of the College's Policy.

BC's presumption of Doe's guilt was apparent when the Investigators, upon discovering that the evidence did not support a finding of the violation for which Doe was charged, changed the charge against him in order to ensure some finding of responsibility. The Investigators unilaterally changed the charge against Doe, after the investigation had been concluded, without providing advance notice of this new charge, or allowing Doe an opportunity to contest it before a final decision was issued.

Further demonstrating the College's failure to afford accused students the requisite presumption of innocence, BC's Policy repeatedly uses the term "victim" (more than 40 times) when referring to the reporting party/complainant. However, "[w]hether someone is a 'victim' is a conclusion to be reached at the end of a fair process, not an assumption to be made at the beginning." *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 573 (D. Mass. 2016).

The foregoing reveals a process in which Doe was presumed guilty from the time the complaint was received, and the investigation was conducted to reach this predetermined result.

### f. The Investigators failed to complete the investigation within 60 days.

BC's Policy provides that the College will endeavor to complete its investigation within 60 days and will keep the parties apprised of when the investigation will continue beyond that time

17

frame. Notwithstanding, the investigation and adjudication took nearly eight months, far more than the 60 days indicated in BC's Policy.

Roe alerted BC officials on November 7 of her allegation and informed BC she wanted to go forward with an investigation on December 7, 2018. Doe was not interviewed until January 29, 2019, 53 days after Roe alerted the school she wanted to proceed with an investigation, and 83 days after the sexual encounter. This was particularly problematic in that Doe's recollection about minor details (i.e. whether he retrieved the condom from his wardrobe or his desk) were assigned great significance in the Investigators' ultimate decision as to which party was more credible.

On March 27, 2019 Doe received a "Timeline Update" from Dean O'Driscoll in which she anticipated the Evidence Binders would be available at the "beginning of next week." However, after being given access to the binder and submitting his response, the next notice Doe received about the progress of the Report was on May 1. Doe was told that they were working on the Report and that he would be alerted after finals. His finals ended on May 10. He finally received the Report on June 18. Notably, the Investigators took the entire time the Code allows for them to complete an investigation (60 days) to write the Report.

The foregoing violations, individually and in the aggregate, resulted in a process that was neither fair nor impartial, ultimately contributing to an erroneous finding against Doe and the resultant damages to his academics and professional ███████. Consequently, Doe has established the likelihood of success on his breach of contract claim.

### 3) *Breach of Contract/Common Law Denial of Basic Fairness*

Plaintiff is also likely to succeed on the merits of his third cause of action- breach of contract/common law denial of basic fairness. Massachusetts courts recognize that a private university may not act "arbitrarily or capriciously" in disciplining a student. *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 600 (D. Mass. 2016). Specifically, "[s]chool disciplinary hearings must be

"conducted with basic fairness." *Cloud v. Trustees of Boston University*, 720 F.2d 721, 725 (citing *Coveney v. President & Trustees of Holy Cross College,* 445 N.E.2d 136, 139 (1983); *Schaer v. Brandeis University*, 432 Mass. 474, 481, 735 N.E.2d 373, 380 (2000). The California Court of Appeal, Second District similarly discussed the requirements of a fair hearing in the private university disciplinary context in *Doe v. Allee* (30 Cal. App. 5th 1036, 1061, 242 Cal. Rptr. 3d 109, 130 (Ct. App. 2019)). The Court in *Allee* affirmed that "[f]or practical purposes, common law requirements for a fair disciplinary hearing at a private university mirror the due process protections at public universities." Accordingly, "when a private university student faces serious discipline for alleged sexual misconduct, and the credibility of witnesses is central to the adjudication of the charge, fundamental fairness requires that the university must at least permit cross-examination of adverse witnesses at a hearing in which the witnesses appear in person or by some other means…before one or more neutral adjudicators with the power independently to judge credibility and find facts." *Id.*

Boston College's obligation to provide basic fairness in its proceedings is separate from and in addition to its contractual obligation to follow the rules it set forth in its policies. *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 601 (D. Mass. 2016). Thus, Defendants had a duty, either under an express or implied contract or as a matter of common law, to ensure that the proceedings against Plaintiff were conducted in good faith and with basic fairness.

While "'Basic fairness' is an uncertain and elastic concept, and there is little case law to serve as guideposts in conducting the fairness inquiry" (*Doe v. Brandeis Univ.,* 177 F. Supp. at 601), "there are two principal threads to the "fairness" inquiry. The first is procedural fairness— that is, whether the process used to adjudicate the matter was sufficient to provide the accused student a fair and reasonable opportunity to defend himself. The second is substantive fairness—

19

that is, even if the procedure was fair, whether the decision was unduly arbitrary or irrational, or tainted by bias or other unfairness. *Doe v. Brandeis,* 177 F.Supp. 3d at 602.

### a) *Failure to provide proper notice of the charges.*

Fair process requires that an accused be notified of the allegations against him. *Goss v. Lopez,* 419 U.S. 565 (1975); *Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 603 (D. Mass. 2016). Notwithstanding, Doe was ultimately found responsible for conduct in violation of BC's Policy that differed from the alleged violation with which he was initially charged.

In the January 23, 2019 Notice to Appear, Dean O'Driscoll advised that he was under investigation for engaging in non-consensual sexual contact with Roe while she was incapacitated, and pointed to the relevant policy sections that were implicated by these allegations. Based on this notice, Doe understood the charges against him to relate to an allegation that Roe was unable to consent due to her incapacitation at the time of the sexual encounter. The letter outlining the charges against Doe was clearly based on the evidence collected during the Investigators' two interviews with Roe, which had spanned over nearly three and a half hours, on January 14 and January 18. Based on the information obtained in those interviews, Dean O'Driscoll sent to Doe the notification of charges the following week.

There was no question, as outlined in the January 23 letter, that the investigation revolved around whether Roe was incapacitated and thus, unable to consent. This fact was confirmed by the Investigators' focus on this issue throughout witness interviews. Numerous people who were present at a party Roe attended before her interactions with Doe were interviewed to discuss this particular issue. Her roommate, with whom she interacted immediately before seeing Doe at ██, was interviewed. People with whom she interacted at ████ and afterwards were interviewed. The interview notes of all of these people almost exclusively centered around whether or not Roe was incapacitated.

In fact, the Investigatory Report itself reiterated that the investigation involved non-consensual activity "all while (Roe) was incapacitated and therefore unable to consent to sexual interaction." Accordingly, based on Doe's understanding of the charges against him, as presented by both Dean Kelly and Dean O'Driscoll, he approached his two investigatory interviews with the objective of disputing Roe's claims that she was incapacitated and thus, unable to consent to sexual activity. However, in issuing their findings, the Investigators cleared Doe of those allegations, changed the theory of the case without providing him notice, and instead found him responsible for allegations supported by different policy sections. At the conclusion of the investigation, Doe was cleared of the charge alleging Roe was unable to consent due to incapacitation. The Investigatory Report specifically found that he "neither knew, nor reasonably should have known, that [Roe] was incapacitated by alcohol during his sexual interaction with her."

Nonetheless, the Investigators abandoned the theory they had charged him with and then found him responsible for an allegation that was not supported by sufficient evidence. Recognizing their error, the Investigators attempted to address this change in the charge in the Report. They noted that they exonerated Doe of the incapacitation charge, but then argued that this exoneration "meant that the Investigators had to consider whether [Roe] provided [Doe] with the consent that the Policy requires to be present in every sexual interaction between individuals within its scope."

This assertion disingenuously suggests that the investigative process was divided into two parts: first, to determine whether a reasonable person in his position would have understood her to be incapacitated and second, whether Roe consented. This was not the case. After interviewing Roe for over three hours, the Investigators and/or Dean Kelly concluded that the only viable charge against Doe was under an incapacitation theory. However, after completing the investigation, and discovering that the evidence irrefutably revealed Roe did not appear to numerous people as though she was incapacitated, the Investigators asserted that their investigation must follow some

21

undefined two-step process wherein, after the evidence fails to support the actual charge, it somehow defaults to a more general inquiry as to consent. Nowhere in the Policy is there authority for such an approach. In fact, Dean Kelly's letter reveals the opposite is true as it specifically stated: "(i)f during the investigation there are additional allegations, we would provide an updated notice to you." At no time did Doe receive such an updated notice.

Had Doe been made aware, prior to appearing for an interview and formulating his defense to the charges, that the central issue in dispute concerned not whether Roe was *unable* to consent due to alcohol incapacitation but instead, whether or not she consented to the activity, he would have taken a different approach to his defense- for instance, highlighting the specific words and actions that demonstrated she was an active and willing participant, rather than focusing on the behaviors that demonstrated she was not incapacitated.

The Investigators' decision to change the charge against Doe after the investigation had been concluded, without providing advance notice of this new charge, or allowing Doe an opportunity to contest it before a final decision was made was a clear violation of Doe's rights to a fair process.

### b) *Depriving Doe of an opportunity to confront or cross-examine his accuser.*

BC deprived Doe of basic fairness when it did not permit him an opportunity to confront or cross-examine his accuser, either directly or through counsel. *See Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 604–05 (D. Mass. 2016) ("In the famous words of John Henry Wigmore, cross-examination is "beyond any doubt the greatest legal engine ever invented for the discovery of truth." 3 Wigmore, Evidence § 1367, p. 27 (2d ed. 1923)).

The ability to cross-examine is most critical when the issue is the credibility of the accuser. *See Donohue v. Baker*, 976 F.Supp. 136, 147 (N.D.N.Y.1997) ("[I]f a case is essentially one of credibility, the 'cross-examination of witnesses might [be] essential to a fair hearing.'") (quoting

*Winnick v. Manning*, 460 F.2d 545, 550 (2d Cir.1972)).") *See also Univ. of Cincinnati*, 872 F.3d 393, 401 (6th Cir. 2017) ("Few procedures safeguard accuracy better than adversarial questioning.") As in *Brandeis,* here, "[t]he entire investigation thus turned on the credibility of the accuser and the accused. Under the circumstances, the lack of an opportunity for cross-examination may have had a very substantial effect on the fairness of the proceeding." *Doe v. Brandeis Univ.,* 177 F. Supp. 3d at 605.

### c) *Depriving Doe of an opportunity to cross-examine witnesses.*

For the same reasons articulated above, BC's failure to permit Doe an opportunity to cross-examine witnesses, either directly or indirectly, deprived him of a fair process.

### d) *Failure to provide Doe access to all evidence collected.*

Prior to appearing for his first interview, the only information presented to Doe was the initial Notice to Appear. Even though Roe had, as of January 23, 2019, appeared for two interviews lasting more than three hours, BC's Policy does not permit the Investigators to provide the respondent with copies of a complainant's interview summaries, any documentary evidence gathered at that point, or other evidence collected.

Instead, Doe was not permitted to review the evidence against him (aside from being confronted with printouts of certain text messages he had never seen before in the midst of his second interview on March 11, 2019), to which he was required to respond in the interviews, until he was given access to the Evidence Binder on April 5, 2019. Though permitted to submit a response to the Evidence Binder, the points raised in his submission were entirely disregarded when the Investigators, unable to find him responsible for the initial charges, abandoned the incapacitation argument and pursued a new theory of the case against him.

*e) Denial of the right to an effective appeal.*

Doe did not have the right to an effective appeal. BC limits appeals to two grounds: (1) material procedural error that likely adversely affected the outcome; or (2) previously unavailable information that likely would have affected the outcome. These narrow grounds deprive a student found responsible for the charges of an opportunity to contest the finding on all available grounds, despite the severe ramifications of a responsibility finding. *See Doe v. Brandeis Univ.,* 177 F. Supp. 3d 561, 607 (D. Mass. 2016) ("Conspicuously absent from that list is the ability to appeal on the ground that the Special Examiner's decision was not supported by the evidence, or that it was otherwise unfair, unwise, or simply wrong.")

In Doe's appeal, he described how BC engaged in substantial procedural errors including: (i) BC failed to notify Doe of the allegations against him, when he was found responsible for conduct in violation of the Policy that differed from the alleged violation with which he was initially charged; (ii) the Investigators failed to complete the investigation within 60 days; (iii) the Investigators misapplied the preponderance of the evidence standard; (iv) the Investigators required Doe to prove his innocence rather than affording him a presumption of innocence; (v) the Investigators did not examine whether the encounter was consensual as demonstrated through both words and actions; (vi) the investigation was not thorough or impartial; (vii) Doe was not permitted to review his accuser's statements, witness statement or any evidence until after he had appeared for two interviews; (viii) BC does not provide a hearing in cases of sexual misconduct while providing hearings in other conduct matters; and (ix) BC failed to ensure confidentiality in the process when it permitted Roe to discuss the allegations with Doe's ██████. Further, Doe described that he had recently become aware of new evidence that was not available to him during the investigation process, which would affect the finding of non-consent- specifically, one of the

24

witnesses previously interviewed confided in Doe that he had been present in the suite during the sexual encounter and had heard unambiguous signs of consensual sex from both parties.

On July 24, 2019, Vice President for Student Affairs Joy Moore denied Doe's appeal, on the grounds that it did not state a valid ground for appeal in accordance with BC's Policy. In arriving at this decision, Vice President Moore overlooked each of Doe's articulated procedural arguments, reasoning that the points raised amounted to Doe's personal views concerning how the evidence was weighed, rather than procedural errors. She further concluded that regardless of any such errors, the outcome would not have changed. Vice President Moore also declined to consider the material information provided by Roommate 1 after the investigation process concluded as "new evidence," on the grounds that such information was "available" when Roommate 1 was interviewed. In this way, Vice President Moore penalized Doe for the Investigators' failure to conduct a thorough investigation in which they obtained all critical information from relevant witnesses.

Second, Defendants breached the duty of good faith and basic fairness because they failed to afford Doe substantive fairness when the College issued a decision that was unduly arbitrary and irrational, and was tainted by bias or other unfairness. *Doe v. Brandeis,* 177 F.Supp. 3d at 602. *See* discussion concerning Title IX- Erroneous Outcome *infra.*

The investigation process and findings thus violated the contractual relationship. Defendants' breach of the duty to ensure basic fairness proximately caused Plaintiff to sustain substantial injury, damage, and loss, including, but not limited to: mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

*f)* **Failure to separate the investigation and adjudication process.**

BC's Policy employs an investigative model whereby one or more internal and/or external investigators interview the parties and witnesses, collect evidence, prepare a report, and make

25

findings of responsibility, which may only be challenged on very limited grounds. This failure to separate out the investigation and adjudication functions results in a process that deprives an accused of a fair process. This is so because "[t]he dangers of combining in a single individual the power to investigate, prosecute, and convict, with little effective power of review, are obvious. No matter how well-intentioned, such a person may have preconceptions and biases, may make mistakes, and may reach premature conclusions." *Doe v. Brandeis,* 177 F. Supp. at 606.

Under the single (or in this case, dual) investigator model, as one federal district judge has described the process, a single individual "is given complete authority to decide whether the accused [is] 'responsible' for the alleged violations," acting "simultaneously [as] the investigator, the prosecutor, and the judge who determine[s] guilt." *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 579 (D. Mass. 2016). This model contrasts with the procedures employed by BC in non-sexual misconduct related disciplinary matters where the accused is afforded a live hearing before a hearing panel, with an opportunity to submit questions for his accuser.

The investigator model has been criticized by judges and commentators because it is an inquisitorial, as opposed to adversarial, process; it offers no checks or balances against investigator bias, including unconscious sexual bias; it allows a single individual to act as prosecutor, investigator, judge, and jury determining guilt; and it allows the investigator to find the accused guilty without ever affording him a hearing where evidence can be confronted, witnesses questioned, and the accuser cross-examined. Doe's inability to present his case before an impartial and separate adjudication panel substantially prejudiced him and may have adversely affected the outcome. The foregoing constituted violations of Doe's right to a fair process.

### 4) *Estoppel*

Plaintiff is also likely to succeed on his equitable estoppel claim. To establish a claim of equitable estoppel in Massachusetts, a plaintiff must demonstrate: (1) a representation, or conduct

amounting to a representation, intended to induce a course of conduct on the part of the person to whom the representation was made, (2) an act or omission resulting from the representation by the person to whom the representation was made, and (3) detriment to the person as a consequence of the act. *Boutilier v. John Alden Life Ins. Co.,* 2000 WL 1752623, at \*9 (D. Mass. Sept. 29, 2000).

The Complaint describes that BC expected or should have expected Doe to accept its offer of admission and offer to join its ███████████, incur tuition and fees expenses, and choose not to attend other colleges based on its express and implied promises that BC would not tolerate, and Doe would not suffer, discrimination or harassment by fellow students or faculty members and would not deny Doe his procedural rights should he be accused of a violation of BC's policies. Doe did in fact rely to his detriment on these express and implied promises and representations made by BC, by choosing to attend BC rather than other schools of equal caliber and paying the required tuition and fees. Based on the foregoing, BC is liable to Doe based on Estoppel.

### 5) *Negligence*

Finally, Plaintiff is likely to succeed on the merits of his negligence claim. To recover in an action for negligence in Massachusetts, the plaintiff must satisfy the elements of (1) a legal duty owed by defendant to plaintiff; (2) a breach of that duty; (3) proximate or legal cause; and (4) actual damage or injury. *Doe v. Emerson Coll.,* 153 F. Supp. 3d 506, 514 (D. Mass. 2015). In conducting its investigation and adjudication of Roe's complaint against Doe, the College owed Doe a common law duty to exercise reasonable care, with due regard for uncovering the truth, applying the College's fairly and impartially, appreciating the severity of the charges and potential consequences, and in consideration of Doe's fundamental rights to a fair process.

Through the acts set forth above, the College breached its duty by carelessly, improperly, and negligently performing its investigation and adjudication and facilitating a process that violated the rights and interests of Doe.

Specifically, the College has negligently trained and supervised the individuals it employs to serve as investigators and adjudicators in Title IX disciplinary proceedings. Evidence of the College's negligent training and selection of its investigators was made apparent by, among other things, the fact that, upon discovering that the evidence did not support a finding of a policy violation, the Investigators decided to change the charge against Doe after the investigation had been concluded, without providing advance notice of this new charge, or allowing Doe an opportunity to contest it before issuing a final decision.

Moreover, the College was negligent when it failed to take any action in response to a clear violation of Doe's right to confidentiality in the process. Specifically, Roe reported to Doe's ███ that someone on the ███ had sexually assaulted her. This disclosure occurred before a formal complaint was filed, and before Doe had the opportunity to appear for a first interview to present his account of the events. This inappropriate disclosure was condoned by the College as Roe was accompanied to this meeting by Senior Associate █████████████████████.

A non-negligent university conducting a Title IX disciplinary proceeding would have ensured that its personnel were thoroughly familiar with its procedures and capable of carrying them out in a fair and impartial manner to ensure a correct outcome.

As a direct result of the College's negligence, and as a direct and proximate cause thereof, Doe has been seriously and irreparably damaged as follows: he has suffered mental anguish; severe emotional distress; injury to reputation; past and future economic loss; deprivations of due process; loss of educational opportunities; and loss of future career prospects.

### C. __The Balance Of Hardships Tips Decidedly In Plaintiff's Favor.__

Plaintiff satisfies the third prong for a preliminary injunction, which is that the balance of hardships tips decidedly in Plaintiff's favor. As noted above, without injunctive relief, Plaintiff will lose an entire academic year, delaying his anticipated graduation date and postponing his

ability to earn an income. In addition, Plaintiff will lose his ███████ on the BC ████████████, thus eradicating his ███████████ eligibility and preventing him from ever being ███████ by a ████ ████████████████████████. He will also be unable to secure employment in another field or obtain admission to a graduate school, as his transcript will be permanently marked with a notation of the disciplinary suspension.

Plaintiff faces severe hardships if injunctive relief is not granted. Thus, "in the absence of a preliminary injunction [Plaintiff] will continue to suffer real, unavoidable consequences even if he wins this suit." *King v. DePauw Univ.,* No. 2:14-CV-70-WTL-DKL, 2014 WL 4197507, at \*14 (S.D. Ind. Aug. 22, 2014). In contrast, granting an injunction to reinstate Plaintiff places no real hardship on BC. Throughout the course of BC's 6 month's long investigation process, Plaintiff continued his studies, and remained on campus and on the ████████████ without issue. The only restriction BC placed upon him was a mutual Stay Away Order, which Plaintiff faithfully abided by, also without issue. Consequently, his reinstatement would simply restore the status quo prior to his suspension. If BC ultimately prevails on the merits, the Court can then direct that Doe serve his suspension and that BC maintain Plaintiff's disciplinary record in its files.

Evidently, the balance of hardships tips decidedly in favor of granting the temporary restraining order and preliminary injunctive relief. *See King v. DePauw Univ*., *supra*, 2014 WL 4197507,\*14 (finding the balance of harm in student's favor even though university has "interest in enforcing its own rules of conduct"…because "the harm [university] will have suffered by [student's] court-ordered return to campus . . . , while real, will not be as great as the harm [student] will have suffered if he is not permitted to return to campus but ultimately wins.")

### D. The Requested Injunction Is In The Public Interest.

Plaintiff satisfies the fourth prong for a preliminary injunction, which is that the requested injunction is in the public interest. What should be clear is that the public, as well as the parties

involved in this lawsuit, have a shared interest in the fairness, reliability, and transparency of these proceedings. *See*, *e.g.*, Nancy Gertner, *Complicated Process*, 125 Yale L.J. Forum 442, 448-449 (2106) ("There is . . . 'a real contest about where the line between sex and sexual violence or harassment is, and as with all lines, there will be uncertainty over where some marginal cases fall.' An administrative framework – the 'sex bureaucracy' – policing these lines with few procedural protections, and less than transparently, raises . . . questions about fairness").

The regime of the April 4, 2011 Dear Colleague Letter led to campus sexual misconduct tribunals where there is use of prosecutorial "investigation," lack of reasoned decision-making, presumption of male guilt, a failure to apply the burden of proof in fact, denial of meaningful appeal, manifest bias against males and unfair hearings. That the public is not served by such proceedings was recognized by Department of Education Secretary Betsy DeVos, who in vacating the April 4, 2011 Dear Colleague Letter rightly denounced these proceedings as involving denials of due process that are wholly un-American: www.ed.gov/news/speeches/secretary-devos-prepared-remarks-title-ix-enforcement. Granting the requested temporary restraining order and preliminary injunction in this case serves the public interest.

## CONCLUSION

For the reasons stated above, the Court should grant a temporary restraining order and preliminary injunction restraining Defendants from suspending Plaintiff from Boston College pending the adjudication of the merits of the Complaint.

## REQUEST FOR EVIDENTIARY HEARING

**PLAINTIFF HEREBY REQUESTS AN EVIDENTIARY HEARING ON THIS MOTION.**

Dated:   New York, New York
         July 29, 2019

Respectfully submitted,

NESENOFF & MILTENBERG, LLP
*Attorneys for Plaintiff John Doe*

By: */s/ Tara J. Davis*
Andrew T. Miltenberg, Esq. (*pro hac vice* pending)
Stuart Bernstein, Esq. (*pro hac vice* pending)
Tara J. Davis, Esq. (BBO # 675346)
363 Seventh Avenue, 5th Floor
New York, New York 10001
(212) 736-4500
amiltenberg@nmllplaw.com
sbernstein@nmllplaw.com
tdavis@nmllplaw.com