# EXHIBIT E

June 27, 2019

**By EMAIL:**
Appeal Officer
Boston College
140 Commonwealth Avenue
Chestnut Hill, MA 02467

      Re:  **Appeal of** ██████████████

To Whom it May Concern:

  I submit this appeal of the decision dated June 18, 2019 which found me responsible (the "Decision") for a violation of the Sexual Assault provision of the Boston College ("BC" or the "College") Student Sexual Misconduct Policy 2018-2019 (the "Policy") and issued a sanction of suspension, stemming from an alleged incident that occurred on November 4, 2018 involving ██████████████ ("Complainant" or "██████").

  First, and most importantly, I would like you to know that I have never in my life been involved in any disciplinary process, and my moral and ethical standards are from an upbringing such that I would never think to engage in the type of behavior of which I have been accused. I was raised in a close-knit family, in which I was taught the importance of respect and compassion for others, especially for the women in my life. I have always lived by the mantra of "paying it back and paying it forward," which has been reflected in my dedication to volunteer work, in fighting for what is right, and for assisting those in need. I chose to attend Boston College because it allowed me to pursue my dreams of not only ██████████████ ██████████████ but also because it would provide me with a degree from the ██████████████████████████ which opens the door to preeminent career opportunities. I am extremely grateful to be pursuing my academic and ████████ careers here and would never engage in conduct that could jeopardize that. Furthermore, I would never intentionally cause harm to anyone and am deeply distressed about the false allegations made against me.

  I am appealing the Decision on the grounds that (1) BC committed material procedural errors that likely adversely affected the result of the conduct adjudication, and (2) I have recently become aware of new evidence that was unavailable to me at the time of the adjudication process, which would have likely affected the finding. Accordingly, I respectfully request that the Decision finding me responsible for a violation of the Policy be reversed, and the sanction of suspension be vacated.

**I.**  **Procedural errors that unfairly and materially affected the outcome of the case.**

  BC engaged in substantial procedural errors that adversely affected the outcome of the case when the Investigators failed to notify me of the allegations against me, incorrectly applied the standard of review, operated from the presumption that I was guilty of the misconduct alleged, sought to collect evidence that supported their conclusion and disregarded potentially exculpatory

1

evidence. The shoddy and superficial investigation process was replete with procedural errors that deprived me of a fair proceeding, as outlined below.

    A.    <u>BC failed to notify me of the allegations against me.</u>

Fair process requires that an accused be notified of the allegations against him. Notwithstanding, I was ultimately found responsible for conduct in violation of BC's Policy that differed from the alleged violation with which I was initially charged. In the January 23, 2019 Notice to Appear, Dean O'Driscoll advised that I was under investigation for engaging in non-consensual sexual contact with the Complainant while she was incapacitated, and pointed to the relevant policy sections that were implicated by these allegations. Based on this notice, I understood the charges against me to relate to an allegation that Complainant was unable to consent due to her incapacitation at the time of our encounter. The investigative team then cleared me of those allegations, changed the theory of the case without providing me notice, and found me responsible for allegations supported by different policy sections.

I met with Dean Corey Kelly on December 14, 2018 and, as the Investigatory Report states, I was specifically informed that I would receive written notification of ▇▇▇ allegations **and the policy sections that were implicated by those allegations**, from Dean Kristen O'Driscoll. (page 3). I then (over a month later) on January 23, 2019 was notified that the allegation against me was that I engaged in "non-consensual sexual contact through kissing and touching of intimate body parts and penetrating her vagina with (my) penis **without her consent while ▇▇▇ was incapacitated**." The letter also underscored the school's position that **"(i)f during the investigation there are additional allegations, we would provide an updated notice to you."**

The letter outlining the charge against me (sexual intercourse with an incapacitated person) was obviously based on the Investigators' interviews of ▇▇▇. At the time of the January 23, 2019 letter, ▇▇▇ had been interviewed twice: on January 14, 2019 for two hours and on January 18 for another hour and 15 minutes. Based on these interviews, I was sent the above-referenced letter the following week. I was accused of having nonconsensual sex with ▇▇▇ while she was incapacitated. The Investigators decided that this was the appropriate charge and then proceeded to investigate that charge.

There is no question, as outlined in the January 23 letter, that the investigation was focused on whether or not ▇▇▇ was incapacitated. The investigation revolved around how much she had to drink. Numerous people were interviewed from a party she attended before our interactions. Her roommate, with whom she interacted immediately before seeing me at ▇▇▇, was interviewed. People with whom she interacted at ▇▇▇ and afterwards were interviewed. The interview notes of all of these people almost exclusively centered around whether or not ▇▇▇ was incapacitated, i.e. what I was charged with. In fact, the Investigatory Report itself in the, "Scope of the Investigation," section reiterates that the investigation involved non-consensual activity "all while (▇▇▇) was incapacitated and therefore unable to consent to sexual interaction." Accordingly, based on my understanding of the charges against me, as presented by both Dean Kelly and Dean O'Driscoll, I approached my two investigatory interviews with the objective of disputing Complainant's claims that she was incapacitated and thus, unable to consent to sexual activity.

2

At the conclusion of the investigation, I was cleared of this charge. The Investigatory Report specifically found that I "neither knew, nor reasonably should have known, that ▇▇▇ was incapacitated by alcohol during (my) sexual interaction with her." Nonetheless, the Investigators abandoned the theory they had charged me with (only after there was indisputable evidence that no reasonable person would have believed she was incapacitated) and then found me responsible for an allegation that, on its face, was not supported by sufficient evidence when her narrative was vetted by the Investigators (i.e. she did not give me express consent to have sex with her). And to be clear, the flaws in ▇▇▇ initial narrative (discussed below) could never be meaningfully remedied by any investigation as there were only two of us in the room.

The Investigators clearly recognized this error and attempted to address it in footnote 115. They note that they exonerate me of the incapacitation charge they were investigating, but then argue that this exoneration "meant that the Investigators had to consider whether ▇▇▇ provided [me] with the consent that the Policy requires to be present in every sexual interaction between individuals within its scope." This assertion disingenuously suggests that the investigative process was divided into two parts: first, to determine whether a reasonable person in my position would have understood her to be incapacitated and second, whether ▇▇▇ consented. This is not the case. These two theories are utterly incompatible. Ironically, it was the investigative team who determined this after listening to ▇▇▇ describe her memory of that evening for over three hours. They vetted her narrative and concluded the only viable charge against me was under an incapacitation theory.

The Policy defines Consent as

"…the clear and voluntary agreement to engage in particular sexual activity, communicated through mutually understandable words or actions. Consent is always freely informed and actively given. Silence or lack of resistance cannot be assumed to imply consent. Consent must be ongoing and if may be withdrawn at any time. Consent for one sexual act does not imply consent for any subsequent sexual activity. Consent may never be obtained through use of coercion, intimidation, force, or threats."

"Consent cannot be obtained from an individual who is incapable of giving consent because the person…(i)s incapacitated, including through the consumption of alcohol or drugs."

The Investigators could have charged me under the theory that ▇▇▇ did not convey consent if they believed her narrative, in any conceivable way, could support that claim. It did not. Now, when the evidence irrefutably revealed ▇▇▇ did not appear to numerous people (including her own roommate) as though she was incapacitated, the Investigators assert that their investigation must follow some undefined two-step process wherein, after the evidence fails to support the actual charge, it somehow defaults to a more general inquiry as to consent. Nowhere in the Policy is there authority for such an approach. In fact, Dean Kelly's letter reveals the opposite is true as it specifically stated: "(i)f during the investigation there are additional allegations, we would provide an updated notice to you." At no time did I receive such an updated notice.

Had I been made aware, prior to appearing for an interview and formulating my defense to the charges, that the central issue in dispute concerned not whether Complainant was *unable* to consent due to alcohol incapacitation but instead, whether or not she consented to the activity, I would have had a completely different focus when alerted on January 23. The encounter happened on November 4. Therefore, the passage of time between my interview and the incident was significant. After reading the January 23 letter my focus was on the incapacitation issue in light of the information I was provided. As discussed further below, I was not as concerned about certain facts, such as where in my room I retrieved the condom from, as the January 23 letter suggests these types of facts were peripheral to the thrust of the investigation: ▓▓▓ incapacitation. Nonetheless, these were precisely the types of topics the investigators focused on as they soon learned ▓▓▓ did not appear incapacitated to a number of independent witnesses.

Moreover, prior to appearing for my first interview, the only information presented to me was the initial Notice to Appear. Even though Complainant had, as of January 23, 2019, appeared for two interviews lasting more than three hours, the Investigators failed to provide me with copies of Complainant's interview summaries, any documentary evidence gathered at that point, or other evidence collected. Instead, the Investigators left me in the dark, hindering my ability to meaningfully respond to the allegations against me. In fact, I was not permitted to review the evidence against me (aside from being confronted with printouts of certain text messages I had never seen before in the midst of my second interview on March 11, 2019), to which I was required to respond in my interviews, until I was given access to the Evidence Binder on April 5, 2019. Though permitted to submit a response to the Evidence Binder, as discussed in further detail below, the points raised in my submission were entirely disregarded when the Investigators, unable to find me responsible for the initial charges, abandoned the incapacitation argument and pursued a new theory of the case against me. Specifically, the Investigators' new theory of the case was that although a reasonable person would not have known Complainant was incapacitated, nonetheless she still did not provide express consent to sexual intercourse.

The above-described actions by the investigative team is, unto itself, procedural error that directly resulted in an adverse finding against me. However, it also reveals other problematic policy violations discussed below. The failure to provide me with all documents and statements gathered during the investigation prior to being subjected to two interviews, and the Investigators' decision to change their theory of the case and pursue new charges against me without notifying me of such charges, deprived me of my fundamental right to be notified of the allegations against me, hindered my ability to defend myself, and thus resulted in a biased process calculated to lead to the foregone conclusion that I was responsible for the misconduct alleged, all of which resulted in a deprivation of my due process rights.

### B.  The Investigators failed to complete the investigation within 60 days.

BC's Policy provides that the College will endeavor to complete its investigation within 60 days and will keep the parties apprised of when the investigation will continue beyond that time frame. To date, the investigation has been ongoing for more than six months, far more than the 60 days indicated in BC's Policy. ▓▓▓ alerted BC officials on November 7 of her allegation and informed BC officials she wanted to go forward with an investigation on December 7, 2018. I was alerted to this fact on December 14. The Investigative Team, however, did not even reach out to

4

██████ until January 2 and only interviewed her weeks after that. Further, I was not interviewed until January 29, 2019, 53 days after ██████ alerted the school she wanted to proceed and 83 days after our encounter. This is particularly problematic in that my recollection about minor details (i.e. did I retrieve the condom from a wardrobe v. desk) were assigned great significance. However, it is the school's failure to abide by the 60-day rule that allowed for a passage of time that logically affects one's recollection.

On March 27, 2019 I received a "Timeline Update" from Dean O'Driscoll in which she anticipated the Evidence Binders would be available at the "beginning of next week." However, after being given access to the binder and submitting my response, the next notice I received about the progress of the Report was on May 1. I was told that they were working on the Report and I would be alerted after finals. My finals ended on May 10. On May 21, still having not received the Final Report, I received an email from Dean O'Driscoll stating that her and Ms. Davis were "striving to submit the final report after the upcoming Memorial Day holiday." Yet, I did not receive any correspondence after the Memorial Day holiday. I finally received the Report approximately one month after this latest correspondence, on June 18. It is worth noting that my response to the Evidence Binder was submitted on April 18 and I was given 10 days to review the entire Evidence Binder and submit a substantive response. The investigative team took the entire time the Code allows them to complete an investigation (60 days) to simply write the report---again, a task I was given 10 days to complete.

    C.  <u>The Investigators misapplied the preponderance of the evidence standard.</u>

The Investigators utilized an incorrect application of the Preponderance of the Evidence standard in reaching the conclusion that I was responsible for a Policy violation. First, the Policy incorrectly defines Preponderance of the Evidence as "more convincing than the information in opposition to it." The proper standard is whether the alleged events were more likely than not to have occurred, not whether one version presented is more convincing than the other version. In light of the fact that the Investigators deemed ██████ incapacitated, it is impossible to then argue she can be relied upon to offer credible facts that would be necessary to sustain the necessary burden of proof and find me responsible.

As outlined below, had the Investigators properly applied the requisite standard of review, made appropriate assessments of credibility and considered all of the evidence presented by every party and witness, they undoubtedly would have arrived at the conclusion that I was not responsible for a violation of BC's Policy.

After spending over 3 hours interviewing ██████ it was obvious to the investigative team (and any reasonable, objective, fact-finder) that the only *possible* Policy violation her narrative could support was an allegation that ██████ had nonconsensual sex with me because she was incapacitated. Inevitably, whether or not I was responsible for this allegation would hinge on whether 1) ██████ was, in fact, incapacitated and 2) whether a reasonable person in my shoes would have understood this to be the case. The Investigators then found that the evidence supported the fact ██████ was incapacitated but there was no evidence that I should have understood that to be the case. Therefore, the Investigative Report, by definition, makes clear what the Investigators realized on January 18: it is impossible to substantively rely on ██████ narrative to make a finding of responsibility that is not grounded in an incapacitation theory.

5

The Report outlines how the Investigators "find, by a preponderance of the evidence that ▇ was highly intoxicated to the point of being unable to make informed, rational judgments and decisions (i.e. incapacitated) starting at some point during the ▇, and including when she encountered ▇ at ▇ and then accompanied him to his suite and room on November 4, 2018." In fact, the report provides 22 distinct reasons why they believe that she was incapacitated. All of these reasons, reveal that ▇ cannot be depended on to give a reliable narrative on which to base a finding of responsibility.

Among other evidence that reveals she is an unreliable witness is that the Investigators credit that "she did not recall large passages of time" and that the texts "corroborated ▇ statement that she could not recall much of what had transpired between her and ▇ due to her level of intoxication at the time." Similarly, as to what she shared with her roommates, the Investigators write, "▇ appeared unable to recall most of the details of her interactions with ▇ and that this inability was upsetting to her." The Investigators reiterate that ▇ had to "put the pieces together" and that her "texts were full of spelling mistakes and incomplete sentences and their overall tenor was disjointed, repetitive, and very emotional." The Investigators note the texts lack coherence. They note that her memory was "spotty" and further comment that "▇ stated that while she had a "vague memory of some conversation about condoms," she had no recollection of asking ▇ to get or wear one. She said that part of their interaction was "all fuzzy.""

It is not surprising that based on this narrative, the Investigators obviously (and immediately—i.e. by January 23) recognized that her memory of that night was so flawed that it could not support a claim that ▇ did not consent to sexual intercourse *despite* the fact that she related to them the issue about the thong. This is undeniable. The Investigators immediately understood that the only viable allegation that could be investigated would center around whether or not ▇ presented in a way that I would have understood her to be incapacitated. I was alerted to this on January 23 and the Investigators (approximately five months after I received the letter) found that I "did not know, nor that [I] reasonably should have known, that ▇ was incapacitated by alcohol." Then, amazingly, the Investigators defaulted to the theory they had obviously rejected after her lengthy interviews: that they could rely on her version of events to support a claim of non-consensual intercourse. This, on its face, reflects that the Investigators misapplied the preponderance of the evidence standard. The other evidence they recovered makes this fact even more clear.

▇ claim actually became weaker as the investigation unfolded: ▇ ultimately admitted to consensual interactions she had never revealed before: she conceded she kissed me, physically moved her body in a way so I could help her remove her spandex shorts, and (most importantly) she ultimately even admitted she remembered that we had a conversation about a condom. Not only did these facts corroborate the other witnesses' testimony that she did not appear incapacitated, but also it simultaneously eviscerated any viable claim she did not consent (again, a policy section, not implicated in the allegations in the January 23 notification letter). In January, the Investigators had no sufficient evidence to even investigate a claim of nonconsensual sex under any theory other than incapacitation, and then, after learning numerous other facts that reveal she gave affirmative signs of consent I was, nonetheless, found responsible. Ironically, although these

6

additional facts were all exculpatory it further cemented what was obvious by the end of her second interview on January: her narrative is unreliable. At the close of the investigation, her unreliability did not only hinge on the fact that her memory was "spotty" and "fragmented" but also that it shifted in significant ways.

        D.    <u>The Investigators inappropriately tasked me with proving my innocence.</u>

The Policy fails to explicitly state that I should be presumed "not responsible" unless and until an investigation determines this to be the case. Nonetheless, I assume that the Investigators would concede that there is a presumption that I am "not responsible" and it is their job to investigate the case and only find me responsible if they find credible and sufficient evidence that I violated the Policy. Their repeated and relentless reliance on what I did or did not say to ▇▇▇ during our ▇▇▇ conversation (and at other times after my sexual encounter with ▇▇▇) shifted the burden of proof in this case so that it was borne by me. The Investigatory Report makes that undeniably clear.

In my interview with the investigative team, I explained that ▇▇▇ seemed very upset during the ▇▇▇ conversation. I noted she was squeezing a stress ball throughout the conversation. ▇▇▇ herself acknowledged that she said she wanted to keep the conversation broad and "did not really want to hear "all of the details."" I also noted ▇▇▇ snapped at me when I confronted her with (what I thought) was the most compelling fact that she both did not appear to have "blacked out" and that she affirmatively consented to having sex with me; she specifically asked me to get a condom before we had sex. I had understood from ▇▇▇ (as did the Investigators) that she had already admitted this fact to ▇▇▇ (although not to the Investigators in her initial 2 part/3-hour interview). ▇▇▇ immediately conceded the point to me but then yelled at me about whether I thought she was blind.

Despite these facts, the Investigators consistently noted that I didn't interrogate ▇▇▇ about a number of points they found particularly relevant. In fact, the Report lists 7 distinct bullet points under the heading, "▇▇▇ stated in her interviews, that ▇▇▇ did not tell her the following additional things during the conversation in ▇▇▇, that he stated in his interviews during this investigation."

First, the ▇▇▇ exchange took place on December 7, about 4 weeks after our sexual encounter and before ▇▇▇ even made a formal complaint. Nonetheless, the Investigators make it clear I had, in their eyes, the obligation to cross-examine ▇▇▇ (after already angering her with the one fact I knew she had already conceded: that she asked me to get a condom) at ▇▇▇ and make all my points to prove my case weeks before this investigation even began. I understand that the Investigators are trying to cobble together a case against me because (by the Investigators' own concession) ▇▇▇ narrative was utterly incoherent and unreliable, however, it is clear by doing so, they shifted the burden of proof to me.

The unfairness of this burden shifting is underscored by the fact that, ironically, Boston College does not employ a hearing model for resolving its Title IX complaints but, instead, uses an investigative team. Even if the school used a hearing model it is unlikely, at best, that the school would have allowed me to question ▇▇▇ myself. Yet, despite the fact Boston College shuns this

7

approach, this is exactly what the investigative team determined I should have done to prove my case to them. Of course, the Investigative Report spends so much time on these points because they understand that there were only me and ▮▮▮ in my room during the encounter and ▮▮▮ narrative alone does not credibly support the charges. And now, my failure to have asked all the questions they deemed (months later) to be appropriate, from their perspective only and as "arm chair quarterbacks" has been used against me as affirmative evidence of my responsibility. This is burden shifting at its worst as it underscores the Investigators are not relying on actual evidence but simply my reaction to the allegations to prove the case against me.

It is also clear the Investigators shifted the burden to me as, since ▮▮▮ offers no meaningful facts as to what unfolded in my bedroom, they rely on her usual customs and practice when having sex in order to draw conclusions as to what they deem the most important fact in the case: the issue of the thong. For instance, they write that they credit ▮▮▮ statement that she had never had sex while keeping her underwear on, and had no recollection of pulling her underwear to the side, nor that I did. This objectively reveals that the Investigators are relying on the fact she does *not* have a memory of something as evidence of that fact because it is not something she has done in the past.

No objective fact-finder in any fact-finding endeavor would accept someone's "normal practice" in other encounters as substantive proof to address an important issue that a person has zero memory of. Additionally, any rationale for doing so is utterly undercut by the Investigators' own report as they determined that ▮▮▮ was acting abnormally (as it relates to sexual activity) the entire evening and that such conduct was evidence of her incapacitation. For instance, they quote ▮▮▮ who noted ▮▮▮ "seemed more "outgoing" and "touchy" than usual." ▮▮▮ who noted she was "more outgoing" and ▮▮ who said she was "grinding" with people and dancing in a "sexual manner" and was "uncharacteristically flirtatious." If the evidence is that ▮▮▮ was acting in an atypical sexual nature that whole evening why is it relevant that she had never had sex while wearing a thong before? More importantly, it is a Policy violation to shift the burden of proof to me and force me to counter the Investigators' reliance on ▮▮▮ lack of memory as substantive proof of something that occurred between us, as opposed to her actual memory of an occurrence.

  E. <u>The Investigators failed to meaningfully apply the Policy's definition that consent is the clear and voluntary agreement to engage in particular sexual activity, communicated through mutually understandable words or actions.</u>

The Investigative Report, in contravention of the Policy, arbitrarily divides my very brief sexual encounter with ▮▮▮ into two sections when analyzing whether ▮▮▮ consented to having sex with me: before ▮▮▮ commented about the removal of the thong and afterwards. A review of the actual evidence, however, is that this methodology undercuts the Policy's mandate that consent must be determined by analyzing what was "communicated through mutually understandable words or actions."

The purported rationale offered by the Investigatory Report is that the Policy states "(c)onsent must be ongoing, and it may be withdrawn at any time. Consent for one sexual act does not imply consent for any subsequent sexual activity." However, at the same time, the Investigative

8

Report concedes that ▇ never explicitly told me that she did not want to have sex with me but "this was what she meant when she told (me) that (I) did not "get to take [her] underwear off."" To "mean" something is what you have in mind as your purpose or intention. The real issue is, despite what she may or may not been thinking (or "meant"), did ▇ *convey* that she consented to have sex? In order to determine this (precisely because she did not explicitly say she did not want to have sex with me) all of the "words and actions" that occurred before penetration must be considered in determining whether ▇ conveyed consent. Her own words in text messages after the fact confirmed, "Like he didn't know," which provides the foundation that she did not tell me "No." I was not aware nor did she make me aware until she told me to stop.

   The Investigators did not simply refuse to do this, they employed skilled sleight of hand to argue that critical facts that unambiguously conveyed consent to have sex only supported consent to "make out." The Investigators then deemed these important facts irrelevant when considering whether or not ▇ expressed consent to have sex. Specifically, they write, "▇ apparent consent to the initial part of the parties' sexual interaction is irrelevant to whether ▇ gave consent to ▇ to penetrate her vagina." This was procedural error.

   The Investigators credit that ▇ made the "flirtatious" comment, "I know you want to do it." They consider it a relevant factor in assessing whether she wanted to "make out" with me but considered it irrelevant as to whether she consented to the penetration. They credit that she said this but do not discuss at all the fact that the "flirtatious" comment of me wanting to do "it" obviously referred to sex.

   Equally troubling, is that they limit the fact that ▇ arched her back to facilitate the removal of her spandex as evidence of "making out" but failed to consider this fact when determining whether or not she conveyed consent through "mutually understandable words and actions." In order to seemingly justify this, they define "make out" as "kiss, lie in close proximity to each other on the bed, while touching, partially undressed." They, of course, do not do any further meaningful analysis that such a definition mandates. For instance, they reference "touching" while partially undressed but do not detail what they mean. The investigator's definition (touching while partially undressed), and many definitions, of "making out," suggests some type of genital stimulation. This is corroborated by the fact that ▇ facilitated the removal of her spandex pants. The Report completely avoids any type of detailed analysis on this point because it reveals that the failure to remove the thong does not speak in any meaningful way to desire not to have her genitals touched or penetrated when considering the totality of the interaction. Stunningly, they then limit that fact, without any analysis (as mandated by the Policy) to whether or not she consented to "making out."

   Perhaps these facts would be irrelevant if ▇ explicitly stated she did not want to have sex. However, her comment about the thong, (an item of clothing that is not, like spandex shorts, a meaningful barrier to sexual intercourse) did not remotely undercut all of these other acts that unambiguously conveyed consent. The fact that the Investigators did not even consider these facts when analyzing this issue is procedural error.

   Although ▇ arching of her back and comment "I know you want to do it" were ignored by the Investigators when considering the issue of consent, the most glaring error was the

9

Investigators utter dismissal of the fact I spoke with ▇ about using a condom multiple times before the penetration occurred. There is no explanation as to why this is not dispositive as to the issue of consent. The Investigative Report gives this issue short shrift conclusory stating, with no analysis: "The Investigators find further that whatever conversation the parties had about a condom was not sufficient to counter the fact that ▇ expressed a lack of consent to ▇ for penetration by telling him not to remove her underwear."

The Investigative Report utterly discounts the fact that before the penetration took place there was a conversation about a condom. It is worth noting that this fact is not in dispute. ▇ immediately corroborated the fact that a condom was discussed when, minutes after the encounter, she referenced it to ▇. Further, she, *eventually*, told the Investigators she had a "vague memory of some conversation about condoms." Finally, in the conversation at ▇, ▇ does not dispute my assertion that "she asked (me) if he had a condom" but rather responded "But did I tell you to get a condom or ask you to use a condom?" This demonstrates that she recalled more about the substance of the conversation, beyond just the fact that a conversation took place concerning a condom. This fact alone (and the overwhelming corroboration of this fact) makes it more likely than not ▇ conveyed consent as to the actual penetration. Nonetheless, the Investigative Team "found it more likely than not that the parties had some conversation about a condom, but that it did not consist of ▇ giving ▇ an unambiguous instruction to put a condom on in order to have sex with her. The evidence concerning the conversation about a condom did not outweigh the evidence supporting a finding that ▇ did not give ▇ "clear and voluntary agreement," "through mutually understandable words or actions, "to his penetration of his vagina." Importantly however, in making this erroneous assessment, the Investigators also disregard the fact that ▇ claimed to have no recollection of how her underwear was moved to the side, while I specifically recalled and stated that she moved it to the side herself; this action further supported her clearly expressed consent to engage in sexual intercourse.

Inherent in the use of a condom is the fact that penetration will occur and the parties are taking steps to reduce the probability of pregnancy or a sexually transmitted infection. Perhaps recognizing the importance of this fact, the Investigators felt the need to discredit me on this point despite all of the independent corroboration. For instance, in footnote 89 the Investigators write: "In his second interview, ▇ stated that ▇ might have said, "Do you have a condom?" as opposed to "Get a condom." In his comments to the summary of this second interview, ▇ stated that ▇ asked him to get a condom." They also assign some significant to the fact that ▇ related to them that, at ▇, I said she "asked (me) if (I) had a condom" as opposed to "get a condom." Amazingly, they label these statements as inconsistencies. There is no clearer proof that these Investigators are simply trying to diminish the fact that this conversation about the condom is dispositive (and corroborated by multiple witnesses). It is impossible to believe that any objective investigator could draw some relevant distinction between a participant saying "Do you have a condom?" versus "Put a condom on." At this point in the encounter ▇ proved she could and did communicate with me. She did not say "no," and she did not remain silent; she spoke to me about a condom. ▇ omitted this fact in her first interview, claiming her memory on this point is "fuzzy", but the Investigators' focus instead is on the relevance of "do you have a condom" v. "put a condom on."

10

Finally, as the Policy makes absolutely clear---consent can be withdrawn---the opposite is true as well. Even if the Investigators believe that ▇ request to remove the thong had the importance they believed it had, there was the conversation wherein ▇ asked me about whether I was wearing the condom before penetration and before I had put it on. Of course, as to this period of time, ▇ claims her memory is "fuzzy." Although the Investigators were content to point out the fluidity of a sexual interaction when determining ▇ consented to the first half but not the second, they had no interest in even attempting to opine on the fact that after the thong exchange was when the (undisputed) condom conversation happened where she confronted me about whether I had put the condom on yet. There is nothing to undercut this fact and independent evidence to support it. The fact that the Investigators ignored this shows that this aspect of the Policy (the definition of consent) was inconsistently applied in the investigation and is independent procedural error.

F. The Investigation was not "thorough," it lacked integrity, and was incomplete.

The Investigators' refusal to examine ▇ narrative in the same manner they examined what I said reflects that they failed their mandate to conduct a complete and thorough investigation with integrity. The Investigators take a critical eye to much of what I offered in this case (as well as some of my witnesses). However, they are utterly silent on a number of critical inconsistencies and omissions by ▇. As described below, the Investigatory Report reveals that ▇ was utterly untruthful when describing important aspects of the encounter yet her narrative was not critically reviewed. My statements, however, were dissected in a fundamentally different manner.

1) The Investigators never probed why ▇ omitted the fact that she engaged in consensual interactions with me in her first two interviews.

On January 23 I was charged with nonconsensual sexual activity that, aside from the penetration, included "kissing and touching of intimate body parts." Although, the investigation deemed me Not Responsible for this conduct, a critical point is that the investigation lacked integrity as the Investigators never addressed the fact that ▇ intentionally lied to them about the core issue in the case: the consensual nature of our encounter. The investigation revealed that ▇ texted and spoke to her friends *within hours* after the encounter on November 4 and, among other points, conceded she made out with me. Nonetheless, she refused to admit this to the Investigators during the January 14 and January 18 interviews (interviews that took place over two months after sending these texts), and makes allegations that are fundamentally at odds with the narrative version contained in the texts. Any "thorough investigation" would have explored why ▇ made this material omissions. In light of the texts and conversations with her friends there can be no dispute she remembered these aspects of the night. She intentionally did not inform the Investigators of these facts.

▇ was not asked once about this critical fact nor was it referenced at all in the Investigatory report. Did ▇ intentionally omit these facts because they were embarrassing or cast her in a negative light? These questions needed to be asked. This is especially so, in light of the repeated credibility determinations the investigative team made as to all of my statements. The Investigators repeatedly questioned my honesty but not once addressed the fact that ▇ lied

11

about the consensual nature of our sexual interactions (literally) minutes before we actually had sex.

> 2) The Investigators never probed why ▆▆▆ omitted the fact that she had a conversation with me about a condom before the penetration.

As with the consensual sexual contact that ▆▆▆ belatedly admitted to (despite admitting it to ▆▆▆ immediately after our encounter) the fact we spoke about a condom. Again, this fact, by any objective analysis, is dispositive as to consent and I discuss this elsewhere in the appeal. However, the fact she omitted it, although she clearly remembered that part of the evening, is relevant as to her credibility. Once again, ▆▆▆ is omitting facts that speak to the core issue in this case: consensual sex.

> 3) The Investigators did not a) question ▆▆▆ about her text where she explicitly confessed that she consented to the initial penetration and b) did not address this fact in their report despite the Policy's mandate that they offer a rationale for their findings.

The morning after ▆▆▆ and I had sex she texted ▆▆▆. In the relevant portions (with the individual text messages separated by "/") ▆▆▆ writes:

> ▆▆▆ took me back to his room/don't tell anyone this please/I don't want anyone to know/We made out/And then he kept trying to take my pants off/Or thong at least…because he started to have sex with me/And I kept being like wait/Wait wait/And then he started too/And it was fine/But I was so upset because I didn't really wanna/And it was fine/But I was so upset because I didn't really wanna/And he stopped when I said stop/And he was like something wrong somethings wrong/And I was like panicked and crying/And I don't remember leaving

She adds, "I was just so upset that I let myself have that happen." She then clarifies that she "let ▆▆▆ fucking ▆▆▆ fuck meeee" and further (and unequivocally) makes clear that when she said stop he did and most importantly, **"I just like let him start/Like he didn't know..I didn't want it at all/idk/I'm just mad."** This text exchange began on November 4, 2018, hours after the incident.

This text was so important I highlighted it for the Investigators in my April 18 submission. I wrote:

> From the witness summary, it appears that ▆▆▆ was not asked about one of the most relevant concessions in that text exchange: she conceded to ▆▆▆ (the same morning as the encounter) that the two began to have consensual sex and 1) "he stopped when [she] said stop" and, 2) "I just like let him/start/Like he didn't know… I didn't want it at all/idk/I'm just mad." This is what ▆▆▆ explains happened: they began to have sex and there came a time that ▆▆▆ indicated that she did not want to have sex anymore (because her

12

back hurt) and he respected that request. Putting aside all the other evidence in this case, this text *from* ▬▬ reveals that the charges against ▬▬ must result in a finding that he is not responsible. **Far from being incapacitated, ▬▬ did not lose any ability to make an informed decision about having sexual intercourse with ▬▬. In her own words, she "let him" begin, she made no indication that she did not want to—"he didn't know," and when she decided it should end she told him to stop. He did. These facts are dispositive.**

Further, these texts are important for what they reveal but they are also important when assessing ▬▬ credibility and whether she was forthcoming during the course of the investigation. It is clear from this very candid exchange with ▬▬ that the next morning ▬▬ remembers consensually kissing ▬▬ (i.e. "We made out") and that she initially consented to having sex with him (i.e. "I just let him start") that she, subjectively (at least the next day) did not want to have sex but, based on her actions, ▬▬ would not have known (i.e. "Like he didn't know") and then he stopped when she said stop. Despite the critical information contained in these texts, ▬▬ meets with Investigators on January 14 and January 18, over two months after sending these texts, and makes allegations that are fundamentally at odds with the narrative version contained in the texts.

Despite the importance of this issue it received no attention in the 62-page Investigative Report. How can a 62-page Investigatory Report which concludes that ▬▬ did not provide consent to me not address a text where she states she "let (me)" begin? This text alone makes it "more likely than not" ▬▬ provided consent (i.e. "let me" penetrate her). The fact that this critical piece of evidence was 1) not initially addressed with ▬▬, 2) not followed-up on when I raised it on April 18 and 3) was ignored in the Investigatory Report makes it utterly clear this investigation lacked "integrity," and was not "thorough" or "complete" as mandated by the Policy.

While ignoring this important point, the Investigative Report also distorts the other critical section of this text. ▬▬ texted that "Because he started to have sex with me/And I kept being like wait/Wait wait/And then he started to/ And it was fine". Attempting to address ▬▬ unambiguous reference that the beginning of the sex was "fine" the investigators write footnote 83 and adopt ▬▬ blatant shifting of the tense from "it was fine" to "it's fine" and her revisionist explanation of what she meant by "it's fine". They write,

> "▬▬ stated that this was her way of trying to suppress her emotions while she was at work. She stated, "Saying, "It's fine" is a way for me to try to suppress something that's bothering me, or act like it didn't happen when deep down it is really affecting me….When something traumatizing like this happens, or even anything out of the ordinary, it takes me a while to process things or

13

> even believe that something happened, so me saying this to one of my closest friends was me trying to come to terms with something that I had not fully processed yet."

The text did not say "it's fine" but rather "it was fine" and this comment was an unambiguous reference to the start of the sexual encounter, i.e. the penetration. Amazingly, the investigators allow ▮▮▮▮ to convert her comment "it *was* fine" (specifically referring to the beginning of the sexual encounter) to some amorphous "It's fine" referring generally about her feelings in that moment as she "processes" the encounter. There can be no doubt she is referring to the act of penetration as she continues the text (again using the past tense) that she ultimately told me to stop—and she then makes clear that, upon her request I did; and that all of this happened after the penetration which was "fine."

Facts matter and investigators are meant to be objective and independent. ▮▮▮▮, obviously recognizing the issues this text presents for her allegation, changes the tense of the text from "it was fine" to "it's fine." She then offers an explanation for this text that is utterly irrelevant to the fact that the text, and the use of the past tense "it was fine" is referring to the act of penetration and not an effort to "suppress something that's bothering" her. It is up to any objective investigator to independently examine and scrutinize a narrative. As noted elsewhere, the investigators seem singularly focused on performing this task when reviewing my narrative. In this case, when explicitly referencing the moment of penetration (he started to have sex with me) ▮▮▮▮ texted "And it was fine." Instead of scrutinizing this text, which again could singularly be relied on to support a finding of "Not Responsible" the investigators adopted ▮▮▮▮ patently false, revisionist explanation.

   4) <u>The Investigators refused to review all the relevant evidence as to the issue of whether ▮▮▮▮ conveyed consent to have sex with me.</u>

The Investigators admitted that they did not consider "▮▮▮▮ alleged post-penetration instructions, comments, actions" when considering whether she consented. This was procedural error. Specifically, ▮▮▮▮ instructed me to "go slow" multiple times and to "keep it there" (referring to my penis when it was fully inserted in her vagina) and that she did not want to flip over because she did not want me to "cum too fast." As to this last point, ▮▮▮▮ even conceded that she has said this in past sexual encounters. This is particularly problematic procedural error because ▮▮▮▮ has no memory of the majority of the interaction and concedes she never explicitly told me not to penetrate her. These facts are relevant in assessing what actually happened as these statements serve to corroborate all the other actions ▮▮▮▮ took to convey consent. They cannot simply be ignored.

The Investigatory Report, itself, reveals that it was procedural error not to consider these facts when meaningfully analyzing the issue of consent as this is exactly the methodology they employed when assessing the alleged non-consensual touching at ▮▮▮▮. In their analysis of the evidence as to the touching in ▮▮▮▮ the Investigators correctly reviewed *all* the evidence to make a final determination. In that incident, the Investigators considered the conduct following that touching (the grabbing of the waist) to determine whether there was a Policy violation; in other words, they were open to factoring in all the relevant evidence. Specifically, as to the ▮▮▮▮

14

▇ analysis the Investigators write, "(n)one of the witnesses observed any negativity between the parties as they interacted after this touching; in fact, the opposite was true. ▇ bought food for ▇ and joined him and his friends in ▇ suite."

Therefore, although the Investigators considered all the evidence (both before and after the alleged nonconsensual touching) to determine whether there was a Policy violation for what occurred at ▇ the Investigators explicitly reject this approach as to ▇ second allegation. This is additional proof that the Investigators were in a result driven analysis. The fact that the Investigators rejected the exact methodology they employed as to the first allegation when reviewing the evidence of the second allegation is procedural error.

> 5) <u>There are numerous examples that show that this was not a fact-driven endeavor but a result-based report.</u>

Amazingly, the Investigators assign great weight to the fact ▇ stated she was crying when in my suite. First, ▇ in a text to ▇, asks him if she was crying when she interacted with him. Although, she was, in fact, crying at this point, her lack of memory as to that makes it clear that she is totally unreliable witness to conclude she was crying in my room. Second, the Investigators dismiss [Roommate 1] account that she was not crying claiming that it was "fleeting" and that he was "not well-acquainted" with ▇. One can pass a stranger on the street and see if tears are coming from their eyes in the moment it takes to walk by. Nonetheless, the Investigators do not credit me, do not credit [Roommate 1], do not consider the fact that ▇ texted ▇ that she did not even recall crying when interacting with him, and they ultimately conclude she was crying in the suite. [Roommate 1] account of seeing her, saying hello and her leaving is direct evidence that was ignored and explained away by the statement it was "fleeting." She walked right past him and said "hey."

The inherent inconsistencies of this report also show that the standard of proof could not have been applied correctly. In the section justifying their claim that ▇ was incapacitated they write that "the weight of the evidence (including ▇ own statements) supported a finding that ▇ (who was sober) performed each sexual act of a physical nature during the parties interactions in the room ▇ stated ▇ did not touch him in a sexual manner at any point and did not touch his penis or genitals." Not true. The report, itself, quotes me as saying that we started to kiss and "continued kissing as well as "grinding" against, each other."

Further, ▇ (ultimately) conceded (as she had in her texts the same morning of the encounter) that "she had some memory of kissing ▇ and allowing him to remove her shorts." These are all important facts and the investigative summary simply gets them wrong. Further, although the Investigators occasionally use ▇ comments to her friends as helpful corroboration of her narrative there is no similar analysis as to what I said. For instance, the Report notes I told my friend ▇ that ▇ made "some of the first moves" and ▇ recalled me saying that ▇ did not want me to have sex with her from behind because I would "cum too quick." Again, the inconsistency of the Investigators' approach to viewing my narrative versus ▇ is striking and is procedural error. While the Investigators discussed ▇ demeanor when speaking with her roommates about the alleged incident, they excluded information concerning my reaction to learning of these false charges; i.e. being shocked, scared, upset, and

15

appearing as though I was going to vomit. This further demonstrates the biased nature of the Investigation Report.

      F.      <u>Denial of the opportunity to review evidence.</u>

BC's Policy states: "the University will provide an opportunity for all parties to present written statements, identify witnesses, and submit other evidence, as well as the opportunity to review and respond to available evidence." As discussed above, I was not permitted to review the Complainant's statements, any documentary evidence gathered, or a description of the allegations against me prior to appearing for two interviews. The first opportunity I had to review the evidence against me was during my April 5, 2019 review of the Investigators' Evidence Binder, after I had already participated in two investigatory interviews.

By depriving me of the opportunity to review and respond to all available evidence prior to subjecting me to two interviews, BC violated its own Policy as well as my fundamental right to a fair and impartial process.

      G.      <u>Failure to provide a hearing.</u>

BC's Policy deprived me of a full hearing and a meaningful opportunity to be heard. Incredibly, while BC conducts hearings for general student conduct matters, students accused of sexual misconduct are deprived of this right, despite the more serious nature of the charges and the ramifications of a responsible finding. As a result, I was denied the opportunity to confront and question my accuser, question the witnesses, challenge the evidence against me, and have my case heard before an impartial panel. Instead, the Investigators were given full and unfettered discretion to determine what evidence they deemed credible and relevant, what evidence to include or exclude from the interview summaries and final Report, make assessments of credibility, and reach conclusions concerning responsibility. Consequently, because there is no independent hearing panel, the Investigators are able to act as both judge and jury, thereby directing the outcome of the investigation.

This conflict of interest is exacerbated by the assignment of two Investigators who are unable to remain neutral. As an employee of the College, Dean O'Driscoll subscribes to the College's (commendable) goal of eliminating sexual violence on its campus. The failure to issue findings of responsibility and sanction reported instances of sexual violence would go against this objective, and potentially compromise her position within the Dean of Students Office. Similarly, Investigator Jenn Davis has built a business over the past four years investigating university Title IX and workplace misconduct allegations. Certainly, she strives to maintain the College as a client with the intention of being retained on future cases at BC. The failure to issue responsibility and findings or impose sanctions could likewise compromise any future business or paychecks from the College.

Given the severity of the potential sanctions and the significant impact that a finding of responsibility would have on my education and future career, I should have been afforded a full

16

hearing consisting of a truly independent panel, cross-examination of all witnesses, and the right to confront and question my accuser.

H. <u>Failure to ensure confidentiality.</u>

BC's Policy discusses at length the manner in which a complainant's identity and allegations are kept confidential. Conversely, demonstrating a bias against the accused, there is no reference made in the Policy to a respondent's right to confidentiality and privacy. (Student Sexual Misconduct Policy 2018-2019, pg. 9-10). My right to confidentiality in this investigation was violated when Complainant, with the approval of the College, reported to my ███ that a ████████████ had sexually assaulted her. This disclosure occurred before I even had the opportunity to appear for a first interview to present my account. A few days later, ███ held a meeting with the ████ ████, during which he generally addressed the issue of consent, and provided a warning about the meaning of consent. Noticeably, ████████████████████████████████████████████████████████████████████. With only ███ ████████ ████ ████, my ████ was readily able to determine that I was the one accused, and called me into his office to ask me about the situation in vague terms the day before my first interview. Consequently, any member of the ████ who was not aware that I was the one accused of sexual assault was now able to piece two and two together. The foregoing constituted a clear violation of my rights to confidentiality and privacy in the process, yet the College has failed to take any action in response.

Moreover, this action on the part of the Complainant, and inaction on the part of the College, further illustrates the College's clear bias against me, and predetermination of my guilt. There is no other logical explanation for the College allowing someone who alleges a claim of sexual assault to disclose that allegation to a school official, in this case an ████████████, prior to the accused having any opportunity to defend himself. The foregoing begs the question of whether, in every case of a sexual assault allegation made against one its ████████, BC permits the accusing party to alert the respondent ████████████ of such charges. The only explanation for condoning such a disclosure prior to an investigation and finding is a presumption of guilt against the accused.

II. **New information that was not available to me at the time of the adjudication process would have affected the outcome.**

Since the issuance of the June 18, 2019 Resolution Letter, I have become aware of new evidence that directly bears on the issue of Complainant's consent to sexual activity. Specifically, I informed [Roommate 1], one of the witnesses, in this case about the school's finding against me. He then confided to me that he had heard unambiguous signs of consensual sex from his location in the common area of the suite at the time of the relevant sexual activity. I believe he should be re-interviewed as to what he heard, as his statements are directly material to the determination of whether ████████ did in fact consent to sexual intercourse.

17

### III. Conclusion.

The foregoing procedural errors, individually and when taken together, unfairly and materially affected the outcome of my case. BC's Sexual Misconduct Policy guidelines are vague, biased in favor of the accuser and provide little, if any, guidelines regarding the rights of the accused. Consequently, the Investigators engaged in a procedurally flawed investigation that resulted in an erroneous finding of responsibility and an unduly severe sanction of suspension. Given the lack of credible evidence supporting Complainant's claims, the testimony and documentary evidence corroborating my account, the numerous procedural errors discussed herein and my prior unblemished disciplinary record, the sanction imposed was excessively harsh, unreasonable and punitive.

I have absolutely no history of the behavior I am being accused of, and my friends, teachers, ███████, and family can attest to this. I must reinforce that I would never engage in any conduct that was not consensual and I firmly believe that I have not engaged in any conduct which could be considered a violation of BC Policy. For all of the reasons stated above, I respectfully request that the Decision finding me responsible for a violation of the Policy be reversed.

Sincerely,

███████████████