# United States Court of Appeals
## For the First Circuit

No. 19-1871

JOHN DOE,

Plaintiff, Appellee,

v.

TRUSTEES OF BOSTON COLLEGE,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Douglas P. Woodlock, U.S. District Judge]

Before

Lynch, Boudin, and Lipez,
Circuit Judges.

Daryl J. Lapp, with whom Elizabeth H. Kelly and Locke Lord LLP were on brief, for appellant.
Jeannie Suk Gersen, with whom Andrew T. Miltenberg, Stuart Bernstein, Tara J. Davis, and Nesenoff & Miltenberg, LLP were on brief, for appellee.

November 20, 2019

**LYNCH**, **Circuit Judge**. This is an expedited appeal from entry of a preliminary injunction based on a Massachusetts law contract claim. The preliminary injunction prohibited the Trustees of Boston College ("BC") from imposing a suspension of one year on student John Doe, who was found after extensive investigation by BC to have engaged in sexual assault in the form of a nonconsensual penetration of a female student, Jane Roe. Roe filed a disciplinary complaint against Doe under BC's Student Sexual Misconduct Policy, and the suspension decision was the outcome of the procedures set forth in that Policy.

The district court found Doe had shown a probability of success on the merits of the state law claim of violation of a contractual obligation of basic fairness. It ruled on this state law question primarily by reference to a decision of this court concerned with the requirements of the federal due process clause as to a public university. It is quite clear, and the parties do not dispute, that federal due process law does not dictate to states the procedures which its private colleges must follow in administering student discipline.

Massachusetts law as it currently stands does not require the college discipline process Doe says must be a part of a contractual obligation of basic fairness. To the extent the district court was, without expressly saying so, attempting to base its ruling on a prediction of future developments in

Massachusetts contract law, it also erred. Any such future developments are up to the state courts and legislature, not the federal courts.

For the reasons more fully stated below, we hold the district court erred in finding a probability of success as to Doe's claim under Massachusetts contract law and erred in granting the injunction. We now reverse, vacate the injunction, and remand. We describe the pertinent facts, procedures followed, and history of the litigation.

I.

A. Background

The parties agree that the contract involved is found in BC's Student Sexual Misconduct Policy ("the Policy"), which was incorporated into its 2018-2019 Student Guide. That policy defines conduct subject to discipline. It provides, in relevant part, that "sexual misconduct" includes "sexual assault," which is "any sexual contact or sexual penetration with another individual without consent." "Consent" is defined in relevant part as "the clear and voluntary agreement to engage in particular sexual activity."[1] Doe does not dispute that a school may discipline a student responsible for sexual assault.

---

[1] The Policy lists circumstances when an individual cannot give consent, including when an individual "[i]s incapacitated, including through the consumption of alcohol or drugs."

- 3 -

The event at issue in this case is Roe's claim that Doe sexually assaulted her, by penetration to which she had not consented, in the early morning of November 4, 2018. Without disputing that the sexual interaction occurred, Doe contended that it was at all times consensual.

Doe's challenge is to the adequacy of the procedures set forth in the Policy, alleging that some form of cross-examination of the accuser must be provided before any conclusion can be reached. We describe those procedures, which were followed in this case.

The Policy defines in detail the processes for the college to follow once a sexual misconduct complaint is filed.[2] When a sexual misconduct complaint is made, the Policy provides that one or more internal or external investigators must investigate by interviewing the parties and other witnesses and gathering any other relevant evidence. The investigators must give all parties an opportunity to present written statements, identify witnesses, submit evidence, and review and respond to

---

[2] The processes used to respond to sexual misconduct complaints differ from those used for other Code of Student Conduct violations. BC adopted the processes for sexual misconduct violations in 2014 "with the intent of making the reporting of assaults more easily available to members of the community." BC says that, in its experience since the adoption of the policy, it believes this goal has been facilitated.

evidence. Both complainant and respondent may select an adviser to be present at any meeting related to the reported misconduct.

Here, the investigators followed the iterative process described in the Policy. BC used two investigators: an assistant dean at BC and an external investigator. The accuser Roe was questioned at length on three occasions, the second two building on the information provided by the accused in his interviews, as well as information drawn from interviews with others and documentary evidence. Investigators probed her account for detail, and she was asked to clarify ambiguities. The accused was questioned on two occasions, following and building on information obtained both from the accuser and the accused and on other information. Doe, the accused, was represented by counsel at all relevant times. Roe, the accuser, was accompanied at each interview by a "support person."

After each time the complainant and respondent were interviewed, each was provided a written summary of his or her own interview and given five days to review it and provide comments to the investigators. At each stage, both Doe and Roe submitted written comments on the summary of each interview. Investigators conducted the next interview before receiving comments from either on the summary of the previous interview. The Policy does not provide either the complainant or the respondent an opportunity for cross-examination of the parties or of other witnesses.

- 5 -

Once the investigators gathered the evidence, the complainant and respondent were given an opportunity to review that evidence and submit further comments. Here, at the conclusion of the investigation, both Doe and Roe were allowed to review an Evidence Binder of all of the evidence gathered, including the interview summaries, and provide further comments. Doe did so and submitted a further comment document of seventeen pages. Roe also did so.

After receipt of those comments, the investigators prepared a written report that determined, using a preponderance of the evidence standard, whether Doe violated the Policy. Here, the investigators' final report spanned sixty-three single-spaced pages. It described in great detail the steps the investigators followed and the evidence they gathered. The report addressed each party's statements and arguments at each stage of the investigation, included detailed factual support for each of its conclusions, and explained the reasons for each of its credibility determinations.

The report concluded that several of Doe's statements about the alleged sexual misconduct lacked credibility. The report noted that some of Doe's statements were inconsistent between his two interviews by investigators and that some of his later statements were implausible in light of his earlier statements. The report also noted that some statements and actions Doe alleged

- 6 -

as evidence of Roe's consent occurred after sexual penetration and so could not have provided consent for that act.

The report credited Roe's version of the facts concerning crucial aspects of the sexual encounter and her lack of consent for sexual penetration. It found that Roe's statements were supported by the weight of the evidence and corroborated by her contemporaneous messages to friends.

The report found that, although Roe's "words and actions . . . conveyed clear and voluntary consent" for the initial part of her sexual encounter with Doe, Doe's penetration of Roe occurred "without having obtained her consent to do so." The report found Doe responsible for violating the Policy.

The investigators submitted the report to the Office of the Dean of Students and the Student Affairs Title IX Coordinator, who, in accordance with the Policy, determined the appropriate sanctions based on the report's finding of responsibility. On June 18, 2019, on the basis of the report, the two offices imposed a one-year suspension on Doe, to take effect immediately.

After the two offices' determination of appropriate sanctions, the respondent has the right of appeal, but an appeal is limited as to what may be argued. The decision of the Appeals Officer, who is appointed from the Office of Dean of Students, is then final. On June 27, 2019, Doe appealed BC's decision. The Appeals Officer denied the appeal on July 24, 2019.

- 7 -

B.  Litigation History

On July 29, 2019, Doe filed suit against BC in the U.S. District Court for the District of Massachusetts, alleging various state law claims and a claim for violation of Title IX, and moved for a preliminary injunction staying his suspension.

The district court granted Doe's motion for preliminary injunction, finding a substantial likelihood that Doe would succeed on his claim that BC's disciplinary process deprived him of fair process in violation of Massachusetts contract law.[3]

We set forth the reasoning used by the district court from the transcript of the preliminary injunction hearing. The court opined that the core consideration was with "how it is that credibility determinations are made when we're dealing with claims of sexual misconduct." It stated:

> Now, it's not cross-examination that I have in mind that's of a type that one used to see anyway in criminal cases, particularly rape cases. But it is the opportunity to observe together and ask questions with respect to the core issues. The . . . fundamental deficiency here that I see is that the BC process didn't provide . . . a mechanism for that. That's a fundamental deficiency in the wake of Haidak [v. Univ. of Mass.-Amherst, 933 F.3d 56 (1st Cir. 2019)], I believe.

---

[3] Issuance of the injunction was not based on Doe's allegation that BC violated Title IX or any of the other state law claims.

- 8 -

The court continued:

> John Doe and Jane Roe should be subject to some form of real-time examination with questions to come by their adversaries. It's not necessary that it be done in the way that it's done in the courtroom. It's not necessary that it be done by lawyers for them or even by them themselves. In fact, that might not be a good idea. But some mechanism for that real-time evaluation, it seems to me, is necessary; and in its absence, the process is deficient.

And so it concluded:

> [T]his much is clear to me, that number one, a private institution like BC should follow practices that we'll call fair process that are parallel to due process claims against public institutions and that that fair process directs that when credibility of a central issue in a case such as this is presented, the process has to enable the factfinder to evaluate the credibility of the respective claims by a real-time process at which both of the respective parties are present and have the opportunity to suggest questions. That wasn't provided here. And it is required I think to develop a fully satisfactory process.[4]

We will refer to the process the district court deemed necessary as "quasi-cross-examination in real time." Though the components of that process were not specified in Doe's briefing, in response to questions at oral argument, counsel for Doe replied

---

[4] The court also separately and additionally found the review procedure inadequate, noting that "what we see in the appellate evaluation is basically a further deference to the role of the investigators without any critical analysis of what they've done."

- 9 -

that the claim included at least these components: (1) both complainant and respondent and their representatives must be available at the same time for questioning by a "neutral," though not necessarily in the same room; (2) each must be informed of the exact statements of the other in real time, whether by transcript or some other means; (3) both the complainant and respondent must have the opportunity to submit questions to the "neutral," either orally or in writing, to be put to the other side; and (4) the "neutral" may be a hearing officer or may be an investigator. There is no contention that formal cross-examination such as takes place in criminal cases is required. Doe's position is that quasi-cross-examination in real time may be part of an investigative disciplinary system, and does not require that there be an adjudicatory hearing.

II.

A. Legal Analysis

We review the district court's decision to grant a preliminary injunction for abuse of discretion. OfficeMax, Inc. v. Levesque, 658 F.3d 94, 97 (1st Cir. 2011). We review its findings of fact for clear error and issues of law de novo. Id.

The showing of a likelihood of success on the merits is the most important of the four preliminary injunction factors. Ross-Simons of Warwick, Inc. v. Baccarat, Inc., 102 F.3d 12, 16 (1st Cir. 1996) ("Likelihood of success is the main bearing wall

of the four-factor framework."). When this probability finding is made in error, the district court has abused its discretion and we are required to vacate the injunction. See Withrow v. Larkin, 421 U.S. 35, 46 (1975); New Comm Wireless Servs., Inc. v. SprintCom, Inc., 287 F.3d 1, 14 (1st Cir. 2002).

Under Massachusetts breach of contract law as to private academic institutions, two tests are relevant to Doe's breach of contract claim.

1.  Reasonable Expectations

The first test looks at the terms of the contract established between the college and the student and asks whether the reasonable expectations of the parties have been met. Schaer v. Brandeis Univ., 735 N.E.2d 373, 378 (Mass. 2000); Cloud v. Trs. of Bos. Univ., 720 F.2d 721, 724 (1st Cir. 1983).

Although the district court did not base its conclusion of probability of success on this reasonable expectation theory, Doe nonetheless advances it on appeal. Doe does not dispute that the Policy in fact governed BC's investigation and resolution of the complaint in this case.

We reject Doe's argument that his reasonable expectations arising from the contract were that he would be given the opportunity to engage in quasi-cross-examination of Roe in real time. Nothing in the contract provides any basis for the expectation. Indeed, the contract procedures explicitly do not

- 11 -

provide for any such opportunity. Given the Policy's plain description of BC's investigation process, Doe could not have reasonably expected to be allowed quasi-cross-examination in real time.

    2. <u>Basic Fairness</u>

The district court instead based its finding of probability of success on the second test, that is, whether the procedures followed were "conducted with basic fairness." <u>Schaer</u>, 735 N.E.2d at 380 (quoting <u>Cloud</u>, 720 F.2d at 725). The district court read this court's decision in <u>Haidak</u> as supporting its conclusion that the Massachusetts law concept of fundamental fairness required a "real-time process at which both of the respective parties are present and have the opportunity to suggest questions." In so concluding, in our view, the district court committed several errors of law, which require that the injunction be vacated.

We start with the articulated basis for the district court's decision: that <u>Haidak</u> leads to the conclusion that the requirement for quasi-cross-examination in real time is inherent in the Massachusetts law requirement of basic fairness.[5] <u>Haidak</u>, which involved a public university and the federal due process clause, was concerned with a different claim. 933 F.3d at 65. It

---

    [5] We do not decide whether BC in fact violated the requirements described in <u>Haidak</u>. 933 F.3d at 71-72.

does not govern this Massachusetts state law issue and provides no basis to depart from the Massachusetts cases we describe below. BC is not a public university or a government actor and is not subject to due process requirements.

Indeed, the highest court of Massachusetts, the Supreme Judicial Court (SJC), has been explicit that a private university need not comply with federal due process to meet the basic fairness requirement in disciplining students. Schaer, 735 N.E.2d at 381 (private university not bound by due process clause); Coveney v. President & Trs. of Coll. of Holy Cross, 445 N.E.2d 136, 138-40 (Mass. 1983) (holding that, where a private college expelled a student before any opportunity for disciplinary hearing, it was "clear that because the college is a private institution, [the student] had no constitutional right to a hearing").

Existing Massachusetts law does not support the district court's conclusion for several reasons. Doe concedes that no state case imposes the requirement he seeks. Importantly, no Massachusetts state decision has ever found the requirements the district court here imposed to be a necessary part of the basic fairness requirement. In Schaer, a private university found a student responsible for sexual misconduct after a disciplinary process that did not allow the accused student to give any input during the investigation and admitted testimony that would have been excluded in a court proceeding. 735 N.E.2d at 378, 380. The

SJC held that these procedures provided basic fairness. Id. at 381. In Coveney, the private college's student handbook was clear that an accused student was not entitled to a hearing before the imposition of disciplinary sanctions. 445 N.E.2d at 140. Because the student's offending conduct was undisputed, and because the college had no contractual obligation to provide a hearing process, the SJC held that the college's disciplinary decision was not arbitrary or capricious and did not violate the student's contractual rights. Id. at 139-40.

Massachusetts case law has also clearly approved school disciplinary procedures which did not involve any opportunity for the accused student to pose questions to be addressed to the accuser, through surrogates or directly, much less to do so in "real time." See Driscoll v. Bd. of Trs. of Milton Acad., 873 N.E.2d 1177, 1187 (Mass. App. Ct. 2007).

In Driscoll, the Massachusetts Appeals Court held that a private school's expulsion of a seventeen-year-old student for serious sexual misconduct with a younger student did not violate the basic fairness provision when the school followed procedures much less rigorous that those followed by BC. Id. When school administrators learned of the misconduct, they met with the younger student and her parents and asked the younger student to produce a written statement, which she wrote after the meeting and submitted the following day. Id. at 1182. School administrators

- 14 -

informed the accused student of the allegations against him the day after they received the younger student's statement and immediately told him to produce a written statement, which he did. Id. The school did not give him an opportunity to seek advice or counsel of any kind. Id. The school expelled the accused student the next day without giving him any access to the evidence against him. Id. These approved procedures did not come close to including the quasi-cross-examination in real time requirement found necessary by the district court. See id. at 1187.

Nor have the federal courts required quasi-cross-examination in real time when applying Massachusetts basic fairness law. This court in Doe v. Trustees of Boston College, 892 F.3d 67, 88 (1st Cir. 2018), concerning an earlier version of BC's conduct code, held that, where the school's policies themselves state a requirement of basic fairness, a failure to follow those policies could give rise to a claim.[6] Although the disciplinary procedures then in effect at BC provided for a live hearing at which each side could put questions to the witnesses

---

[6] Doe also held that, under Massachusetts law, "whenever a school expressly promises no less than basic fairness, . . . the school's implied duty [of basic fairness] becomes superfluous and the court's analysis to ensure that the disciplinary proceedings were 'conducted with basic fairness' focuses on assuring compliance with the express contractual promise." 892 F.3d at 88 (quoting Cloud, 720 F.2d at 725) (emphasis added). In this case, the Code stated that it "exists to . . . assure fundamental fairness."

and parties through a hearing chairperson, nothing in Doe suggested that basic fairness required that procedure, and Doe has conceded that his claim does not require there be a hearing. To be clear, no party asserts that a school's mere adherence to its policies itself resolves a basic fairness claim.

Further, the finding of probability of success did not respect the deference Massachusetts law requires as to the choices of student discipline proceedings made by private academic institutions. Massachusetts law is clear that "[w]e adhere to the principle that courts are chary about interfering with academic and disciplinary decisions made by private colleges and universities." Schaer, 735 N.E.2d at 381 (internal quotation omitted). "A college must have broad discretion in determining appropriate sanctions for violations of its policies." Coveney, 445 N.E.2d at 139. Massachusetts law permits its colleges and universities flexibility to adopt diverse approaches to student discipline matters that do not meet federal due process requirements.[7]

Federal courts are not free to extend the reach of state law. See Erie R. Co. v. Tompkins, 304 U.S. 64, 78 (1938) (federal courts must apply state law as "declared by its Legislature in a

---

[7] Fourteen private Massachusetts institutions of higher education have filed a brief as amici curiae, which describes these varying approaches.

statute or by its highest court in a decision"); Braga v. Genlyte Grp., Inc., 420 F.3d 35, 42 (1st Cir. 2005). When applying state law, "we will take care not to extend state law beyond its well-marked boundaries in an area . . . that is quintessentially the province of state courts," Markham v. Fay, 74 F.3d 1347, 1356 (1st Cir. 1996), and must exercise considerable caution when even considering the adoption of a new application, Doyle v. Hasbro, Inc., 103 F.3d 186, 192 (1st Cir. 1996). A litigant who chooses federal court over state court "cannot expect this court 'to . . . blaze new and unprecedented jurisprudential trails'" as to state law. A. Johnson & Co. v. Aetna Cas. & Sur. Co., 933 F.2d 66, 73 n.10 (1st Cir. 1991) (quoting Kotler v. Am. Tobacco Co., 926 F.2d 1217, 1224 (1st Cir. 1990)). Rather, this court "must take state law as it finds it: 'not as it might conceivably be, some day; nor even as it should be.'" Kassel v. Gannett Co., 875 F.2d 935, 950 (1st Cir. 1989) (quoting Plummer v. Abbott Labs., 568 F. Supp. 920, 927 (D.R.I. 1983)).

This limited role of federal courts in matters of state policy respects the design of our federal system, which allows a "state [to], if its citizens choose, serve as a laboratory; and try novel social and economic experiments without risk to the rest of the country." New State Ice Co. v. Liebmann, 285 U.S. 262, 311 (1932) (Brandeis, J., dissenting). We give particular respect to state regulation of education, an area in which our "lack of

- 17 -

specialized knowledge and experience counsels against premature interference with the informed judgments made at the state and local levels." San Antonio Indep. Sch. Dist. v. Rodriguez, 411 U.S. 1, 42 (1973).

Whether Massachusetts in the future will wish to redefine the requirements of contractual basic fairness in college and university discipline matters poses important policy choices for the Supreme Judicial Court and/or state legislature to make.

### III.

There is no need to say more. We reverse, vacate the grant of preliminary injunction, and remand to the district court for any further proceedings, consistent with this opinion. No costs are awarded.