UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| JOHN DOE,<br><br>        Plaintiff<br><br>    v.<br><br>TRUSTEES OF BOSTON COLLEGE,<br><br>        Defendant | Civil Action No: 1:19-cv-11626-DPW |

**MEMORANDUM IN SUPPORT OF DEFENDANT'S MOTION
TO DISMISS THE AMENDED COMPLAINT**

**RELEVANT FACTS**

**A.      The Complaint of Sexual Assault Against Doe**

On November 7, 2018, a female BC student ("Jane Roe") reported to an Associate Dean that John Doe had engaged in sexual contact with her, including vaginal penetration with his penis, without her consent. Amended Complaint ("AC") ¶ 114. On December 7, Roe told the Associate Dean that she wanted to go forward with a formal complaint against Doe. *Id*. ¶ 116. On December 14, the Associate Dean met with Doe and informed him of Roe's allegations. *Id.* ¶¶ 42, 120. On January 23, 2019, Doe received formal, written notice that Roe accused him of "engaging in non-consensual sexual contact through kissing and touching of intimate body parts and penetrating her vagina with [his] penis without her consent while [she] was incapacitated," which, if established, would be a violation of the Sexual Misconduct Policy in the Code of Student Conduct. *Id.* ¶¶ 123-24.

Roe's complaint was addressed pursuant to BC's 2018-2019 Student Sexual Misconduct Policy, which was incorporated in the Student Guide. Ex. A; Ex. B at 2; Ex. C at 5.[1] The Policy

---

[1] Exhibits are to the Declaration of Elizabeth H. Kelly, Dkt. No. 51. The Policy and Student Guide are cited throughout the Complaint and thus are properly before the Court. *See Ironshore Specialty Ins. Co. v. United States*, 871 F.3d 131, 135 (1st Cir. 2017).

1

prohibits students from engaging in sexual conduct with a person without that person's "clear and voluntary agreement to engage in particular sexual activity, communicated through mutually understandable words or actions." Ex. A at 5. The Policy goes on to state:

> Consent is always freely informed and actively given. Silence or lack of resistance cannot be assumed to imply consent. Consent must be ongoing, and it may be withdrawn at any time. Consent for one sexual act does not imply consent for any subsequent sexual activity. … Consent cannot be obtained from an individual who is incapable of giving consent because the person … [i]s incapacitated, including through the consumption of alcohol or drugs. *Id.*

### B. The Investigation

Pursuant to the Policy, complaints of sexual assault are investigated by one or more internal or external investigators who are trained in sexual misconduct investigations. Ex. A at 11-12. The investigators interview the complainant and the respondent, interview other witnesses with relevant information, and otherwise gather any relevant evidence. *Id.* at 13. The complainant and respondent each have the opportunity to present written statements, review and comment on the investigators' summaries of their own interviews, identify any relevant witnesses, submit any relevant evidence, review the evidence collected by the investigators, and provide written comments on that evidence before the investigators reach a final determination. *Id.* The investigators then issue a final report, which includes their determination as to whether the respondent engaged in conduct which violates the Sexual Misconduct Policy, using the preponderance of the evidence standard. *Id.* at 12-13.

The final report is provided to the Title IX Coordinator and the Office of the Dean of Students for review and approval and, if a violation has been found, a determination of the appropriate sanction(s). *Id.* at 13. The complainant and respondent each have the right to appeal the outcome on the basis that either a material procedural violation or information previously unavailable to the appealing party likely would have affected the outcome. *Id.* at 14; Ex. B at 7.

The Student Guide provides that students involved in conduct proceedings have the "right to a fair procedure, which is appropriate to the circumstances," Ex. C at 2, and ensures "fundamental fairness to the complainant and to the respondent." Ex. B at 2; AC ¶ 197.

An assistant dean at BC and an external investigator were assigned to conduct an investigation and determine whether the evidence supported a finding that Doe engaged in non-consensual sexual activity with Roe. AC ¶¶ 122-24. The investigators conducted multiple interviews of both Roe and Doe, interviewed 16 other witnesses, and reviewed text messages and other evidence. *Id.* at ¶¶ 122, 128, 130, 134; *see also* Ex. D a 3-9.[2] Doe had the assistance of counsel throughout the investigation. *Id.*; AC ¶ 128. At all times during the investigation, including his interviews with the investigators, Doe had the opportunity to offer evidence, submit written statements, identify witnesses who might be helpful to his case, and suggest lines of inquiry for Roe and other witnesses. AC ¶¶128-36; Ex. A at 12-13.[3]

At the end of the investigation, the investigators prepared a binder of all the evidence they collected, including summaries of all interviews, which was made available to Roe, Doe, and Doe's attorney. AC ¶¶ 138-39; Ex. D at 8-9. Doe submitted a lengthy response, including detailed arguments about Roe's account of the events and her credibility. Ex. D at 9; AC ¶¶ 140-41. After reviewing Doe's comments, the investigators completed their report. AC ¶¶ 141-44.

C.   **The Investigators' Findings**

The investigators summarized their findings, including the accounts offered by Roe and Doe, in relevant part as follows:

At around 1:30 a.m. on November 4, 2018, Doe encountered Roe at a "late night" dining

---

[2] The investigation report is referenced throughout the Complaint and thus is properly before the Court. *See* note 1.

[3] The opportunity to suggest witnesses to be interviewed inherently includes the opportunity to suggest questions for those witnesses. Doe alleges he was not permitted an opportunity to suggest questions of the witnesses. AC, ¶¶ 145-46. He does not allege that he submitted or suggested any questions but was rebuffed.

facility on campus and joined her in line to get food. Ex. D at 21.[4]  Roe, Doe, and some of Doe's friends went to Doe's suite; after Doe's friends left, Roe and Doe went into his room. *Id.* at 32.

Roe had been at a party drinking vodka that night and said that she had a fragmented memory of what transpired in Doe's room. *Id.* at 32.  She recalled being on Doe's bed and Doe kissing her neck. *Id.* at 33.  She acknowledged that she might have asked Doe to kiss her neck. *Id.*  Roe recalled that Doe took her shorts off and that she lifted her back so he could do so. *Id.*  When Doe tried to take off her underwear, she recalled "scooching up the bed" and saying, "No, you don't get to take my underwear off." *Id.*  Roe said she then realized that Doe was on top of her and penetrating her vagina with his penis while she still had her underwear on. *Id.*  She recalled Doe telling her to flip over onto her stomach, but she did not recall if she did so. *Id.* at 34.  Roe recalled that her head was turned to the side, Doe was on top of her, and she said, "Stop" or "Stop, stop, can we stop?" *Id.*  Roe recalled that Doe then said, "Oh no, something's wrong," at which point he stopped penetrating her and jumped off the bed. *Id.*

According to Doe's version of the events, he and Roe were in bed "grinding" against each other; she asked him to kiss her neck; she said, "I know you want to do it"; she told him to "get a condom"; and they discussed why he had not put it on yet. *Id.* at 38, 39.  Doe acknowledged that Roe told him that he was not allowed to take off her underwear, but he said that she then pulled her underwear to the side. *Id.*  Doe said that he then put a condom on and penetrated her vagina with his penis; during the penetration Roe said several things indicating her consent; and they stopped having sex because Roe said her back hurt. *Id.* at 40-41.

In his first interview, Doe said that he and Roe had no conversation immediately prior to his penetration of her and that he did not recall Roe telling him to penetrate her. *Id.*  In his

---

[4] Roe alleged that Doe put his arm around her waist and pulled her toward him while they were in line, without her consent. *Id.* at 31.  The investigators found that Doe reasonably believed Roe had consented to this. *Id.* at 32.

4

second interview, Doe claimed to have said in his first interview that Roe said, "Do it" right before he penetrated her. *Id*. at 40, 34 n.74. The investigators did not credit Doe's account based on their notes and their recollections of the first interview, as reflected in their written summary of it, to which Doe had signed off. *Id.*

On December 7, 2017, after Doe learned that Roe was considering a complaint against him for nonconsensual sex, Doe and Roe met to discuss their encounter. *Id.* at 51-52. Before the meeting, Doe texted Roe that he "just wanted to clear things up." *Id.* at 51. It was undisputed that during this conversation, Doe gave Roe "his take" on what happened, *id.* at 52, but in doing so he never told Roe that she said, "Do it," or "get a condom"; he did not claim that she pulled her underwear to the side; he did not claim that she said "go slow" while he was penetrating her; and he did not claim that she said her back hurt. *Id.* at 54.

The investigators found that Roe was incapacitated at the time of the encounter as a result of her drinking that night, but they also found that Doe did not know nor should he reasonably have known that she was incapacitated. *Id.* at 56-58. The investigators found that Roe communicated consent to certain aspects of her interaction with Doe, but that she never expressed affirmative consent to Doe's penetration of her. *Id.* at 58-62.

Central to the investigators' conclusion that Roe never communicated consent to penetration was the fact, which Doe did not dispute, that Roe told Doe not to remove her underwear. *Id.* at 59. Doe said he thought that meant only that Roe did not want him to see her pubic hair, but the investigators credited Roe's account that she did not care about that, and in any event Doe's inference about why Roe wanted him not to remove her underwear was not an affirmative communication by Roe that she consented to penetration. *Id.* at 39, 59, 61. The investigators also found it more likely than not that Roe never pulled her underwear to the side, as she credibly stated that was not something she ever had done while having sex. *Id.* at 60-61.

5

The investigators also found it significant that Doe made several assertions that were central to his defense only once the formal investigation was underway, and not in his earlier meeting with Roe when they met to discuss what had happened, and that Doe's story changed in certain respects between his first and second interviews. *Id.* at 60-62. The investigators found it was more likely than not that Roe did not say "Do it." *Id.* at 60. They also found that whatever conversation the parties had about a condom, which was unclear, was not sufficient to demonstrate that Roe expressed affirmative consent to penetration. *Id.* at 60-61.

After weighing all of the evidence, the investigators found it was more likely than not that Doe had penetrated Roe without her "clear and voluntary agreement … communicated through mutually understandable words or action," and accordingly that he had committed sexual misconduct in violation of BC's Code of Conduct. *Id.* at 62.

### D. The Sanction and Appeal

The investigators' report was reviewed and approved by BC's Student Title IX Coordinator and the Associate Dean of Students. AC ¶ 149. Doe was suspended for one year, to be followed by one year of university probation. *Id.* at ¶ 152.

Doe appealed, claiming there were several procedural errors in relation to the investigation and findings and claiming there was new evidence that was previously unavailable to him – i.e., one of Doe's suitemates, whom the investigators had interviewed, had told Doe that while he was in the common area of the suite, he "heard unambiguous signs of consensual sex" coming from Doe's room. *Id.* ¶¶ 153-55; *see also* Ex. E at 17.

The appeal was reviewed by BC's Vice President for Student Affairs. *Id.* ¶ 156. She determined that Doe had not demonstrated any procedural error; rather, his procedural arguments amounted to disagreements with the investigators' determinations about the credibility of the parties and the weight of the evidence. *Id.* at ¶ 157; Ex. F at 1-7. She also determined that Doe

had not shown the "new" evidence was unavailable to him at the time of the investigation, in light of the fact that the suitemate had been interviewed by the investigators with respect to his observations during the events at issue, and in any event Doe had not shown that this "new" evidence likely would have changed the outcome of the investigation.  *Id.* at ¶ 158; Ex. F at 6.

## ARGUMENT

**I.     THE COMPLAINT FAILS TO STATE A CLAIM.**

   **A.     Counts II and III – Breach of Contract and Basic Fairness**

   **1.     Standard of Review**

"[T]wo tests are relevant to Doe's breach of contract claim" – whether BC complied with its stated procedures as it would reasonably expect a student to understand them, and whether those procedures afford "basic fairness."  *Doe v. Trs. of Bos. Coll.*, Dkt. No. 55, slip op. at 11-12. 12-16 (1st Cir. Nov. 20, 2019) (citing *Schaer v. Brandeis Univ.*, 432 Mass. 474, 482 (2000); *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 724-25 (1st Cir. 1983)); *see also Walker v. Pres. & Fellows of Harvard Coll.*, 840 F.3d 57, 61 (1st Cir. 2016) (quoting *Schaer*, 432 Mass. at 478); *Coveney v. Pres. & Trs. of Coll. of Holy Cross*, 388 Mass. 16, 22 (1983).  "Basic" or "fundamental" fairness means notice of the allegations against the student, a meaningful opportunity to be heard, and an outcome that is not arbitrary and capricious.  *Cloud v. Trs. of Bos. Univ.*, 720 F.2d 721, 724-25 (1st Cir. 1983); *Schaer*, 432 Mass. at 478; *Coveney*, 388 Mass. at 19; *Driscoll v. Trs. of Milton Acad.*, 70 Mass. App. Ct. 285, 295 (2007).  Private educational institutions must also be afforded appropriate deference in relation to the procedures they adopt for addressing allegations of student misconduct.  *See Doe v. Trs. of Bos. Coll.*, Dkt. No. 55, slip op. at 12-16 (citing *Schaer*, 432 Mass. at 482; *Coveney*, 388 Mass. at 22); *see also Havlik v. Johnson & Wales Univ.*, 509 F.3d 25, 35 (1st Cir. 2007); *Russell v. Salve Regina Coll.*, 890 F.2d 484, 489 (1st Cir. 1989), *rev'd on other grounds*, 499 U.S. 225 (1991).

Where, as in this case, a university's procedures contain an explicit promise of "fundamental fairness," any implied promise of "basic fairness … becomes superfluous and the court's [determination whether] the disciplinary proceedings were 'conducted with basic fairness'… focuses on assuring compliance with the express contractual promise" – i.e., whether the university substantially complied with its stated policies. *Doe v. Trs. of Bos. Coll.*, Dkt. No. 55, slip. op. at 15, n.6 (quoting *Doe v. Trs. of Bos. Coll.*, 892 F.3d 67, 88 (1st Cir. 2018)); *see also Doe v. Vanderbilt Univ.*, No. 3:18-CV-00569, 2019 WL 4748310, at *15 (M.D. Tenn. Sept. 30, 2019) (the "implied covenant of good faith and fair dealing creates a duty to provide basic fairness," which the university meets "by complying with the terms of [its stated policies for student conduct proceedings], that are designed to be fair"); *Doe v. Trs. of Univ. of Penn.*, 270 F. Supp. 3d 799, 812 (E.D. Pa. 2017) ("promises of 'fairness' do not give rise to 'fairness' obligations that are independent of, and separate from, the obligations imposed by the more specific provisions in the Disciplinary Procedures, which themselves describe proceedings designed to be 'fair'"); *Fellheimer v. Middlebury Coll.*, 869 F. Supp. 238, 244 (D. Vt. 1994) (same).

A university's obligation to provide "basic" or "fundamental" fairness accordingly is satisfied as long as the university complies with its procedures and those procedures afford the student notice of the charges against him and the opportunity to present his defense – giving no regard to arguments that different or additional procedures were needed to afford "basic fairness." *See Doe v. Trs. of Bos. Coll.*, 892 F.3d at 80-82, 82-83, 88-89 (rejecting arguments that the dean's office should have conducted a "threshold investigation," the university police should have conducted an investigation, the hearing panel should have received "investigatory training," and a hearing schedule should have been handled differently – because all of these were arguments for procedures different from those the university adopted).

### 2. Doe's Contract and Fairness Claims All Fail as a Matter of Law.

#### a. Doe was not entitled to confront and cross-examine Roe.

Doe claims BC deprived him of "basic fairness" because its procedures did not afford him the opportunity to confront or cross-examine Roe and other witnesses. AC ¶¶ 261-69. On appeal from the order granting Doe a preliminary injunction in this case, the First Circuit rejected that argument. *Doe v. Trs. of Bos. Coll,* Dkt. No. 55, slip op. at 12-16. The First Circuit also rejected Doe's argument, advanced for the first time on appeal, that he had a "reasonable expectation" under the contract that there would be some opportunity for cross-examination of Roe. *Id*. at 11-12.

#### b. BC provided adequate notice to Doe.

Doe claims BC failed to provide adequate notice of the charges against him because the written notice focused on Roe's alleged incapacitation and failed to put him on notice of the need to defend himself against a claim of nonconsensual sex regardless of incapacitation. AC ¶¶ 241-260. *Id.* The written notice undercuts his claim completely. It provides the details of Roe's allegation – that Doe engaged in "non-consensual sexual contact through kissing and touching of intimate body parts and penetrating [Roe's] vagina with [his] penis without [her] consent while [she] was incapacitated." *Id.* ¶ 124. The notice was not limited to the allegation that consent was absent solely because Roe was incapacitated. It said that Doe allegedly engaged in sexual contact with Roe "without her consent *while* [she] was incapacitated" (emphasis added), not that Doe engaged in sexual contact "without her consent *because* [she] was incapacitated."

It also is clear from the investigative report that Doe knew Roe's consent was at issue, regardless of her alleged incapacitation. Doe offered the investigators evidence of what he claimed were affirmative expressions of Roe's consent, including her alleged statements "Do it" "go slow," etc. Ex. D at 61.

### c. Doe had no right to review the evidence until it was assembled.

Doe claims BC breached its obligation of fairness because he was not permitted to review the evidence until it all was assembled. AC ¶ 270-72. Doe cites no requirement in BC's policies that it provide him access to evidence before he was interviewed or contemporaneously as it was gathered. The claim fails for that reason alone. Moreover, Doe and his attorney had access to all the evidence and the opportunity to comment on it before the investigators made any findings or prepared their final report. Ex. D at 8-9. The process was fair and consistent with BC's policy.

### d. Doe was not denied an "effective" appeal.

Doe claims he was denied the right to an "effective" appeal because he could not appeal on the basis that the investigators' decision was not supported by the evidence or was "unfair, unwise, or simply wrong." AC ¶ 273 (citing *Doe v. Brandeis Univ.*, 177 F. Supp. 3d 561, 607 (D. Mass. 2016)). BC allows appeals only on the basis of a material procedural error or new evidence which was not available to the appellant at the time of the original decision and which likely would affect the outcome. *Id.* There is nothing unfair about that. *See Doe v. Trs. of Bos. Coll.*, 892 F.3d at 88 (in analyzing the fairness of student disciplinary proceedings, the court limits it review to compliance with express contractual promises).

Moreover, it is well-settled that even public universities need not afford students **any** right to appeal a disciplinary decision. *Winnick v. Manning*, 460 F.2d 545, 549 n.5 (2d Cir. 1972); *Gomes v. Univ. of Maine Sys.*, 365 F. Supp. 2d 6, 14 (D. Me. 2005). Nor is there any Massachusetts law requiring student disciplinary appeal boards or officials at private schools to apply any particular level of review in appeals. See *Doe v. Trs. of Bos. Coll,* Dkt. No. 55, slip op. at 12-16 (refusing to extend Massachusetts law to impose disciplinary procedures not required by existing Massachusetts law and affording deference to the procedures the institution adopted). It follows that when universities do provide for appeals, they can limit the grounds,

and where an appeal can be made only on procedural grounds, a student has no expectation of a review on the merits. *Gomes*, 365 F. Supp. 2d at 33.

The *Brandeis* case on which Doe relies is easily distinguished. The student in that case could appeal only on the basis of procedural error, but that was just one factor among many Judge Saylor considered in determining that the plaintiff had been denied a fair process, including, unlike in this case, that the plaintiff was not provided notice of the numerous allegations against him, he was prevented from providing witnesses and evidence, he was denied the assistance of an attorney, and he was not allowed to review the evidence against him until the entire proceeding was over. 177 F. Supp. 3d at 604-07. It also is important to note that *Brandeis* was decided before both of the *Doe v. BC* cases that have reached the First Circuit, and both times the First Circuit has declined to cite *Brandeis* as a useful precedent on what constitutes "basic fairness" under Massachusetts law.

Doe also alleges that the appellate officer misapplied BC's policy in denying his appeal. AC ¶¶ 274-78. The letter denying Doe's appeal recites and applies the correct standard, from Section 5.6 of the Student Guide. Ex. F at 1, 6. The fact that the appellate officer, later in that paragraph, referred to the evidence as having been "available" during the investigation, rather than using the full phrase "available to the student," is of no consequence, because it is undisputed that the evidence in fact was "available" to Doe. *Id.* at 6. Doe knew that the investigators had interviewed his suitemate; he had an opportunity to review the summary of his suitemate's testimony and comment on it; and he had every opportunity to speak with his suitemate to make sure that he provided any evidence that might help his case. Ex. A at 6, 8-9, 42. The suitemate's account was readily "available" to Doe, whether or not Doe collected it.

Moreover, the appellate officer also found that Doe had failed to demonstrate that the "new" evidence likely would have affected the outcome. *Id.* at 6. Doe's appeal failed to include

11

any actual statement from the suitemate, nor did it include any specifics as to what the suitemate claimed to have heard. Ex. F at 6.[5] Doe's allegation that the decision was "unduly arbitrary and irrational, or tainted by bias or other unfairness" is entirely conclusory. AC ¶ 279.

### e. Doe had no right to investigation separate from adjudication.

Doe claims that BC's investigative model for addressing complaints of sexual misconduct is unfair because it fails to "separate out the investigation and adjudication functions." AC ¶¶ 283-91. This argument, like Doe's other fairness arguments, is foreclosed by the First Circuit's decision in the first *Doe v. Trs. of Bos. Coll.* case, as well as its recent decision in this case, because it argues for the adoption of procedures different from BC's express contractual promises; it seeks to extend Massachusetts law beyond established precedent; and it fails to respect the deference owed to private institutions to choose their own procedures.[6]

Doe also alleges that by using the term "for review and approval," the policy called for the "rubber stamping" of the investigation report by the Office of the Dean of Students and Student Affairs Title IX Coordinator, denying Doe an opportunity for a meaningful review or challenge. AC ¶ 288. Here, too, Doe fails to state a claim for breach of contract by arguing that BC should have adopted procedures that in his view (or even the Court's) might be "better" than the ones it did adopt. As a matter of basic fairness, BC had no obligation to provide for any "review" at all. The fact that BC's procedures do not provide for a substantive review of the investigators' report accordingly is of no consequence.

---

[5] Doe's Amended Complaint alleges for the first time that the witness told Doe he heard moaning from both parties and heard Roe telling Doe not to ejaculate too quickly. AC ¶ 155.

[6] Combining investigative and adjudicative functions in a single person does not violate any principle of due process in any event. *See Withrow v. Larkin*, 421 U.S. 35, 47-55 (1975); *Pathak v. Dep't of Veterans Affairs*, 274 F.3d 28, 33 (1st Cir. 2001); *Doe v. Miami Univ.*, 882 F.3d 579, 601 (6th Cir. 2018).

### f. The investigation was thorough and impartial.

Doe alleges in conclusory fashion that BC's investigation was not thorough or impartial. AC ¶¶ 199-204.  His argument is not based upon any specific facts from which it could be established that the investigation was not thorough (such as allegations that there was relevant evidence the investigators failed to pursue) or that the investigators actually were not impartial (such as statements by the investigators evidencing bias against him or in favor of Roe).  Rather, Doe's claim is based merely on his disagreement with how the investigators weighed the evidence, especially in relation to Roe's credibility.

The fact that the investigators made judgments about the evidence that are different from what Doe would have preferred, or different from what another reviewer – or the Court – might have made, is of course irrelevant.  Such determinations are not subject to second-guessing in court.  *See Doe v. Univ. of Dayton*, 766 F. App'x 275, 288 (6th Cir. 2019) (investigator not required to draw respondent's preferred conclusions from the evidence); *Doe v. Phillips Exeter Acad.*, 2016 WL 6651310, *2 (D.N.H. Nov. 10, 2016) (It is not the court's role to conduct an "appellate review of the investigator's factual findings and conclusions.").[7]

Doe also contends that the appellate officer was not "thorough" when she declined to require the investigators to re-interview his suitemate.  AC ¶ 202.  As the appellate officer correctly noted, however, Doe failed to specify in his appeal what evidence of consent the witness would provide.  Ex. F at 6.  Moreover, as the appellate officer also noted, this witness already had been interviewed by the investigators about what he saw and heard on the night in question, and he had failed to provide any information about supposed "signs of consent" at that

---

[7] *See also Doe v. Brown Univ.*, 210 F. Supp. 3d 310, 313 (D.R.I. 2016); *Doe v. Univ. of the South*, 687 F. Supp. 2d 744, 755 (E.D. Tenn. 2009); *Gomes*, 365 F. Supp. 2d at 14; *Morale v. Grigel*, 422 F. Supp. 988, 1004-05 (D.N.H. 1976); *Schaer*, 432 Mass. at 479 n.9; *cf. Doe v. Univ. of Denver*, No. 16-CV-00152-PAB-KMT, 2018 WL 1304530, at *11 (D. Colo. Mar. 13, 2018); *Yu v. Vassar Coll.*, 97 F. Supp. 3d 448, 462 (S.D.N.Y. 2015).

time. *Id*. Doe now claims the suitemate told him that he did not disclose the information to the investigators because they questioned him in a "hostile" manner and he feared getting into trouble, AC ¶ 202 n.7, but Doe said nothing to that effect in his appeal and thus these new allegations do not demonstrate any lack of thoroughness by the appeals officer.

Doe has provided no facts to support his claim that the investigation was not impartial. Such conclusory allegations are insufficient to overcome the presumption of honesty and integrity on the part of university decision-makers. *See Doe v. Trs. of Bos. Coll.*, 892 F.3d at 84; *Pathak*, 274 F.3d at 33 (*citing Withrow*, 421 U.S. at 47).

### g.     The investigators applied the correct standard of review.

Doe claims the investigators failed to apply the preponderance of evidence standard. AC ¶¶ 205-13. Here, too, Doe's claim is merely one of disagreement with the investigators' assessments of the evidence, including their assessments of credibility, which is not the basis for a breach of contract claim. Doe's claim rests entirely on his own account of the events at issue, ignoring the fact that the investigators did not credit significant aspects of his account, as well as other evidence that supported Roe's account. *Id.* ¶ 211; Ex. D at 59-62. His arguments also fail to appreciate the Sexual Misconduct Policy's strict requirement of affirmative consent, which must be "clearly" communicated. Ex. A at 5.

### h.     BC did not violate any obligation of confidentiality.

Section 5 of the Student Guide requires "all parties" to a sexual misconduct proceeding to maintain the confidentiality of the process. Ex. B, at § 5.7.2. Doe claims BC approved of Roe's "violation of confidentiality" when she reported to a university official that Doe had sex with her without her consent. AC ¶¶ 214-19. Doe admits that at the time Roe made this report, she had not yet made a formal complaint. *Id.* ¶¶ 113-16. There were no "parties" to a student conduct proceeding, and thus Roe had no obligation of confidentiality, at that point. Moreover, it is self-

evident that a university such as BC should not seek to prevent a sexual assault victim from reporting an assault to responsible university personnel, nor rebuke a victim for doing so.

### i. BC did not breach its obligation to presume Doe was innocent.

Doe claims BC failed to presume he was innocent. AC ¶¶ 220-25. Doe's claim rests on nothing but a conclusory allegation that the investigators were biased against him from the outset. *See id.* As explained above, such conclusory allegations fail as a matter of law.

### j. BC had no obligation to complete the investigation in 60 days.

Doe complains the investigation took longer than 60 days to complete, allegedly in violation of BC's policy. AC ¶¶ 226-33. The policy says only that BC "will endeavor to complete the investigation within 60 working days of [its] commencement" and that "this timeframe may be extended to ensure the integrity and completeness of the investigation." Ex. A at 12. Doe makes no claim that BC did not "endeavor" to timely conduct the investigation; rather, he just complains that it took longer than he would have liked, AC ¶¶ 226-33, notwithstanding the numerous interviews that had to be conducted; the large amount of evidence that needed to be gathered and analyzed; and the impact of holidays and exam periods, which, the Policy recognizes as reasons to extend the time to complete an investigation. Ex. A at 12.

### B. Count IV - Estoppel

Doe's promissory estoppel claim is duplicative of his breach of contract claims and fails for the same reasons. Moreover, where, as in this case, a written contract governs a matter, recovery under a quasi-contract theory is not available. *Doe v. Brown Univ.*, 166 F. Supp. 3d 177, 196 (D.R.I. 2016); *Doe v. Brandeis Univ.*, 177 F. Supp. 3d at 612-13; *Trent Partners & Assocs. Inc. v. Digital Equip. Corp.*, 120 F. Supp. 2d 84, 104-05 (D. Mass. 1999).

### C. Count I - Title IX

Doe alleges that BC discriminated against him on the basis of gender in violation of Title

IX, asserting the theory of "erroneous outcome." AC ¶¶ 168-90. A student making this claim has to show that he was innocent but wrongly found to have committed an offense and that gender was a motivating factor in the erroneous finding. *See Doe v. Colgate Univ.*, 760 F. App'x 22, 30 (2d Cir. 2019); *Yusuf v. Vassar Coll.*, 35 F.3d 709, 715 (2d Cir. 1994); *accord Doe v. Trs. of Bos. Coll.*, 892 F.3d at 90. Doe can show neither.

As explained above, there are no procedural irregularities that cast any articulable doubt on the validity of the investigators' findings. *See Doe v. Univ. of the Sciences*, No. CV 19-358, 2019 WL 3413821, at *5 (E.D. Pa. July 29, 2019) (rejecting similar claims of procedural irregularities). Nor has Doe alleged facts to establish a causal connection between the allegedly flawed outcome and gender bias. To be actionable under Title IX, allegations of bias must pertain to the specific individuals involved in the disciplinary proceeding at issue. *See Doe v. W. New England Univ.*, 228 F. Supp. 3d 154, 188-189 (D. Mass. 2017) (citing *Mallory v. Ohio Univ.*, 76 F. App'x 634, 640 (6th Cir. 2003)); *see also Yusuf*, 35 F.3d at 715; *Doe v. Vanderbilt Univ.*, 2019 WL 4748310, at *8; *Doe v. Case Western Reserve Univ.*, No. 1:17 CV 414, 2019 WL 1982266, *9, 11 (N.D. Ohio May 2, 2019); *Doe v. Univ. of Denver*, 2018 WL 1304530, at *11. Doe, however, has not alleged any statements, nor any other evidence, evidencing anti-male bias on the part of the investigators or the individuals who determined his sanction.

Nor is Doe's Title IX claim supported by his conclusory allegations that the Department of Education and others have "pressured" BC and other universities to actively pursue allegations of sexual assault on campus. AC ¶¶ 19-36. However, this supposed "pressure" to take campus sexual assault seriously is gender-neutral – it does not include any alleged "pressure" to treat men differently on the basis of their gender. *See Doe v. Trs. of Bos. Coll.*, 892

F.3d at 92.[8]  Courts repeatedly have rejected conclusory allegations of pressure when, as in this case, there is no evidence that outside pressure actually influenced the school to aggressively pursue sexual assault cases in a biased manner.  *See, e.g. Doe v. Vanderbilt Univ.*, 2019 WL 4748310, at *9 (quoting *Doe v. Baum*, 903 F.3d 575, 586 (6th Cir. 2018) ("[E]xternal pressure alone is not enough; rather, external pressure 'combined with other circumstantial evidence of bias in [a complainant's] specific proceeding' is what makes a claim plausible."); *Ruff v. Bd. of Regents of Univ. of New Mexico*, 272 F. Supp. 3d 1289, 1302 (D.N.M. 2017); *Doe v. Columbia Coll. Chicago*, 299 F. Supp. 3d 939, 956 (N.D. Ill. 2017); *Doe v. Univ. of Colo., Boulder through Bd. of Regents of Univ. of Colo.*, 255 F. Supp. 3d 1064, 1078 (D. Colo. 2017).

Doe's allegation that only males have been suspended or expelled for sexual assault at BC, AC ¶ 186, also does not show bias.  *See Doe v. Trs. of Bos. Coll.*, 892 F.3d at 92 ("The gender of the students accused of sexual assault is the result of what is reported to the University, and not the other way around.").  Nor is Doe's claim supported by the allegation that BC adopted an investigator model to "mak[e] the reporting of assaults more easily available."  AC ¶ 37.  Sexual assault victims can be male or female, and taking steps to "make reporting easier" or otherwise to enforce sexual misconduct rules does not evidence anti-male bias.  *See Austin v. Univ. of Ore.*, 205 F. Supp. 3d 1214, 1227 (D. Ore. 2016), *aff'd*, 925 F.3d 1133 (9th Cir. 2019); *Z.J. v. Vanderbilt Univ.*, 355 F. Supp. 3d at 684; *Doe v. Univ. of Cincinnati*, 173 F. Supp. 3d 586, 602 (S.D. Ohio 2016).

### D.     Count V - Negligence

Doe's claim that BC was negligent in conducting an inadequate investigation, AC ¶¶ 299-300, is barred by the First Circuit's decision in *Doe v. Trs. of Bos. Coll.*, 892 F.3d at 94-95

---

[8] Doe claims one aspect of this "pressure" is the Department of Education's 2011 "Dear Colleague" Letter, AC ¶¶ 19-36, but the Department withdrew that Letter before the investigation in Doe's case.  *Id.* ¶¶ 45-47.

(universities owe no duty in tort with respect to student conduct proceedings). Doe's claim for negligent training and supervision, AC ¶¶ 301-02, fails because he does not allege that BC knew or should have known that any relevant employee was "unfit" for her position. *See Foster v. The Loft, Inc.*, 26 Mass. App. Ct. 289, 289-91 (1988); *see also Saldivar v. Racine*, 818 F.3d 14, 21 (1st Cir. 2016); *Vicarelli v. Bus. Int'l, Inc.*, 973 F. Supp. 241, 246 (D. Mass. 1997); *Roe v. Ne. Univ.*, No. CV 16-03335-C, 2019 WL 1141291, at *11 (Mass. Super. Mar. 8, 2019). Doe's negligence claim also fails because he did not suffer a physical injury or the threat of a physical injury. *See Doe v. Senechal*, 66 Mass. App. Ct. 68, 76 (2006). Without a personal injury or any property damage, Doe's claim also is barred by the economic loss doctrine. *Patriarca v. Ctr. for Living & Working, Inc.*, No. 99689B, 1999 WL 791888, at *5, n.6 (Mass. Super. Sept. 8, 1999) (doctrine applied to negligent supervision and retention claim).

## II.  THE COURT SHOULD RETAIN SUPPLEMENTAL JURISDICTION.

Should the Court dismiss Doe's Title IX claim, it should retain supplemental jurisdiction and dismiss the remaining state-law claims for the reasons stated above.

Whether to exercise supplemental jurisdiction after the federal claim has been dismissed is discretionary. *See* 28 U.S.C. § 1367(c)(3). In exercising that discretion, a court should consider "comity, judicial economy, convenience, fairness, and the like." *Roche v. John Hancock Mut. Life Ins. Co.*, 81 F.3d 249, 257 (1st Cir. 1996). While dismissal sometimes is appropriate if all federal claims are eliminated early in the proceedings, "each case must be gauged on its own facts" in a "pragmatic" manner. *Id.*

It would be appropriate for the Court to retain jurisdiction in light of its significant investment of time and resources in connection with the proceedings on the motion for preliminary injunction, the motion to proceed pseudonymously, and the motion to seal, its extensive review of redactions to the record, and its attention to the issues raised in this motion to

dismiss.  An additional factor in determining whether to exercise supplemental jurisdiction is "the presence of novel or sensitive issues of state law."  *Sexual Minorities Uganda v. Lively*, 899 F.3d 24, 35 (1st Cir. 2018); *see also* 28 U.S.C. § 1367(c)(1).  This case involves no such issues.

## Conclusion

The Court should dismiss Plaintiff's Amended Complaint.

TRUSTEES OF BOSTON COLLEGE,

/s/Elizabeth H. Kelly
Daryl J. Lapp (BBO No. 554980)
   daryl.lapp@lockelord.com
Elizabeth H. Kelly (BBO No. 672277)
   liz.kelly@lockelord.com
LOCKE LORD LLP
111 Huntington Avenue
Boston, MA 02199

November 21, 2019     617.230.0100

## Certificate of Service

I certify that on November 21, 2019, this document was filed through the ECF System of the United States District Court for the District of Massachusetts and will be served electronically on the Registered Participants identified in the Notice of Electronic Filing.

/s/Elizabeth H. Kelly
Elizabeth H. Kelly

81653134v.5